# EXHIBIT
# 6

EXECUTION COPY

# SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

between

**REVELATION ENERGY, LLC,**
a Kentucky limited liability company, doing business at
1051 Main Street, Milton, West Virginia 25504;

and

**REVELATION ENERGY HOLDINGS, LLC,**
a Delaware limited liability company, doing business at
1051 Main Street, Milton, West Virginia 25504;

and

**ALPHA HIGHWALL MINING, LLC,**
a Kentucky limited liability company, doing business at
1051 Main Street, Milton, West Virginia 25504

and

**UNITED BANK, INC.,**
a West Virginia banking corporation, doing business at
500 Virginia Street, East, Charleston, West Virginia 25501.

**February 28, 2013**

**EXECUTION COPY**

# TABLE OF CONTENTS

1.     **DEFINITIONS.** ...............................................................................2
    1.1.   CERTAIN SPECIFIC TERMS ....................................................2
    1.2.   SINGULARS AND PLURALS ...................................................10
    1.3.   UCC DEFINITIONS. ...............................................................10

2.     **DEBTOR'S ACCOUNTS AND BORROWING BASE** .......................10
    2.1.   INITIAL ADVANCE; CASH NEEDS OF ACCOUNTS. ...............11
    2.2.   RECEIPTS RECEIVED BY ACCOUNTS. ..................................11
    2.3.   LIMITATIONS ON ADVANCES. .............................................11
    2.4.   INVESTMENT OF EXCESS CASH...........................................12
    2.5.   BORROWING CAPACITY; ADJUSTMENT..............................12
    2.6.   AUDIT....................................................................................12
    2.7.   AUTHORIZED PERSONS. .......................................................13
    2.8.   COMPUTATION OF DAILY OUTSTANDING BALANCE.........13
    2.9.   RECEIVABLES BORROWING BASE; ADJUSTMENT.............13
    2.10.  ACCOUNT STATED. ..............................................................14

3.     **COLLATERAL AND INDEBTEDNESS SECURED.** ..........................14
    3.1.   SECURITY INTEREST............................................................14
    3.2.   OTHER COLLATERAL. ...........................................................16
    3.3.   EXCLUSIONS..........................................................................16
    3.4.   INDEBTEDNESS SECURED....................................................16
    3.5.   MATURITY DATE....................................................................16

4.     **REPRESENTATIONS AND WARRANTIES.** ....................................17
    4.1.   EXISTENCE.............................................................................17
    4.2.   CAPACITY. .............................................................................17
    4.3.   VALIDITY OF RECEIVABLES. ...............................................17
    4.4.   TITLE TO LAND UNDERLYING PHELPS LOADOUT. ............18
    4.5.   TITLE TO COLLATERAL. .......................................................18
    4.6.   NOTES RECEIVABLE. ............................................................18
    4.7.   EQUIPMENT. ..........................................................................18
    4.8.   PLACE OF BUSINESS. ...........................................................18
    4.9.   FINANCIAL CONDITION. .......................................................19
    4.10.  TAXES....................................................................................19
    4.11.  LITIGATION...........................................................................19

i

4.12.   ERISA MATTERS. ..................................................................................................19
4.13.   TITLE TO LAND UNDERLYING JACKSON LOADOUT. ......................................20
4.14.   VALIDITY OF TRANSACTION DOCUMENTS. ......................................................20
4.15.   NO CONSENT OR FILING. ......................................................................................20
4.16.   NO VIOLATIONS. ......................................................................................................20
4.17.   CONTINGENT LIABILITIES. ...................................................................................20
4.18.   COMPLIANCE WITH LAWS. ...................................................................................21
4.19.   LICENSES, PERMITS, ETC. ......................................................................................21
4.20.   LABOR CONTRACTS. ...............................................................................................21
4.21.   CONSOLIDATED SUBSIDIARIES. ..........................................................................21
4.22.   OWNERSHIP OF DEBTOR. ......................................................................................21
4.23.   BROKERS. ...................................................................................................................21
4.24.   ADVERSE CHANGE. .................................................................................................21
4.25.   DAMAGE OR DESTRUCTION. .................................................................................21
4.26.   KEY MAN LIFE INSURANCE POLICY. ..................................................................22
4.27.   NO MISLEADING INFORMATION. ..........................................................................22
4.28.   ADVANCES FOR WORKING CAPITAL ONLY. ......................................................22

5.   CERTAIN DOCUMENTS TO BE DELIVERED TO SECURED PARTY. .....................22
5.1.   DOCUMENTS. ............................................................................................................22
5.2.   INVOICES. ..................................................................................................................22
5.3.   CHATTEL PAPER. ......................................................................................................23
5.4.   CLOSING DOCUMENTS. ..........................................................................................23

6.   COLLECTIONS. ...................................................................................................................23

7.   PROMISE TO PAY CERTAIN PAYMENTS. .....................................................................24
7.1.   PROMISE TO PAY MONTHLY INTEREST PAYMENTS; PROMISE TO PAY PRINCIPAL AT
        MATURITY OR TO ALLEVIATE EXCESS OVER BORROWING CAPACITY ...........................24
7.2.   PROMISE TO PAY INTEREST AFTER THE MATURITY. .....................................25
7.3.   PROMISE TO PAY FEES. ..........................................................................................25
7.4.   PROMISE TO PAY COSTS AND EXPENSES. ..........................................................25

8.   PROCEDURES AFTER SCHEDULING RECEIVABLES. ................................................26
8.1.   CREDIT AND EXTENSIONS. ...................................................................................26
8.2.   RETURNED INSTRUMENTS. ...................................................................................26
8.3.   DEBIT MEMORANDA. ..............................................................................................26
8.4.   NOTES RECEIVABLE. ...............................................................................................27

ii

EXECUTION COPY

| | | |
|---|---|---|
| 9. | **AFFIRMATIVE COVENANTS.** | 27 |
| 9.1. | FINANCIAL STATEMENTS. | 27 |
| 9.2. | U.S. GOVERNMENT AND OTHER SPECIAL RECEIVABLES. | 28 |
| 9.3. | TERMS OF SALE. | 28 |
| 9.4. | BOOKS AND RECORDS. | 28 |
| 9.5. | EXAMINATIONS. | 29 |
| 9.6. | VERIFICATION OF COLLATERAL. | 29 |
| 9.7. | RESPONSIBLE PARTIES. | 29 |
| 9.8. | TAXES. | 29 |
| 9.9. | LITIGATION. | 29 |
| 9.10. | INSURANCE. | 30 |
| 9.11. | GOOD STANDING; BUSINESS. | 30 |
| 9.12. | PENSION REPORTS. | 30 |
| 9.13. | NOTICE OF NON-COMPLIANCE. | 31 |
| 9.14. | COMPLIANCE WITH ENVIRONMENTAL LAWS. | 31 |
| 9.15. | DEFEND COLLATERAL. | 31 |
| 9.16. | USE OF PROCEEDS. | 31 |
| 9.17. | COMPLIANCE WITH LAWS. | 31 |
| 9.18. | MAINTENANCE OF PROPERTY. | 31 |
| 9.19. | LICENSES, PERMITS, ETC. | 31 |
| 9.20. | TRADEMARKS AND PATENTS. | 31 |
| 9.21. | ERISA. | 32 |
| 9.22. | MAINTENANCE OF OWNERSHIP. | 32 |
| 9.23. | ACTIVITIES OF SUBSIDIARIES. | 32 |
| 9.24. | CHANGE OF ADDRESS/LOCATION OF COLLATERAL. | 32 |
| 9.25. | PAYMENT DIRECT TO UNITED PAYMENT ACCOUNT. | 32 |
| | | |
| 10. | **NEGATIVE COVENANTS.** | 32 |
| 10.1. | LOCATIONS OF BUSINESS RECORDS. | 33 |
| 10.2. | BORROWED MONEY. | 33 |
| 10.3. | SECURITY INTEREST AND OTHER ENCUMBRANCES. | 33 |
| 10.4. | STORING AND USE OF COLLATERAL. | 33 |
| 10.5. | MERGERS, CONSOLIDATIONS, OR SALES. | 33 |
| 10.6. | MEMBERSHIP INTERESTS. | 33 |
| 10.7. | DIVIDENDS OR DISTRIBUTIONS. | 34 |
| 10.8. | INVESTMENTS AND ADVANCES. | 34 |
| 10.9. | GUARANTIES. | 34 |
| 10.10. | NAME CHANGE. | 34 |
| 10.11. | DISPOSITION OF COLLATERAL | 34 |

iii

10.12. FINANCIAL COVENANTS. ........................................................................34

10.13. ADVANCES FOR WORKING CAPITAL ONLY. ...........................................34

11.    DEFAULT. .........................................................................................................35

11.1.  EVENTS OF DEFAULT. ............................................................................35

11.2.  EFFECTS OF AN EVENT OF DEFAULT. ...................................................38

12.    SECURED PARTY'S RIGHTS AND REMEDIES. ...........................................38

12.1.  GENERALLY. ...........................................................................................38

12.2.  NOTIFICATION OF ACCOUNT DEBTORS. ...............................................39

12.3.  POSSESSION OF COLLATERAL. ..............................................................39

12.4.  COLLECTION OF RECEIVABLES. ............................................................39

12.5.  ENDORSEMENT OF CHECKS; DEBTOR'S MAIL. .....................................39

13.    MISCELLANEOUS. ...........................................................................................40

13.1.  PERFECTING THE SECURITY INTEREST; PROTECTING THE COLLATERAL. ...........40

13.2.  COMPLIANCE WITH OTHER LAWS. .......................................................40

13.3.  WARRANTIES. .........................................................................................40

13.4.  SALES ON CREDIT. ..................................................................................40

13.5.  PERFORMANCE OF DEBTOR'S DUTIES. ..................................................40

13.6.  NOTICE OF SALE. ....................................................................................40

13.7.  WAIVER BY SECURED PARTY. ...............................................................41

13.8.  WAIVER BY DEBTOR. .............................................................................41

13.9.  SETOFF. ...................................................................................................41

13.10. ASSIGNMENT. .........................................................................................41

13.11. SUCCESSORS AND ASSIGNS. ..................................................................42

13.12. MODIFICATION. ......................................................................................42

13.13. COUNTERPARTS. ....................................................................................42

13.14. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. .............................42

13.15. INDEMNIFICATION. .................................................................................42

13.16. TERMINATION; PREPAYMENT PREMIUM. ..............................................43

13.17. FURTHER ASSURANCES. ........................................................................44

13.18. HEADINGS. .............................................................................................44

13.19. CUMULATIVE SECURITY INTEREST, ETC. .............................................44

13.20. SECURED PARTY'S DUTIES. ...................................................................44

13.21. NOTICES GENERALLY. ...........................................................................44

13.22. SEVERABILITY. .......................................................................................45

13.23. INCONSISTENT PROVISIONS. ..................................................................45

13.24. ENTIRE AGREEMENT. .............................................................................45

iv

13.25.  APPLICABLE LAW. ..................................................................................... 45

13.26.  CONSENT TO JURISDICTION. ................................................................... 45

13.27.  JURY TRIAL WAIVER. ................................................................................ 46

**SCHEDULE**

**EXHIBIT A**

**EXHIBIT B**

**EXHIBIT C**

**EXHIBIT D**

**EXHIBIT E**

v

Confidential – Subject to Protective
Order

AP-0001332

EXECUTION COPY

## SECOND AMENDED AND RESTATED
## LOAN AND SECURITY AGREEMENT

THIS SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT ("Agreement"), dated the 28th day of February, 2013, is between REVELATION ENERGY, LLC, a Kentucky limited liability company, ("Debtor"); UNITED BANK, INC., a West Virginia banking corporation, ("Secured Party"); REVELATION ENERGY HOLDINGS, LLC, a Delaware limited liability company, ("Guarantor I"); ALPHA HIGHWALL MINING, LLC, a Kentucky limited liability company, ("Guarantor II")(collectively, Guarantor I and Guarantor II are referred to as the "Guarantors").

WHEREAS, Debtor, Secured Party, and Guarantors entered into that certain Loan and Security Agreement dated July 18, 2011 ("Loan Agreement");

WHEREAS, Debtor, Secured Party, and Guarantors amended the Loan Agreement by that certain First Amendment to Loan and Security Agreement dated October 2012 ("First Amendment");

WHEREAS, Debtor and MR Coal Marketing & Trading, LLC, a Delaware limited liability company, ("MR Coal"), are entering into that certain Master Coal Purchase and Sale Agreement dated on an even date hereof ("MPA"), that certain Coal Services Agreement dated on an even date hereof ("CSA"), that certain Put and Call Agreement dated on an even date hereof ("PCA"), and other related documents (collectively, the "Mercuria Documents") whereby MR Coal has agreed to (i) purchase substantially all of Debtor's account receivables and inventory as of the date hereof, and (ii) periodically purchase substantially all of Debtor's inventory going into the future ("Mercuria Relationship");

WHEREAS, certain transactions contemplated under the Mercuria Relationship are prohibited by the Loan Agreement, as amended;

WHEREAS, Debtor continues to desire certain financial accommodations from Secured Party;

WHEREAS, Secured Party continues to desire to provide certain financial accommodations to Debtor;

WHEREAS, Guarantors continue to desire to guarantee payment of the financial accommodations made by Secured Party to Debtor as an inducement for Secured Party to extend said financial accommodations to Debtor;

WHEREAS, the parties desire to amend the Loan Agreement, as amended, to accommodate the Mercuria Relationship and to provide certain financial accommodations to Debtor;

Page 1 of 47

Confidential – Subject to Protective
Order

AP-0001333

EXECUTION COPY

NOW, THEREFORE, in consideration of and as a specific inducement for Secured Party to extend certain financial accommodations to Debtor, and other valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

## 1. DEFINITIONS.

### 1.1. CERTAIN SPECIFIC TERMS

For purposes of this Agreement and all amendments, restatements and modifications hereto, the following terms shall have the following meanings:

(a)   "Account Debtor" means the person, firm, or entity obligated to pay a Receivable.

(b)   "Advance" means a loan made to Debtor by Secured Party, pursuant to this Agreement.

(c)   "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. For purposes of the definition of Affiliate, the term "control" as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management of such Person, whether through ownership of voting securities, as trustee or executor, by contract or any other means; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(d)   "Borrowing Capacity" means, at the time of computation, the net amount determined by taking the lesser of the following amounts:

(i)   Eleven Million One Hundred Thousand Dollars (U.S. $11,100,000.00), or

(ii)   an amount equal to the Receivables Borrowing Capacity;

and subtracting from the lesser of (i) or (ii) above the aggregate outstanding Advances to date. The Borrowing Capacity shall be calculated weekly, or more frequently if the Secured Party deems in good faith that a downward adjustment is necessary based upon changed circumstances of the Debtor.

(e)   "Business Day" means a day other than a Saturday, Sunday, or other day on which banks are authorized or required to close under the laws of West Virginia.

(f)   "Collateral" means collectively all of the property of Debtor or a Third Party subject to the security interests and described in Sections 3.1 and 3.2 of this Agreement.

Confidential – Subject to Protective Order

AP-0001334

EXECUTION COPY

(g)     "Credit" means any discount, allowance, credit, rebate, or adjustment granted by Debtor with respect to a Receivable, other than a cash discount described in **Item 1** of the Schedule.

(h)     "CSA" is defined in the third recital of this Agreement.

(i)     "Debtor" is defined in the Preamble of this Agreement.

(j)     "Debtor Accounts" means the bank accounts described in Section 2 of this Agreement.

(k)     "Debtor Money Market Mutual Fund Account" means an account in compliance with SEC Rule 2(a)-7 established for Debtor by Secured Party.

(l)     "Environment" means any water including, but not limited to, surface water and ground water or water vapor; any land including land surface or subsurface; stream sediments; air; fish, wildlife, plants; and all other natural resources or environmental media.

(m)     "Environmental Laws" means all federal, state, and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances, regulations, codes, and rules relating to the protection of the Environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production, or Disposal of Hazardous Substances and the policies, guidelines, procedures, interpretations, decisions, orders, and directives of federal, state, and local governmental agencies and authorities with respect thereto.

(n)     "Environmental Permits" means all licenses, permits, approvals, authorizations, consents, or registrations required by any applicable Environmental Laws and all applicable judicial and administrative orders in connection with ownership, lease, purchase, transfer, closure, use, and/or operation of any property owned, leased, or operated by Debtor or any subsidiary and/or as may be required for the storage, treatment, generation, transportation, processing, handling, production, or Disposal of Hazardous Substances.

(o)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(p)     "Event of Default" means an Event of Default or Events of Default as defined in Section 11.1 of this Agreement that have not been cured within any applicable cure periods.

(q)     "Extension" means the granting to an Account Debtor of additional time within which such Account Debtor is required to pay a Receivable.

(r)     "Federal Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. Section 101, et seq., entitled "Bankruptcy", as amended, or any successor federal bankruptcy law.

Confidential – Subject to Protective Order

AP-0001335

EXECUTION COPY

(s)     "First Amendment" is defined in the second recital of this Agreement.

(t)     "GAAP" shall mean those generally accepted accounting principles set forth in Statements of the Financial Accounting Standards Board and in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants or which have other substantial authorities support in the United States of America and are applicable in the circumstances, as applied on a consistent basis. The term "consistent basis" shall, however, mean not only that the accounting principles observed in the current period are comparable in all material respects to those applied in the preceding period, but that, in the case of financial statements furnished to Secured Party, the methods of calculation, aggregation and presentation of the balance sheet, statements of income and statements of cash flows shall be substantially the same and as required by this Agreement.

(u)     "Guarantors" is defined in the Preamble of this Agreement.

(v)     "Guarantor I" is defined in the Preamble of this Agreement.

(w)     "Guarantor II" is defined in the Preamble of this Agreement.

(x)     "Hazardous Substances" means, without limitation, any explosives, radon, radioactive materials, asbestos, urea formaldehyde foam installation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, coal slurry, hazardous wastes, hazardous or toxic substances, and any other material defined as a hazardous substance in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601(14), as amended from time to time.

(y)     "Hourly Employees Payroll Account" means the Debtor's zero-balance account (United Account # ███ -8375) held in trust by Secured Party to be used to fund the payroll and benefit obligations of employees of the Debtor.

(z)     "Indebtedness" means the indebtedness secured by the Secured Party's security interests and described in Section 3.4 of this Agreement.

(aa)     "Ineligible Receivables" means the following described Receivables and any other Receivables which are not reasonably satisfactory to Secured Party for credit or any other reason:

(i)     Any Receivable which has remained unpaid for more than the number of days specified in **Item 2** of the Schedule, and, any receivable which is not denominated in U.S. Dollars, unless specifically permitted in **Item 4** of the Schedule or approved in writing by the Secured Party and which is not otherwise ineligible.

(ii)     Any Receivable with respect to which a representation or warranty contained in Section 4.3 of this Agreement is not, or does not

Page 4 of 47

Confidential – Subject to Protective
Order

AP-0001336

continue to be, true and accurate, including, without limitation, any Receivable subject to defense or a setoff or recoupment.

(iii)    Any Receivable with respect to which Debtor has extended the time for payment without the prior written consent of Secured Party, except as provided in Section 8.1(a) of this Agreement.

(iv)    Any Receivable as to which any one or more of the following events occurs: (1) a Responsible Party shall die or be judicially declared incompetent; (2) a request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as a bankrupt, or other relief under the bankruptcy, insolvency, or similar laws of the United States, any state or territory thereof, or any foreign jurisdiction, now or hereafter in effect, shall be filed by or against a Responsible Party; (3) a Responsible Party shall make any general assignment for the benefit of creditors; (3) a receiver or trustee, including, without limitation, a "custodian", as defined in the Federal Bankruptcy Code, shall be appointed for a Responsible Party or for any of the assets of a Responsible Party (under the bankruptcy laws of the United States or otherwise) or any formal or informal proceeding for the dissolution or liquidation or settlement of claims against, or winding up of affairs of, a Responsible Party shall be instituted; (4) all or any material part of the assets of a Responsible Party shall be sold, assigned, or transferred; (5) a Responsible Party shall fail to pay its debts as they become due; or (6) a Responsible Party shall cease doing business as a going concern.

(v)    To the extent that the outstanding dollar amount of all Receivables owed by an Account Debtor constitutes a percentage equal to or greater than the percentage specified in **Item 3** of the Schedule of the aggregate outstanding dollar amount of all Receivables, the portion of said Receivables in excess of the percentage specified in **Item 3** of the Schedule.

(vi)    All Receivables owed by an Account Debtor which does not maintain its chief executive office in the United States or which is not organized under the laws of the United States or any state thereof, unless otherwise specified in **Item 4** of the Schedule.

(vii)    Any Receivables owed by an Account Debtor, if Debtor or any person who, or entity which, directly or indirectly controls Debtor, either owns in whole or material part, or directly or indirectly controls, such Account Debtor.

Confidential – Subject to Protective Order

AP-0001337

EXECUTION COPY

(viii)   Any Receivable arising from a consignment or other arrangement, pursuant to which the subject inventory is returnable if not sold or otherwise disposed of by the Account Debtor any Receivable constituting a partial billing under terms providing for payment only after full shipment or performance; any Receivable arising from a bill and hold sale or in connection with any prebilling where the Inventory or services have not been delivered, performed, or accepted by the Account Debtor if Secured Party has not entered into a satisfactory written agreement with such Account Debtor relating to such Receivables; and any Receivable as to which the Account Debtor contends the balance reported by Debtor is incorrect or not owing.

(ix)   Any Receivable which is unenforceable against the Account Debtor for any reason.

(x)   Any Receivable which is an Instrument, Document, or Chattel Paper or which is evidenced by a note, draft, trade acceptance, or other instrument for the payment of money where such Instrument, Document, Chattel Paper, note, draft, trade acceptance, or other instrument has not been expressly approved by Secured Party.

(xi)   Any Receivable or Receivables owed by an Account Debtor which exceeds any credit limit established by Secured Party for such Account Debtor; provided, that such Receivable or Receivables shall be ineligible only to the extent of such excess.

(xii)   Any Receivable for which MR Coal is the Account Debtor which has remained unpaid for more than three (3) Business Days from the date of any applicable invoice issued on a Tuesday or four (4) Business Days from the date of any applicable invoice issued on a Monday.

(xiii)   Any Receivable from MR Coal for which MR Coal has not waived all rights of setoff, offset, reimbursement, and any other net reduction pursuant to the terms and conditions established by that certain Intercreditor Agreement dated on an even date hereof between Debtor, Secured Party and MR Coal.

(xiv)   Any Receivable or Receivables owed by an Account Debtor which is a federal, state, county, municipal, or other governmental entity.

(xv)   Any Receivable owed by an Account Debtor on a cash, or cash on delivery basis.

Confidential – Subject to Protective Order

AP-0001338

(bb)    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(cc)    "Invoice" means any document or documents used, or to be used, to evidence a Receivable.

(dd)    "Loan Agreement" is defined in the first recital of this Agreement.

(ee)    "Loan Base Report" means the Receivables report in the form attached hereto as Exhibit D to be delivered by Debtor to Secured Party in accordance with Section 2.9 hereof.

(ff)    "Lien" means any mortgage, deed of trust, deed to secure debt, pledge, security interest or agreement, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing or any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing).

(gg)    "Management Payroll Account" means the zero-balance account (United Account # ███-8490) held in trust by Secured Party to be used to fund the payroll obligations of the employees of Revelation Management Corporation, a Delaware corporation.

(hh)    "Mercuria Documents" is defined in the third recital of this Agreement.

(ii)    "Mercuria Relationship" is defined in the third recital of this Agreement.

(jj)    "MPA" is defined in the third recital of this Agreement.

(kk)    "MR Coal" is defined in the third recital of this Agreement.

(ll)    "Organizational Documents" means (i) with respect to a corporation, its certificate or articles of incorporation and by-laws; (ii) with respect to a partnership, its partnership certificate and partnership agreement; and (iii) with respect to a limited liability company, its articles or certificate of formation and its operating or management agreement, and, with respect to any of them, any other document required to be filed with public authorities to evidence or establish authority to conduct business.

(mm)    "PCA" is defined in the third recital of this Agreement.

(nn)    "Pension Event" means, with respect to any Pension Plan, the occurrence of (i) any prohibited transaction described in Section 406 of ERISA or in Section 4975 of the Internal Revenue Code; (ii) any Reportable Event; (iii) any complete or partial withdrawal, or proposed complete or partial withdrawal, of Debtor from such Pension Plan; (iv) any complete or partial termination, or proposed complete or partial termination, of such Pension Plan; or (v)

Confidential – Subject to Protective
Order

AP-0001339

EXECUTION COPY

any accumulated funding deficiency (whether or not waived), as defined in Section 302 of ERISA or in Section 412 of the Internal Revenue Code.

(oo)   "Pension Plan" means any pension plan, as defined in ERISA, which is a multiemployer plan or a single employer plan, as defined in Section 4001 of ERISA, and subject to Title IV of ERISA and which is (i) a plan maintained by Debtor for employees or former employees of Debtor; (ii) a plan to which Debtor contributes or is required to contribute; (iii) a plan to which Debtor was required to make contributions at any time during the five (5) calendar years preceding the date of this Agreement; or (iv) any other plan with respect to which Debtor has incurred or may incur liability, including, without limitation, contingent liability, under Title IV of ERISA either to such plan or the Pension Benefit Guaranty Corporation.

(pp)   "Person" means any individual or corporation, firm, partnership, limited liability company, trust or any other entity.

(qq)   "Prime Rate" means the Wall Street Journal Prime Commercial Lending Rate as published from time to time.  If the designated Prime Rate becomes unavailable during the term of the Revolving Line of Credit Note, Secured Party may designate a similar substitute index after notifying Debtor.

(rr)   "Receivable" means the Debtor's right to payment of a monetary obligation, whether or not earned by performance: (1) For property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of; (ii) for services rendered or to be rendered; (iii) for a policy of insurance issued or to be issued; (iv) for a secondary obligation incurred or to be incurred; (v) for energy provided or to be provided; (vi) for the use or hire of a vehicle or vessel under a charter or other contract; or (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, and may, without limitation, in whole or in part be in the form of an Account, Chattel Paper, Document, Instrument, Commercial Tort Claims, Letter of Credit Rights or Letters of Credit, Investment Property or Deposit Accounts with Secured Party, and includes without limitation Billed Installment Payments.

(ss)   "Receivables Borrowing Base" means, at the time of its computation, the aggregate amount of the outstanding Receivables attributable to actual sales of coal by Debtor to an Account Debtor in which Secured Party has a first priority perfected security interest (adjusted (i) with respect to Credits as provided in Section 8.1 and (ii) as provided in Section 2.9) less the amount of Ineligible Receivables and less any reserves established by Secured Party in accordance with Section 2.3 of this Agreement.

(tt)   "Receivables Borrowing Capacity" means, at the time of computation, the sum of the following amounts:

(i)   Five Million Dollars (U. S. $5,000,000.00), and

(ii)   an amount equal to 85% of the Receivables Borrowing Base ;

Confidential – Subject to Protective Order

AP-0001340

and, subtracting from the aforementioned sum, the aggregate outstanding Advances pursuant to the Receivables Borrowing Capacity to date. The Receivables Borrowing Capacity shall be calculated weekly, or more frequently if the Secured Party deems in good faith that a downward adjustment is necessary based upon changed circumstances of the Debtor.

(uu)   "Record" means information that is inscribed in a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form; provided, however, that if Secured Party specifies, with respect to a particular type of writing, that type of writing shall be signed or otherwise authenticated by the Debtor, then the term Record shall only include a writing signed or otherwise authenticated by the Debtor.

(vv)   "Release" means "release", as defined in Section 101(22) of the Comprehensive, Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601(22), as amended from time to time, and the regulations promulgated thereunder.

(ww)   "Reportable Event" means any event described in Section 4043(b) of ERISA or in the regulations issued thereunder with regard to a Pension Plan.

(xx)   "Responsible Party" means an Account Debtor, a general partner of an Account Debtor, or any party otherwise in any way directly or indirectly liable for the payment of a Receivable.

(yy)   "Revolving Line of Credit Note" means the Revolving Line of Credit Note from Debtor to Secured Party in the form attached hereto as Exhibit E.

(zz)   "Schedule" means the schedule executed in connection with, and which is a part of, this Agreement.

(aaa)   "Secured Party" is defined in the Preamble of this Agreement.

(bbb)   "Secured Party Lockbox Agreement" means the lockbox agreement setting forth the arrangement established between Debtor and Secured Party for Secured Party to receive and administer all Proceeds of Collateral, other than electronic payments for Proceeds of Collateral, which will be credited to the United Payment Account when such Proceeds become collected funds.

(ccc)   "Security Interest" means the security interest granted to Secured Party by Debtor or a Third Party as described in Article 3 of this Agreement.

(ddd)   "State" means the State of West Virginia.

(eee)   "Third Party" means any Person who or which has executed and delivered, or who or which in the future may execute and deliver, to Secured Party any agreement, instrument, or document, pursuant to which such Person has guaranteed to Secured Party the payment of the Indebtedness or has granted Secured Party a security interest in or Lien on some or all of such Person's real or personal property to secure the payment of the Indebtedness.

Confidential – Subject to Protective
Order

AP-0001341

(fff)   "Transaction Documents" means this Agreement and all documents, including, without limitation, collateral documents, letter of credit agreements, notes, acceptance credit agreements, security agreements, pledges, guaranties, mortgages, title insurance, assignments, and subordination agreements required to be executed by Debtor, any Third Party, or any Responsible Party pursuant hereto or in connection herewith, as any of the foregoing may be amended and supplemented from time to time and as the foregoing are listed as Transaction Documents in **Exhibit C** hereto.

(ggg)   "UCC" means the West Virginia Uniform Commercial Code as in effect from time to time.

(hhh)   "United Payment Account" means the Debtor's operating bank account (United Account # ███-8482) established by Debtor with Secured Party to which (i) the Proceeds of Collateral, including, without limitation, electronic payments on all Receivables are to be credited, (ii) payments to third parties are to be debited, (iii) amounts collected by Secured Party pursuant to the Secured Party Lockbox Agreement for all Proceeds of Collateral, other than electronic payments on Receivables made to the United Payment Account, are to be credited, and (iv) all other various deposits and withdrawals associated with the general working capital needs of the Debtor incurred in the ordinary course of business are to be made.  The United Payment Account is further described in **Item 5** of the Schedule. Debtor shall direct all Account Debtors to make payments on Receivables directly to the United Payment Account and shall cause any such payments not so made directly to the United Payment Account to be deposited into the Lockbox Account promptly upon receipt by Debtor.

## 1.2.   SINGULARS AND PLURALS.

Unless the context otherwise requires, words in the singular number include the plural, and in the plural include the singular.

## 1.3.   UCC DEFINITIONS.

Unless otherwise defined in Section 1.1 or elsewhere in this Agreement, capitalized words shall have the meanings set forth in the UCC as in effect in the State of West Virginia as of the date of this Agreement.

## 2.   DEBTOR'S ACCOUNTS AND BORROWING BASE

After Debtor has executed agreements and documents related to the establishment of the United Payment Account, the Debtor Money Market Mutual Fund Account, the Hourly Employees Payroll Account, and the Management Payroll Account, (collectively, the "Debtor Accounts"), and, Debtor has executed the Secured Party Lockbox Agreement, the Secured Party shall begin administering the Debtor Accounts within its institution according to the following procedures:

Confidential – Subject to Protective Order

AP-0001342

## 2.1.    INITIAL ADVANCE; CASH NEEDS OF ACCOUNTS.

Each day all cash needs of said Debtor Accounts will be determined by the Secured Party.  Prior to paying those cash needs, Secured Party shall determine whether any liquid funds are available in the United Payment Account.  If there are sufficient liquid funds available in the United Payment Account to cover the total cash needs of the Debtor Accounts, then Secured Party shall debit such amount from the United Payment Account.  If there are not sufficient liquid funds available in the United Payment Account to cover the total cash needs of said Debtor Accounts, then Secured Party shall reduce the cash balance available in the United Payment Account, if any, to one thousand dollars ($1000.00), and shall fund the remaining cash needs of the Debtor Accounts with an Advance equal to the amount necessary to fund the remaining cash needs of the Debtor Accounts, subject to the limitations set out in Section 2.3.  Each day throughout the duration of this Agreement, this automated process shall be repeated by Secured Party.  Debtor hereby acknowledges it is solely responsible for managing the cash needs and the working capital needs of its organization incurred in the ordinary course of business.  Debtor further acknowledges that it is solely responsible for ensuring that (i) there are sufficient funds available from its excess cash among the collected funds available pursuant to the Secured Party Lockbox Agreement, the Debtor Money Market Mutual Fund Account and the United Payment Account to cover the cash needs of its organization, and, in the event that there is insufficient cash available among said accounts, that there is enough Borrowing Capacity to cover any cash needs of its organization, and (ii) that none of the conditions or events set forth in Section 2.3 herein below occur.  In the event that there is insufficient cash available as collected funds pursuant to the Secured Party Lockbox Agreement and in the Debtor Money Market Mutual Fund Account  and the United Payment Account, and there is not enough Borrowing Capacity, to cover the cash needs of the Debtor's organization, or, any of the conditions or events set forth in Section 2.3 herein below have occurred, Secured Party shall have no obligation to make Advances, and, in such event, Debtor shall release, hold harmless, and indemnify the Secured Party for damages or claims incurred by Secured Party as a result of Debtor's lack of sufficient cash, or Borrowing Capacity, to fund the needs of its operations.

## 2.2.    RECEIPTS RECEIVED BY ACCOUNTS.

Each day all cash receipts of said Debtor Accounts will be determined by the Secured Party.  If all of the cash receipts of said accounts exceed the cash needs of said accounts for such day, the excess cash after funding the cash needs of said accounts shall be applied to the outstanding principal of the Indebtedness and, in the event that there is excess cash after reducing the Indebtedness to zero, the Secured Party shall invest such remaining cash in the Debtor Money Market Mutual Fund Account as set forth in Section 2.4 herein below until the next day when such excess cash shall be used to fund the cash needs of said accounts, if any.  Each day throughout the duration of this Agreement, this process shall be repeated by the Secured Party.

## 2.3.    LIMITATIONS ON ADVANCES.

Secured Party shall make daily Advances to Debtor in accordance with Sections 2.1 and 2.2, above, based on the cash needs of the Debtor Accounts, provided that (i) the Borrowing Capacity of the then current Loan Base Report would not be exceeded; (ii) there has not occurred

Page 11 of 47

an Event of Default which has not been cured or an event which, with notice or the lapse of time or both, would constitute an Event of Default that has not been cured; and (iii) all representations and warranties contained in this Agreement and in the other Transaction Documents are true and correct on the date such Advance is made as though made on and as of such date. Notwithstanding any other provision of this Agreement, Secured Party may from time to time reduce or increase the percentage applicable to the Receivables Borrowing Base as it relates to the Borrowing Capacity. The percentage may be reduced if Secured Party determines in its reasonable judgment, that there has been a material adverse change in circumstances related to any or all Receivables from those circumstances in existence on or prior to the date of each Advance, or in the financial or other condition of either Debtor. The percentage may be increased if, following a decrease, the Secured Party determines that there has been a material positive change in such circumstances. Secured Party shall notify Debtor in writing of such reduction or increase in Borrowing Capacity with reasonable promptness and shall specify the reasons for such reduction. Unless otherwise expressly specified herein, Debtor shall have thirty (30) days in which to reduce the amount of the outstanding Advances to an amount in compliance with the reduced Borrowing Capacity.

2.4.   INVESTMENT OF EXCESS CASH.

Each day after the various transfers, debits, and credits described in this Article 2, if there is any excess cash available, Secured Party shall automatically transfer in one hundred dollar increments those said excess funds from the United Payment Account to the Debtor Money Market Mutual Fund Account where such excess funds shall be invested until the next day where the automated transfers, debits, and credits described in this Article 2 shall be repeated and such process shall continually repeat until termination of this Agreement.

2.5.   BORROWING CAPACITY; ADJUSTMENT.

Whenever the outstanding principal balance of Advances exceeds the adjusted Borrowing Capacity, Debtor shall, within five (5) Business Days following notice from Secured Party that the outstanding principal Advances exceed the adjusted Borrowing Capacity, cause the Borrowing Capacity to be increased or pay or cause to be paid to Secured Party the excess of the outstanding principal balance of Advances over the Borrowing Capacity. Debtor shall, commencing not later than March 6, 2013 and continuing on or before each Wednesday thereafter, submit Loan Base Reports to Secured Party. The Borrowing Capacity shall be adjusted at least weekly in accordance with the Loan Base Reports submitted by Debtor as provided in **Item 9** in the Schedule. The Loan Base Reports shall be in the forms shown in Exhibit D attached hereto and incorporated herein; provided, however, the form of the Loan Base Reports may be amended by written notice of the Secured Party.

2.6.   AUDIT.

Secured Party may at any time perform an audit of Debtor's records used in completing the Loan Base Reports, and during such audit shall have access to bills of lading, Invoices, and any other records which Secured Party believes accurately represent the Receivables. The determination reached by Secured Party in its commercially reasonable discretion during any

Confidential – Subject to Protective
Order

AP-0001344

audit shall be binding upon the Debtor, and Debtor's Borrowing Capacity shall be adjusted accordingly.

2.7.    **AUTHORIZED PERSONS.**

Debtor shall from time to time designate in writing to the Secured Party those individuals authorized to manage the daily cash receipts and disbursements of the Debtor Accounts in concert with the Secured Party. Each instruction by an authorized individual shall be conclusively presumed to be made by a person authorized by Debtor to do so, shall constitute a representation and warranty by Debtor to Secured Party that subsections (i), (ii) and (iii) of Section 2.3 are true and correct as of the date of such request, and the making of the Advance to Debtor as hereinafter provided shall conclusively establish Debtor's obligation to repay the Advance.

2.8.    **COMPUTATION OF DAILY OUTSTANDING BALANCE.**

For the purpose of calculating the aggregate principal balance of outstanding Advances under the Revolving Line of Credit Note pursuant to Section 2.1, Advances shall be deemed to be made by Secured Party to Debtor on any date when excess cash (any cash remaining from the prior business day after reducing the outstanding principal balance of outstanding Advances to zero and paying any outstanding interest, when applicable) is not available in the United Payment Account to cover the cash requirements of the United Payment Account (including, but not limited to, any checks drawn against the United Payment Account that have been presented for payment, any pending wire transfers from the United Payment Account to accounts of third parties, any ACH transfers from the United Payment Account to accounts of third parties, any interbank transfers from the United Payment Account to other Debtor Accounts or other accounts of Debtor held in trust by Secured Party, and other cash withdrawals made by Debtor from the United Payment Account) and only to the extent that excess cash of Debtor deposited in the Debtor Money Market Mutual Fund Account will not cover said cash requirements of the United Payment Account. At the end of each business day, Secured Party shall calculate whether any Advances have been made to Debtor. In such event, Secured Party will add these Advances to the existing Advances previously made by Secured Party to Debtor that have not been repaid. The total of said Advances shall be the daily outstanding principal balance owed by Debtor to Secured Party. Notwithstanding any other provision of this Agreement, if any item presented for collection by Secured Party is not honored, Secured Party may reverse any provisional credit which has been given for the item and make appropriate adjustments to the amount of interest and principal due.

2.9.    **RECEIVABLES BORROWING BASE; ADJUSTMENT.**

Debtor shall calculate the Receivables Borrowing Base on or before every Wednesday at noon (EST) based upon the prior week's production during the term hereof in accordance with the loan base report in the form substantially similar to the forms attached hereto as Exhibit D and as Exhibit E, ("Loan Base Report"), and deliver said Loan Base Report to Secured Party for Secured Party's approval by Wednesday at 4 p.m. (EST) of each week. Upon the execution of this Agreement, Debtor shall submit its initial Loan Base Report in a form substantially similar

Page 13 of 47

EXECUTION COPY

to the form attached hereto as Exhibit D based upon the Receivables outstanding as of February 28, 2013, which shall establish the Receivables Borrowing Base through March 5, 2013. On March 6, 2013, Debtor shall submit a second Loan Base Report in a form substantially similar to the form attached hereto as Exhibit E based upon the Receivables outstanding as of March 5, 2013 which shall establish the Receivables Borrowing Base for the week beginning on March 6, 2013 and ending on March 12, 2013. Each rolling week after March 5, 2013, Debtor shall submit a Loan Base Report in a form substantially similar to the form attached hereto as Exhibit E. If the Secured Party approves a Loan Base Report, the Receivables Borrowing Base for the ensuing calendar week shall be determined on the basis of the approved Loan Base Report. If Secured Party disputes any Loan Base Report, the Debtor and Secured Party shall proceed in good faith to attempt to resolve the dispute. If the parties resolve the dispute prior to the 1st Business Day of the following week, the Receivables Borrowing Base for the following week shall be determined on the basis of the agreed upon Loan Base Report. If the parties are unable to agree on the disputed Loan Base Report prior to the 1st Business Day of the week following the week in which the Loan Base Report was initially submitted, the Receivables Borrowing Base for the following calendar week shall be 60% of the then applicable Receivables Borrowing Base. If the parties are unable to agree on the Loan Base Report for two consecutive weeks, the Secured Party may terminate the Debtor's right to receive any additional Advances and declare the Indebtedness due and payable in full, in which case the Debtor shall cause the Indebtedness to be paid in full within thirty (30) days of written demand from the Secured Party.

### 2.10. ACCOUNT STATED.

Debtor agrees that each monthly or other statement of account mailed or delivered by Secured Party to Debtor pertaining to the outstanding balance of Advances, the amount of interest due thereon, fees and costs and expenses shall be final, conclusive and binding on Debtor and shall constitute an "account stated" with respect to the matters contained therein unless, within thirty (30) calendar days from when such statement is mailed or, if not mailed, delivered to Debtor, Debtor shall deliver to Secured Party written notice of any objections which it may have as to such statement of account, and in such event, only the items to which objection is expressly made in such notice shall be considered to be disputed by Debtor. Notwithstanding the foregoing, the Secured Party agrees to correct any demonstrated errors in calculation if brought to the Secured Party's attention prior to the termination of this Agreement.

## 3. COLLATERAL AND INDEBTEDNESS SECURED.

### 3.1. SECURITY INTEREST.

Debtor hereby grants, pledges and assigns to Secured Party a security interest in, and a Lien on, the following property of Debtor wherever located and whether now owned or hereafter acquired:

      (a)     All Debtor Accounts and Receivables.

      (b)     All guaranties, collateral, Liens on, or security interests in, real or personal

Confidential – Subject to Protective
Order

AP-0001346

property, leases, letters of credit, and other rights, agreements, and property securing or relating to payment of the Receivables.

(c)     All books, records, ledger cards, data processing records, computer software, and other property at any time evidencing or relating to Collateral.

(d)     All monies, securities, and other property now or hereafter held, or received by, or in transit to, Secured Party from or for the Debtor, and the United Payment Account and other deposit accounts, credits, and balances with Secured Party existing at any time.

(e)     All intercompany receivables from Alpha Highwall Mining, LLC, a Kentucky limited liability company; Revelation Management Corporation, a Delaware corporation; and from any other Affiliate of the Debtor.

(f)     All guaranty payments, if any, from Mercuria Energy Group Limited, a company organized under the laws of Cyprus, to Debtor under that certain Guarantee dated January 18, 2013.

(g)     All amounts due to Debtor under that certain Guaranty Reimbursement and Indemnification Agreement dated on an even date hereof between Debtor and MR Coal.

(h)     All amounts due to Debtor under that certain Put and Call Agreement dated on an even date hereof between Debtor and Mercuria US Asset Holdings, LLC, a Delaware limited liability company.

(i)     All amounts due to Debtor under that certain Coal Services Agreement dated on an even date hereof between Debtor and MR Coal.

(j)     All amounts due to Debtor under that certain Master Coal Purchase and Sale Agreement dated on an even date hereof between Debtor and MR Coal.

(k)     All amounts due to Debtor under that certain Contract Mining Agreement dated June 10, 2011, as amended, between Debtor and Jewell Smokeless Coal Corporation, a Virginia corporation.

(l)     All Proceeds and products of all of the foregoing in any form, including, without limitation, accounts payable under any policies of insurance insuring the foregoing against loss or damage, and all increases and profits received from all of the foregoing.

The security interests granted by Debtor to Secured Party in (a) through (m) above, are to be first lien security interests.

Confidential – Subject to Protective
Order

AP-0001347

### 3.2.   OTHER COLLATERAL.

In addition to the security interests granted in Section 3.1 above, Debtor or a Third Party shall grant or caused to be granted to or for the benefit of the Secured Party:

(a)   a first lien/mortgage on Borrower's coal load out facility at Phelps, Kentucky;

(b)   a first lien/mortgage on Borrower's coal load out facility at Jackson Kentucky;

(c)   a first lien/assignment of proceeds of a $10,000,000 key man life insurance policy on Jeffery A. Hoops;

(d)   an unconditional guaranty of Guarantor I; and

(e)   an unconditional guaranty of Guarantor II.

### 3.3.   EXCLUSIONS.

(a)   Nothing contained in this Agreement shall limit the rights of Secured Party in and to any other collateral securing the Indebtedness which may have been, or may hereafter be, granted to Secured Party by Debtor or any Third Party pursuant to any other agreement.

(b)   Notwithstanding the foregoing, the Collateral does not include any equipment or vehicles of the Debtor or any of Debtor's general intangibles.

### 3.4.   INDEBTEDNESS SECURED.

The Secured Party's security interests secure payment of the following, whether now existing or hereafter incurred or arising, of every kind and character, primary or secondary, direct or indirect, absolute or contingent, sole, joint or several, and whether such indebtedness is from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred: (a) all Advances; (b) all interest which accrues on any such indebtedness, until payment of such indebtedness in full, including, without limitation, all interest provided for under this Agreement; (c) all other monies payable by  Debtor or Third Party, and all obligations and agreements of Debtor or Third Party to Secured Party, pursuant to the Transaction Documents; (d) all monies payable by any Third Party, and all obligations and agreements of any Third Party, to Secured Party, pursuant to any of the Transaction Documents; and (e) all monies due, and to become due, pursuant to Sections 7.3 and 7.4 of this Agreement.

### 3.5.   MATURITY DATE.

This Agreement shall terminate on February 27, 2014, unless the Secured Party and

Confidential – Subject to Protective
Order

AP-0001348

Debtor mutually agree in writing prior to such date to extend, renew, or otherwise modify the term of this Agreement.

## 4. REPRESENTATIONS AND WARRANTIES.

To induce Secured Party to enter into this Agreement, and make Advances to Debtor from time to time as herein provided, Debtor represents and warrants, and so long as any Indebtedness remains unpaid or this Agreement remains in effect, shall be deemed continuously to represent and warrant as follows:

### 4.1. EXISTENCE.

Debtor is duly organized and existing and in good standing as a limited liability company under the laws of the Commonwealth of Kentucky and is duly licensed or qualified to do business and in good standing in every state in which the nature of its business or ownership of its property requires such licensing or qualification.

### 4.2. CAPACITY.

The execution, delivery, and performance of the Transaction Documents to which Debtor is a party are within the Debtor's powers, have been duly authorized by all necessary and appropriate company and member action, and are not in contravention of any law or the terms of any of Debtor's Organizational Documents or any amendment thereto, or of any indenture, agreement, undertaking, or other document to which Debtor is a party or by which Debtor or any of Debtor's property is bound or affected.

### 4.3. VALIDITY OF RECEIVABLES.

(a) Each Receivable that is not an Ineligible Receivable is genuine and enforceable in accordance with its terms and represents an undisputed and _bona fide_ indebtedness owing to Debtor by the Account Debtor obligated thereon; (b) there are no defenses, setoffs, or counterclaims against any Receivable; (c) no payment has been received on any Receivable, and no Receivable is subject to any Credit or Extension or agreements therefore unless written notice specifying such payment, Credit, Extension, or agreement has been delivered to Secured Party; (d) each copy of each Invoice provided to Secured Party is a true and genuine copy of the original Invoice sent to the Account Debtor named therein and accurately evidences the transaction from which the underlying Receivable arose, and the date payment is due as stated on each such Invoice or computed based on the information set forth on each such Invoice is correct; (e) each aged listing of Receivables organized by, or on behalf of, the Debtor and provided to Secured Party is a true and genuine compilation of the information reflected on the Invoice from Debtor's customer, and the ages of such Receivables are correct; (f) all Chattel Paper, and all promissory notes, drafts, trade acceptances, and other instruments for the payment of money relating to or evidencing each Receivable, and each endorsement thereon, are true and genuine and in all respects are what they purport to be, and are the valid and binding obligation of all parties thereto, and the date or dates stated on all such items as the date on which payment

Confidential – Subject to Protective
Order

AP-0001349

EXECUTION COPY

in whole or in part is due is correct; (g) any services to be performed by Debtor in connection with each Receivable have been performed by Debtor; and (j) all evidence of the performance of any such services by Debtor is true and genuine.

### 4.4. TITLE TO LAND UNDERLYING PHELPS LOADOUT.

Debtor is the owner of the real property underlying the coal loadout facility located in or near Phelps, Kentucky which is described in Exhibit F attached hereto.

### 4.5. TITLE TO COLLATERAL.

(a) Debtor is the owner of the Collateral free of all security interests, Liens, and other encumbrances except as described in **Item 6** of the Schedule; (b) Debtor has the unconditional authority to grant the security interests to Secured Party; and (c) assuming that all necessary UCC filings and mortgage filings have been made (and all steps required by the insurance company in connection with the assignment of the life insurance policy proceeds have been taken) and, if applicable, assuming compliance with the Federal Assignment of Claims Act of 1940, as amended, Secured Party has an enforceable first lien on all Collateral (except as otherwise provided herein), which may be subordinate to those security interests, Liens, or encumbrances identified in **Item 6** of the Schedule. Provided, however, that the failure of Debtor to comply with the Federal Assignment of Claims Act of 1940, as amended, shall not be a default hereunder so long as such Collateral is treated as an Ineligible Receivable.

### 4.6. NOTES RECEIVABLE.

No Receivable is an Instrument, Document, or Chattel Paper or is evidenced by any note, draft, trade acceptance, or other instrument for the payment of money, except such Instrument, Document, Chattel Paper, note, draft, trade acceptance, or other instrument as has been endorsed and delivered by Debtor to Secured Party and has not been presented for payment and returned uncollected for any reason.

### 4.7. EQUIPMENT.

No Equipment other than the improvements and fixtures comprising the Phelps, Kentucky and Jackson, Kentucky coal loadout facilities  is to be included as part of the Collateral.

### 4.8. PLACE OF BUSINESS.

(a) Unless otherwise disclosed to Secured Party in **Item 7** of the Schedule, Debtor is engaged in business operations which are in whole, or in part, carried on at the address specified on the cover page of this Agreement; (b) Debtor's chief executive office is at the address specified as such on the cover page of this Agreement; and (c) Debtor's records concerning the Collateral are kept at the address specified at the beginning of this Agreement or in **Item 7** of the Schedule.

Confidential – Subject to Protective Order

AP-0001350

EXECUTION COPY

4.9.   FINANCIAL CONDITION.

Debtor has furnished to Secured Party Debtor's most current financial statements, which statements represent correctly and fairly the results of the operations and transactions of Debtor as of the dates, and for the period referred to, and have been prepared in accordance with GAAP consistently applied during each interval involved and from interval to interval. Since the date of such financial statements, there have not been any materially adverse changes in the financial condition reflected in such financial statements, except as disclosed in writing by Debtor to Secured Party.

4.10.   TAXES.

Except as disclosed in writing by Debtor to Secured Party:  (a) all federal and other tax returns required to be filed by Debtor have been filed, and all taxes required by such returns have been paid; and (b) Debtor has not received any notice from the Internal Revenue Service or any other taxing authority proposing additional taxes, penalties or interest.

4.11.   LITIGATION.

Except as disclosed in **Item 22** of the Schedule, there are no actions, suits, proceedings, or investigations pending or, to the knowledge of Debtor, threatened against Debtor or any basis therefor that are not either (i) covered by insurance and being actively defended by the insurer, (ii) the subject of indemnification or a tender of defense and being actively defended by the indemnitor or acceptor of the defense.

4.12.   ERISA MATTERS.

(a) No Pension Plan has been terminated, or partially terminated, or is insolvent, or in reorganization, nor have any proceedings been instituted to terminate or reorganize any Pension Plan; (b) Debtor has not withdrawn from any Pension Plan in a complete or partial withdrawal, nor has a condition occurred which, if continued, would result in a complete or partial withdrawal; (c) Debtor has not incurred any withdrawal liability, including, without limitation, contingent withdrawal liability, to any Pension Plan, pursuant to Title IV of ERISA; (d) Debtor has not incurred any liability to the Pension Benefit Guaranty Corporation other than for required insurance premiums which have been paid when due; (e) no Reportable Event has occurred; (f) no Pension Plan or other "employee pension benefit plan" as defined in Section 3(2) of ERISA, to which Debtor is a party has an "accumulated funding deficiency" (whether or not waived), as defined in Section 302 of ERISA or in Section 412 of the Internal Revenue Code; (g) the present value of all benefits vested under any Pension Plan does not exceed the value of the assets of such Pension Plan allocable to such vested benefits; (h) each Pension Plan and each other "employee benefit plan", as defined in Section 3(3) of ERISA, to which Debtor is a party is in substantial compliance with ERISA, and no such plan or any administrator, trustee, or fiduciary thereof has engaged in a prohibited transaction described in Section 406 of ERISA or in Section 4975 of the Internal Revenue Code; (i) each Pension Plan and each other "employee benefit plan", as defined in Section 3(2) of ERISA, to which Debtor is a party has received a favorable determination by the Internal Revenue Service with respect to qualification under Section 401(a)

Confidential – Subject to Protective
Order

AP-0001351

EXECUTION COPY

of the Internal Revenue Code; and (j) Debtor has not incurred any liability to a trustee or trust established pursuant to Section 4049 of ERISA or to a trustee appointed pursuant to Section 4042(b) or (c) of ERISA.

### 4.13.   TITLE TO LAND UNDERLYING JACKSON LOADOUT.

Debtor is the owner of the real property underlying the coal loadout facility located in or near Jackson, Kentucky which is described in Exhibit G attached hereto.

### 4.14.   VALIDITY OF TRANSACTION DOCUMENTS.

The Transaction Documents constitute the legal, valid, and binding obligations of Debtor and any Third Parties thereto, enforceable in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy and insolvency laws, laws affecting creditors' rights generally, and principles of equity and commercial reasonableness.

### 4.15.   NO CONSENT OR FILING.

No consent, license, approval, or authorization of, or registration, declaration or filing with, any court, governmental body or authority, or other Person is required in connection with the valid execution, delivery, or performance of the Transaction Documents or for the conduct of Debtor's business as now conducted, other than filings and recordings to perfect security interests in or Liens on the Collateral in connection with the Transaction Documents.

### 4.16.   NO VIOLATIONS.

Debtor is not in violation of any material term of its Organizational Documents, or of any mortgage, borrowing agreement, or other instrument or agreement pertaining to indebtedness for borrowed money.   Debtor is not in violation of any material term of any other indenture, instrument, or agreement to which it is a party or by which it or its property may be bound, resulting, or which might reasonably be expected to result, in a material and adverse effect upon its business or assets.   Debtor is not in material violation of any order, writ, judgment, injunction, or decree of any court of competent jurisdiction or of any statute, rule, or regulation of any governmental authority.   The execution and delivery of the Transaction Documents and the performance of all of the same, is, and will be, in compliance with the foregoing and will not result in any violation thereof, or result in the creation of any mortgage, Lien, security interest, charge, or encumbrance upon, any properties or assets except in favor of Secured Party.   There exists no fact or circumstance (whether or not disclosed in the Transaction Documents) which materially adversely affects, or in the future (so far as Debtor can now foresee) may materially adversely affect, the condition, business, or operations of Debtor.

### 4.17.   CONTINGENT LIABILITIES.

There are no suretyship agreements, guaranties, or contingent liabilities of Debtor which are not disclosed by the financial statements described in Section 4.9 of this Agreement.

Confidential – Subject to Protective
Order

AP-0001352

EXECUTION COPY

### 4.18.   COMPLIANCE WITH LAWS.

Debtor is in material compliance with all applicable laws, rules, regulations and other legal requirements with respect to its business and the use, maintenance, and operations of the real and personal property owned or leased by it in the conduct of its business.

### 4.19.   LICENSES, PERMITS, ETC.

Each franchise, grant, approval, authorization, license, permit, easement, consent, certificate, and order of and registration, declaration, and filing with, any court, governmental body or authority, or other Person required for or in connection with the conduct of Debtor's business as now conducted is in full force and effect.

### 4.20.   LABOR CONTRACTS.

Debtor is not a party to any collective bargaining agreement or to any existing or threatened labor dispute or controversies.

### 4.21.   CONSOLIDATED SUBSIDIARIES.

[Reserved]

### 4.22.   OWNERSHIP OF DEBTOR.

Debtor's authorized membership units and the number of such units issued and outstanding, are set forth in **Item 8** of the Schedule. All of such membership units are of one class and have been validly issued in full compliance with all applicable federal and state laws, and are fully paid and non-assessable. No other membership units of Debtor of any class or type are authorized or outstanding.

### 4.23.   BROKERS.

No broker or finder brought about the obtaining, making or closing of the financing provided pursuant to this Agreement, and neither Debtor nor Secured Party has any obligation to any Person in respect of any finder's or brokerage fees in connection with the loan contemplated by this Agreement.

### 4.24.   ADVERSE CHANGE.

(a)     There has been no adverse change in the business, operations, assets, financial or other condition of Debtor from that reflected in the historical financial statements of Debtor for the period ended December 31, 2011.

(b)     As of the date of this Agreement, Debtor does not have any material amount of liabilities, contingent or otherwise, not reflected in the financial statements provided to Secured Party.

Confidential – Subject to Protective
Order

AP-0001353

### 4.25.   DAMAGE OR DESTRUCTION.

Since the date of the most recent balance sheet of Debtor that has been delivered to Secured Party, neither the business nor operations nor properties of Debtor have been substantially or materially and adversely affected as the result of any fire, explosion, accident, strike, flood, requisition or taking of property by any governmental authority or act of God.

### 4.26.   KEY MAN LIFE INSURANCE POLICY.

Debtor is the owner of a certain term life insurance policy (Policy No.███0628) on the life of Jeffery A. Hoops for an amount equal to $10,000,000.00. Debtor has not assigned said policy as collateral security.

### 4.27.   NO MISLEADING INFORMATION.

Except as would not have a material adverse effect, none of the information disclosed by Debtor in connection with this Agreement contains any untrue statement of facts or omits to state any fact necessary in order to have made the statement therein not misleading.

### 4.28.   ADVANCES FOR WORKING CAPITAL ONLY.

Upon receipt of Advances, Debtor is only using such Advances for working capital purposes incurred in its ordinary course of business.

## 5.   CERTAIN DOCUMENTS TO BE DELIVERED TO SECURED PARTY.

### 5.1.   DOCUMENTS.

Debtor shall deliver or cause to be delivered to Secured Party, all documents specified in **Item 9** of the Schedule, as frequently as indicated therein or at such other times as Secured Party may reasonably request, and all other documents and information reasonably requested by Secured Party, all in form, content and detail reasonably satisfactory to Secured Party. The documents and schedules to be provided under this Section 5.1 are solely for the convenience of Secured Party in administering this Agreement and maintaining records of the Collateral. Debtor's failure to provide Secured Party with any such schedule shall not affect the security interests of the Secured Party.

### 5.2.   INVOICES.

Debtor shall cause all of its Invoices to be created and to be numbered in accordance with Debtor's standard practices as of the date of this Agreement and Debtor shall not change such practices without prior written notification to Secured Party and no such change shall result in a material adverse effect to Secured Party. If reasonably requested by Secured Party, all copies of Invoices not previously delivered to Secured Party shall be delivered to Secured Party with each schedule of Receivables. Copies of all Invoices which are voided or cancelled or which, for any other reason, do not evidence a Receivable shall be included in such delivery. If any Invoice or

Page 22 of 47

Confidential – Subject to Protective
Order

AP-0001354

EXECUTION COPY

copy thereof is lost, destroyed, or otherwise unavailable, Debtor shall account in writing, in form satisfactory to Secured Party, for such missing Invoice.

### 5.3.   CHATTEL PAPER.

The original of each item of Chattel Paper evidencing a Receivable shall be delivered to Secured Party with the schedule listing the Receivable which it evidences, together with an assignment in form and content satisfactory to Secured Party of such Chattel Paper by the Debtor to the Secured Party.

### 5.4.   CLOSING DOCUMENTS.

Prior to disbursement of any Advances, Debtor shall furnish or execute and deliver to Secured Party, among other things, with the following, the form and substance of which must be acceptable to Secured Party in its reasonable discretion:

(a)   Evidence of hazard insurance on all Inventory and the load out facilities comprising a part of the Collateral in an amount not less than the lesser of the Indebtedness or the insurable value of such collateral with the Secured Party named in such insurance as Lien holder;

(b)   Limited liability company resolutions of Debtor and any Third Party authorizing this Agreement and the other Transaction Documents to which they are a party;

(c)   A written opinion from Debtor's counsel regarding the existence, standing, power and authority of Debtor to execute and deliver the Transaction Documents and to perform thereunder and opining that the Transaction Documents are valid, binding and enforceable in accordance with their terms and any such other matters as Secured Party may reasonably require, which opinion shall be in the form of Exhibit H attached hereto;

(d)   If applicable, Landlord Lien Waiver and Subordination Agreements from lessors of any leased property related to the load out facilities that are a part of the Collateral;

(e)   Revolving Line of Credit Note;

(f)   This Agreement;

(g)   Debtor's General Certificates in the form of Exhibit I attached hereto; and

(h)   all Transaction Documents identified in Exhibit C attached hereto and incorporated herein.

## 6. COLLECTIONS.

Unless Secured Party notifies Debtor that it specifically dispenses with one or more of the following requirements, Debtor shall direct all Account Debtors to make electronic payments on

Page 23 of 47

Confidential – Subject to Protective Order

AP-0001355

EXECUTION COPY

Receivables directly to the United Payment Account and any other Proceeds of Receivables that are received by Debtor, including, without limitation, payments on Receivables, shall be held by Debtor in trust for Secured Party, shall not be commingled with any assets of either Debtor, and shall be delivered immediately to the United Payment Account.  Any payments that are received by Debtor in a form other than electronic payment, including, without limitation, payments on Receivables, shall be held by Debtor in trust for Secured Party, shall not be commingled with any assets of Debtor, and shall be delivered immediately to the Lockbox Account.  Funds in the United Payment Account shall be handled in accordance with Article 2 of this Agreement.

## 7.  PROMISE TO PAY CERTAIN PAYMENTS.

7.1.   PROMISE TO PAY MONTHLY INTEREST PAYMENTS; PROMISE TO PAY PRINCIPAL AT MATURITY OR TO ALLEVIATE EXCESS OVER BORROWING CAPACITY.

(a)   Debtor promises to pay to Secured Party, and, if sufficient funds are available, authorizes the Secured Party to debit from the United Payment Account, the accrued interest on the outstanding principal of Advances at the daily fluctuating per annum rate specified in **Item 10** of the Schedule, and as further evidenced by the Revolving Line of Credit Note referenced in Section 5.4(e) of this Agreement. Any change in the interest rate resulting from a change in the Prime Rate shall take effect simultaneously with such change in the Prime Rate.  Interest shall be computed on the daily unpaid principal balance of Advances.  Interest shall be calculated for each calendar day at 1/360th of the applicable per annum rate which will result in an effective per annum rate higher than that specified in **Item 10** of the Schedule.  In no event shall the rate of interest exceed the maximum rate permitted by applicable law.  If Debtor pays to Secured Party interest in excess of the amount permitted by applicable law, such excess shall be applied in reduction of the principal of Advances made pursuant to this Agreement, and any remaining excess interest, after application thereof to the principal of Advances, shall be refunded to Debtor.  Interest shall be paid (A) on the 5th day of each month in arrears , (B) on termination of this Agreement, pursuant to Section 13.16, (C) on acceleration of the time for payment of the Indebtedness, pursuant to Section 11.2, or (D) on the date the Indebtedness is paid in full, whichever occurs first (the "Interest Payment Date").  On each Interest Payment Date, before funds in the United Payment Account are applied to any cash needs of the Debtor Accounts, the funds in the United Payment Account shall be applied first to any unpaid fees, costs or expenses under the Transaction Documents, second to accrued interest on Advances under the Revolving Line of Credit Note, and third to any cash needs of the Debtor Accounts, and then to the outstanding principal balance of Advances on the Revolving Line of Credit Note. In the event that on any Interest Payment Date the funds in the United Payment Account are insufficient to pay all unpaid fees, costs and expenses under the Transaction Documents and all accrued interest on the Revolving Line of Credit Note and there is not sufficient Borrowing Capacity to fund such payment with an Advance, Debtor shall within five (5) Business Days following written notice from Secured Party that there are not sufficient funds to pay accrued interest, deposit or cause to be deposited into the United Payment Account or pay or cause to be paid directly to Secured Party funds sufficient to pay such accrued interest.

Confidential – Subject to Protective Order

AP-0001356

EXECUTION COPY

(b)     The outstanding principal balance of Advances shall (A) be paid daily to the extent of available funds in accordance with Article 2 of this Agreement, and (B), in any event, shall be paid in full (i) at the Maturity Date, (ii) upon termination of this Agreement pursuant to Section 13.16 of this Agreement, or (iii) upon acceleration of the time for payment of the Indebtedness pursuant to Section 11.2 of this Agreement.   Prior to any such maturity, termination or acceleration, the collected balance in the United Payment Account not then payable to Secured Party for interest, fees or expenses hereunder shall be applied by Secured Party on each Business Day to the outstanding balance of principal Advances in the manner provided in Article 2.

### 7.2.   PROMISE TO PAY INTEREST AFTER THE MATURITY.

At Secured Party's option, after maturity of the Indebtedness, whether by passage of time, termination of this Agreement or acceleration, interest will accrue on the outstanding principal of Advances at the annual rate set forth in **Item 10** of the Schedule or, following written notice from Secured Party to Debtor, at the annual rate of the Prime Rate plus four percent (4%) (the "Default Rate"), not to exceed eight percent (8%), per year on the balance of the Indebtedness not paid at maturity.

### 7.3.   PROMISE TO PAY FEES.

Debtor promises to pay to Secured Party any fees specified in **Item 11** of the Schedule.

### 7.4.   PROMISE TO PAY COSTS AND EXPENSES.

(a)     Debtor agrees to pay to Secured Party, on demand, all costs and expenses as provided in this Agreement, and all costs and expenses incurred by Secured Party from time to time in connection with this Agreement, including, without limitation, those incurred in:  (i) preparing, negotiating, amending, waiving, or granting consent with respect to the terms of any or all of the Transaction Documents; (ii) enforcing the Transaction Documents; (iii) performing, pursuant to Section 13.5, Debtor's duties under the Transaction Documents, upon Debtor's failure to perform them; (iv) filing financing statements, assignments, or other documents relating to the Collateral (e.g., filing fees, recording taxes, and documentary stamp taxes); (v) maintaining the United Payment Account, but not ordinary, general and administrative expenses; (vi) administering the Transaction Documents, but not ordinary general and administrative expenses; (vii) compromising, pursuing, or defending any controversy, action, or proceeding resulting, directly or indirectly, from Secured Party's relationship with Debtor, regardless of whether Debtor is a party to such controversy, action, or proceeding and of whether the controversy, action, or proceeding occurs before or after the Indebtedness has been paid in full; (viii) realizing upon or protecting any Collateral; (ix) enforcing or collecting any Indebtedness or guaranty thereof; (x) employing collection agencies or other agents to collect any or all of the Receivables after an Event of Default; (xi) examining Debtor's books and records or inspecting the Collateral including, without limitation, the reasonable costs of examinations and inspections conducted by third parties; (xii) obtaining independent appraisals from time to time as deemed necessary or appropriate by Secured Party after an Event of Default or with Debtor's consent; and (xiii) obtaining independent onsite surveys of Inventory.

Page 25 of 47

(b)      Without limiting Section 7.4(a), Debtor also agrees to pay to Secured Party, on demand, the reasonable, actual fees and disbursements incurred by Secured Party for attorneys retained by Secured Party for advice, suit, appeal, or insolvency or other proceedings under the Federal Bankruptcy Code or otherwise, or in connection with any purpose specified in Section 7.4(a).

## 8.  PROCEDURES AFTER SCHEDULING RECEIVABLES.

### 8.1.   CREDIT AND EXTENSIONS.

(a)      Granting of Credits and Extensions.  Debtor may grant such Credits and such Extensions as are ordinary in the usual course of Debtor's business without the prior consent of Secured Party; provided, however, that any such Extension shall not extend the time for payment beyond thirty (30) days after the original due date as shown on the Invoice evidencing the related Receivable, or as computed based on the information set forth on such Invoice.

(b)      Accounting for Credits and Extensions.  Debtor shall make a full accounting of each grant for a Credit or Extension, including a brief description of the reasons therefor and a copy of all credit memoranda.  Such accountings shall be in form reasonably satisfactory to Secured Party and shall be delivered to Secured Party daily or at such other intervals as may be specified in **Item 9** of the Schedule.  All credit memoranda issued by Debtor shall be numbered and copies of the same delivered to Secured Party in the same manner as provided in Section 5.2 with respect to Invoices.

(c)      Adjustment to Receivables Borrowing Base.  The Receivables Borrowing Base will be reduced by the amount of all Credits reflected in an accounting required by Section 8.1(b) and by the full amount of any Receivables for which Extensions were granted without the prior written consent of Secured Party.

### 8.2.   RETURNED INSTRUMENTS.

In the event that any check or other instrument received in payment of a Receivable shall be returned uncollected for any reason, Secured Party shall again forward the same for collection or return the same to Debtor.  Upon receipt of a returned check or instrument by Debtor, the Debtor shall immediately make the necessary entries on its books and records to reinstate the Receivable as outstanding and unpaid and immediately notify Secured Party of such entries.  All Receivables of an Account Debtor with respect to which such check or instrument was received shall thereupon become Ineligible Receivables.

### 8.3.   DEBIT MEMORANDA.

(a)      If reasonably requested by Secured Party, Debtor shall deliver, together with the schedule of Receivables provided for in **Item 9** of the Schedule, copies of all debit memoranda issued by Debtor.

Confidential – Subject to Protective Order

AP-0001358

EXECUTION COPY

(b)    All debit memoranda issued by Debtor shall be numbered in the same manner as provided in Section 5.2 with respect to Invoices.

8.4.    NOTES RECEIVABLE.

Debtor shall not accept any note or other instrument (except a check or other instrument for the immediate payment of money) with respect to any Receivable without the prior written consent of Secured Party.  If Secured Party, in its reasonable judgment, consents to the acceptance of any such note or instrument, the same shall be considered as evidence of the Receivable giving rise to such note or instrument, shall be subject to the security interests of the Secured Party, and shall not constitute payment of such Receivable, and the Debtor shall forthwith endorse such note or instrument to the order of Secured Party and deliver the same to Secured Party, together with the Schedule listing the Receivables which it evidences.  Upon collection, the proceeds of such note or instrument may be applied directly to unpaid Advances, interest, and costs and expenses as provided in Section 7.1.

## 9.  AFFIRMATIVE COVENANTS.

So long as any part of the Indebtedness remains unpaid, or this Agreement remains in effect, Debtor agrees to comply with the covenants contained in **Items 14 and 19** of the Schedule or elsewhere in this Agreement, and with the covenants listed below:

9.1.    FINANCIAL STATEMENTS.

Debtor shall furnish to Secured Party the following:

(a)    Within ninety (90) days after the end of each fiscal year, audited, consolidated and consolidating financial statements of Debtor and each consolidated subsidiary of Debtor as of the end of such year, fairly presenting Debtor's and each consolidated Subsidiary's financial position, which statements shall consist of a balance sheet and related statements of income, retained earnings, and cash flow covering the period of Debtor's immediately preceding fiscal year, and which shall be prepared in accordance with GAAP by independent certified public accountants reasonably satisfactory to Secured Party.

(b)    Within forty-five (45) days of the end of each quarter, company prepared financial statements of the Debtor and its consolidated subsidiaries, which statements shall consist of a balance sheet and related statements of income, retained earnings and cash flow covering such quarter.

(c)    Within twenty (20) days after the end of each month, consolidated financial statements of Debtor and each consolidated subsidiary, as of the end of such prior month, fairly presenting Debtor's and subsidiary's financial position, which statements shall consist of a balance sheet and related statements of income, borrowing base report, and covenants report, covering the preceding calendar month, all in such detail as Secured Party may reasonably request and signed and certified to be correct by the president or chief financial

Confidential – Subject to Protective Order

AP-0001359

officer of Debtor or other financial officer satisfactory to Secured Party in the form of Exhibit A attached hereto and made a part hereof. Debtor shall also provide Secured Party with a copy of any other financial statements as and when prepared by Debtor regarding sources and uses of cash.

(d)     Within twenty (20) days after the end of each fiscal quarter of Debtor, a compliance certificate executed by the president or chief financial officer of Debtor or other financial officer satisfactory to Secured Party in the form of Exhibit B attached hereto and made part hereof.

(e)     Within five (5) Business Days of receipt of a written request from Secured Party, such additional information as Secured Party may from time to time reasonably request regarding the financial and business affairs of Debtor or any consolidated subsidiary.

9.2.    U.S. GOVERNMENT AND OTHER SPECIAL RECEIVABLES.

Debtor shall exclude from the Receivables Borrowing Base in its reports to Secured Party any Receivable as to which the perfection, enforceability, or validity of Secured Party's security interests in such Receivable, or Secured Party's right or ability to obtain direct payment to Secured Party of the Proceeds of such Receivable, is governed by any federal statutory requirements including, without limitation, any Receivable subject to the Federal Assignment of Claims Act of 1940, as amended, unless Debtor has perfected Secured Party's Lien in such Receivables under such federal statutory requirements.

9.3.    TERMS OF SALE.

The terms on which sales or leases giving rise to Receivables are made shall be as specified in **Items 15** of the Schedule.

9.4.    BOOKS AND RECORDS.

Debtor shall maintain, at its own cost and expense, accurate and complete books and records with respect to the Collateral, in form reasonably satisfactory to Secured Party, and including, without limitation, records of all payments received and all Credits and Extensions granted with respect to the Receivables, of the return, rejection, repossession, stoppage in transit, loss, damage, or destruction of any Inventory, and of all other dealings affecting the Collateral. After the occurrence and until the wavier or cure of an Event of Default, Debtor shall, upon request of Secured Party, deliver such books and records to Secured Party or its representative on request. At Secured Party's request, Debtor shall mark all or any records to indicate the Secured Party's security interest. Debtor shall further indicate the Secured Party's security interests on all financial statements issued by it or shall cause the Secured Party's security interests to be so indicated by its accountants.

Confidential – Subject to Protective Order

AP-0001360

### 9.5.   EXAMINATIONS.

Debtor shall at all reasonable times and from time to time permit Secured Party or its agents to inspect the Collateral and to examine and make extracts from, or copies of, any of Debtor's books, ledgers, reports, correspondence, and other records.

### 9.6.   VERIFICATION OF COLLATERAL.

Secured Party shall have the right to verify all or any Collateral in any manner and through any medium Secured Party may consider appropriate and Debtor agrees to furnish all assistance and information and perform any acts which Secured Party may require in connection therewith.

### 9.7.   RESPONSIBLE PARTIES.

Debtor shall notify Secured Party of the occurrence of any event specified in Section 1.1(aa)(iv) with respect to any Responsible Party promptly after receiving notice thereof.

### 9.8.   TAXES.

Debtor shall promptly pay and discharge all taxes, assessments, and other governmental charges prior to the date on which penalties are attached thereto, or which may give rise to any Lien or claim upon the Collateral, establish adequate reserves for the payment of such taxes, assessments, and other governmental charges, make all required withholding and other tax deposits, and, upon request, provide Secured Party with receipts or other proof that such taxes have been paid in a timely fashion; provided, however, that nothing contained herein shall require the payment of any tax, assessment, or other governmental charge so long as its validity is being contested in good faith, and by appropriate proceedings diligently conducted, and adequate reserves for the payment thereof have been established.

### 9.9.   LITIGATION.

(a)      Debtor shall promptly notify Secured Party in writing of any litigation, proceeding, or counterclaim against, or of any investigation of, Debtor or any subsidiary if: (i) the outcome of such litigation, proceeding, counterclaim, or investigation involves $100,000.00 or more and is not covered in full by insurance or third party indemnity; (ii) the outcome of such litigation, proceeding, counterclaim or investigation may materially and adversely affect the finances or operations of either Debtor or any subsidiary or title to, or the value of, any Collateral; or (iii) such litigation, proceeding, counterclaim, or investigation questions the validity of any Transaction Document or any action taken, or to be taken, pursuant to any Transaction Document or Secured Party's Lien on and security interest in and to the Collateral.

(b)      Debtor shall furnish to Secured Party such information regarding any such litigation, proceeding, counterclaim, or investigation as Secured Party shall request.

Confidential – Subject to Protective Order

AP-0001361

9.10. <u>INSURANCE</u>.

(a)    Debtor shall at all times carry and maintain in full force and effect such insurance as Secured Party may from time to time reasonably require, in coverage, form and amount, and issued by insurers, reasonably satisfactory to Secured Party, including, without limitation: hazard insurance on the Collateral in an amount not less than the lesser of the outstanding Indebtedness or full insurable value thereof, with Secured Party named as lien holder; workers' compensation or similar insurance; public liability insurance; business interruption insurance; and insurance against such other risks as are usually insured against by business entities of established reputation engaged in the same or similar businesses as Debtor and similarly situated. Secured Party acknowledges that Debtor's current coverages are adequate as of the date of this Agreement.

(b)    Debtor shall deliver to Secured Party the policies of insurance required by Secured Party, with appropriate endorsements designating Secured Party as an additional insured, mortgagee and loss payee as requested by Secured Party. Each policy of insurance shall provide that if such policy is cancelled for any reason whatsoever, if substantial change is made in the coverage which affects Secured Party or if such policy is allowed to lapse for nonpayment of premium, such cancellation, change or lapse shall not be effective as to Secured Party until thirty (30) days after receipt by Secured Party of written notice thereof from the insurer issuing such policy.

(c)    Debtor hereby appoints Secured Party as its attorney-in-fact, with full authority in the place and stead of Debtor, coupled with an interest, and in the name of Debtor, Secured Party, or otherwise, from time to time in Secured Party's discretion, to take any actions and to execute any instruments which Secured Party may deem necessary or desirable to obtain, adjust, make claims under, and otherwise deal with insurance required pursuant hereto and to receive, endorse, and collect any drafts or other instruments delivered in connection therewith.

9.11. <u>GOOD STANDING; BUSINESS</u>.

(a)    Debtor shall take all necessary steps to preserve its existence and its right to conduct business in all states in which the nature of its business or ownership of its property requires such qualification.

(b)    Debtor shall engage only in the business conducted by it on the date of this Agreement.

9.12. <u>PENSION REPORTS</u>.

Upon the occurrence of any Pension Event, Debtor shall furnish to Secured Party, as soon as possible and, in any event, within thirty (30) days after Debtor knows, or has reason to know, of such occurrence, the statement of Debtor setting forth the details of such Pension Event and the action which Debtor proposes to take with respect thereto.

Confidential – Subject to Protective Order

AP-0001362

### 9.13.   NOTICE OF NON-COMPLIANCE.

Debtor shall notify Secured Party in writing of any failure by Debtor or any Third Party to comply with any provision of any Transaction Document immediately upon learning of such non-compliance, or if any representation or warranty contained in any Transaction Document is no longer true.

### 9.14.   COMPLIANCE WITH ENVIRONMENTAL LAWS.

Debtor shall comply in all material respects with all Environmental Laws.

### 9.15.   DEFEND COLLATERAL.

Debtor shall defend the Collateral against the claims and demands of all other parties (other than Secured Party), including, without limitation, defenses, setoffs, recoupments and counterclaims asserted by any Account Debtor against Debtor or Secured Party.

### 9.16.   USE OF PROCEEDS.

Debtor shall use the proceeds of Advances solely for Debtor's working capital needs incurred in the ordinary course of business.

### 9.17.   COMPLIANCE WITH LAWS.

Debtor shall comply in all material respects with all applicable laws, rules, regulations, and other legal requirements with respect to their business and the use maintenance, and operations of the real and personal property owned or leased by Debtor in the conduct of its business.

### 9.18.   MAINTENANCE OF PROPERTY.

Debtor shall maintain its property, including, without limitation, the Collateral, in good condition and repair.

### 9.19.   LICENSES, PERMITS, ETC.

Debtor shall maintain all of its franchises, grants, authorizations, licenses, permits, easements, consents, certificates, and orders, if any, in full force and effect until their respective expiration dates.

### 9.20.   TRADEMARKS AND PATENTS.

Debtor shall maintain all of its trademarks, trademark rights, patents, patent rights, licenses, permits, tradenames, tradename rights, and approvals, if any, in full force and effect until their respective expiration dates.

Confidential – Subject to Protective Order

AP-0001363

EXECUTION COPY

9.21.  ERISA.

Debtor shall comply with the provisions of ERISA and the Internal Revenue Code with respect to each Pension Plan.

9.22.  MAINTENANCE OF OWNERSHIP.

Debtor and Guarantors shall at all times maintain ownership of the percentages of issued and outstanding membership units of each subsidiary set forth in **Item 20** of the Schedule and notify Secured Party in writing prior to the incorporation or establishment of any new subsidiary. Debtor and Guarantors shall not purchase or retire any of its membership interests or units or issue any membership interests or units, except pro rata to its present members, or otherwise change their capital structure or change the relative rights, preferences, or limitations relating to any of their membership units without the prior consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that changes in ownership which are, in the aggregate, less than 5% of the membership units shall not require consent or be a violation of this covenant.

9.23.  ACTIVITIES OF SUBSIDIARIES.

Unless the provisions of this Section 9.24 are expressly waived by Secured Party in writing, if Debtor at any time has any subsidiaries, Debtor shall cause each subsidiary to comply with Sections 9.1, 9.8, 9.10(a), 9.11, 9.14 and 9.17 through 9.21, inclusive and any of the provisions contained in Item 15 of the Schedule, and shall cause each subsidiary to refrain from doing any of the acts proscribed by Sections 10.2, 10.3, and 10.5 through 10.11, inclusive, or proscribed by any of the provisions contained in **Item 14** of the Schedule.

9.24.  CHANGE OF ADDRESS/LOCATION OF COLLATERAL.

Debtor shall notify Secured Party in writing within ten (10) days prior to any change of its name, principal address, state of organization, or location of any Collateral.

9.25.  PAYMENT DIRECT TO UNITED PAYMENT ACCOUNT.

Debtor shall direct all Account Debtors to make payments on Receivables directly to the United Payment Account and shall cause any such payments not so made directly to the United Payment Account to be made to the Secured Party utilizing the methods set forth in the Secured Party Lockbox Agreement.

**10. NEGATIVE COVENANTS.**

So long as any part of the Indebtedness remains unpaid or this Agreement remains in effect, Debtor, without the prior written consent of Secured Party, shall not violate any covenant contained in **Item 19** of the Schedule, and Debtor (and in the case of Section 10.6, the Guarantors) shall not:

Confidential – Subject to Protective
Order

AP-0001364

10.1.  LOCATIONS OF BUSINESS RECORDS.

Move the records concerning the Collateral from the location where they are kept as specified in **Items 7** of the Schedule.

10.2.  BORROWED MONEY.

Without the prior written consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed, create, incur, assume, or suffer to exist any additional liability for borrowed money, except to Secured Party and except as may be specified in **Item 16** of the Schedule.

10.3.  SECURITY INTEREST AND OTHER ENCUMBRANCES.

Create, incur, assume, or suffer to exist any mortgage, security interest, Lien, or other encumbrance upon any of the Collateral, whether now owned or hereafter acquired, except mortgages, security interests, Liens and encumbrances (a) in favor of the Secured Party, and (b) as may be specified in **Item 6** of the Schedule.

10.4.  STORING AND USE OF COLLATERAL.

Place the Collateral in any warehouse which may issue a negotiable Document with respect thereto or use the Collateral in violation of any provision of the Transaction Documents, of any applicable statute, regulation, or ordinance, or of any policy insuring the Collateral.

10.5.  MERGERS, CONSOLIDATIONS, OR SALES.

(a) Merge or consolidate with or into any corporation, partnership, limited partnership or limited liability company without the prior consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed; (b) convey, lease, or sell all or any material portion of its property or assets or business to any other Person, except for sales of Inventory in the ordinary course of its business and in accordance with the terms of this Agreement and leases and subleases in the ordinary course of business; or (c) convey, lease, or sell any of its assets to any Person, for less than the fair market value thereof.

10.6.  MEMBERSHIP INTERESTS.

Purchase or retire any of its membership interests or units or issue any membership interests or units, except pro rata to its present members, or otherwise change Debtor's capital structure or change the relative rights, preferences, or limitations relating to any of its membership units without the prior consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that changes in ownership which are, in the aggregate, less than 5% of the membership units shall not require consent or be a violation of this covenant.

Confidential – Subject to Protective Order

AP-0001365

EXECUTION COPY

10.7. <u>DIVIDENDS OR DISTRIBUTIONS</u>.

Pay or declare any cash or other dividends or distributions on any of its membership units except that (a) a subsidiary may pay dividends of any kind to Debtor, and (b) Debtor shall not pay dividends to its parent or members in excess of earnings for the applicable time period.

10.8. <u>INVESTMENTS AND ADVANCES</u>.

Make any investment in, or advances to, any other Person, except (a) advance payments or deposits against purchases made in the ordinary course of Debtor's regular business; (b) direct obligations of the United States of America; (c) any existing investments in, or existing advances to the subsidiaries; or (d) any investments or advances that may be specified in **Item 17** of the Schedule.

10.9. <u>GUARANTIES</u>.

Without the prior written consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed, become a guarantor, a surety, or otherwise liable for the debts or other obligations of any other Person other than an Affiliate, parent or subsidiary, whether by guaranty or suretyship agreement, agreement to purchase indebtedness, agreement for furnishing funds through the purchase of goods, supplies, or services (or by way of stock or membership unit purchase, capital contribution, advance, or loan) for the purpose of paying or discharging indebtedness, or otherwise, except as an endorser of instruments for the payment of money deposited to its bank account for collection in the ordinary course of business and except as may be specified in **Item 18** of the Schedule.

10.10. <u>NAME CHANGE</u>.

Change its name or form or state of organization without giving at least thirty (30) days prior written notice of its proposed new name or form or state of organization to Secured Party.

10.11. <u>DISPOSITION OF COLLATERAL</u>.

Debtor may not sell, assign, or otherwise transfer, dispose of, or encumber the Collateral or any interest therein or grant a Lien on, security interest therein, or lease or license thereof, except (a) to Secured Party, and (b) the sale of any Collateral so long as the proceeds from such sale are deposited in the United Payment Account.

10.12. <u>FINANCIAL COVENANTS</u>.

Fail to comply with the financial covenants set forth in **Item 19** of the Schedule.

10.13. <u>ADVANCES FOR WORKING CAPITAL ONLY</u>.

Debtor shall not use Advances provided by Secured Party for any other purpose other than working capital purposes incurred in Debtor's ordinary course of business.

Confidential – Subject to Protective Order

AP-0001366

EXECUTION COPY

## 11. DEFAULT.

### 11.1.  EVENTS OF DEFAULT.

The occurrence and continuance uncured beyond any applicable cure period of any one or more of the following events shall constitute an event of default (individually an "Event of Default", and collectively, "Events of Default"):

(a)  Nonpayment. Nonpayment when due of any principal, interest, premiums, fees, costs, or expenses due under the Transaction Documents, which nonpayment continues uncured for five (5) Business Days following notice of non-payment from Secured Party to the Debtor.

(b)  Negative Covenants. Default in the observance of any of the covenants or agreements of Debtor contained in Article 10 of this Agreement which is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

(c)  Article 6. Default in the observance of any of the covenants or agreements of Debtor contained in Article 6 of this Agreement which is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

(d)  Other Covenants. Default in the observance of any of the covenants or agreements of Debtor contained in the Transaction Documents, other than in Article 10, Article 6 or Sections 7.1, 7.2, 7.3, or 7.4, or in any other agreement with Secured Party which is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

(e)  Cessation of Business or Voluntary Insolvency Proceedings. The (i) cessation of operations of Debtor's business as conducted on the date of this Agreement; (ii) filing by Debtor of a petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, relief as a debtor, or other relief under the bankruptcy, insolvency, or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction now or hereafter in effect; (iii) making by Debtor of a general assignment for the benefit of creditors; (iv) consent by Debtor to the appointment of receiver or trustee, including, without limitation, a "custodian", as defined in the Federal Bankruptcy Code, for Debtor or any of Debtor's assets; (v) making of any, or sending of any, notice of any intended, bulk sale by Debtor; or (vi) execution by Debtor of a consent to any other type of insolvency proceeding (under the Federal Bankruptcy Code or otherwise) or any formal or informal proceeding for the dissolution or liquidation of, or settlement of, claims against or winding up of affairs of, Debtor.

(f)  Involuntary Insolvency Proceedings. (i) The appointment of a receiver, trustee, custodian, or officer performing similar functions, including, without limitation, a "custodian", as defined in the Federal Bankruptcy Code, for Debtor or any of Debtor's assets; or the filing against Debtor of a request or petition for liquidation, reorganization, arrangement, adjudication as a bankrupt, or other relief under the bankruptcy, insolvency, or similar laws of the United States of America, any state or territory thereof, or any foreign jurisdiction now or hereafter in effect; or of any other type of insolvency proceeding (under the Federal Bankruptcy

Confidential – Subject to Protective Order

AP-0001367

EXECUTION COPY

Code or otherwise) or any formal or informal proceeding for the dissolution or liquidation of, settlement of claims against, or winding up of affairs of Debtor shall be instituted against Debtor; and (ii) such appointment shall not be vacated, or such petition or proceeding shall not be dismissed, within sixty (60) days after such appointment, filing, or institution.

(g)     Other Indebtedness and Agreements.   Failure by Debtor to pay, when due, (or, if permitted by the terms of any applicable documentation, within any applicable grace period) any indebtedness owing by Debtor to Secured Party or any other Person (other than the Advances   pursuant to this Agreement, and including, without limitation, indebtedness evidencing a deferred purchase price), whether such indebtedness shall become due by scheduled maturity, by required prepayment, by acceleration, by demand, or otherwise, or failure by Debtor to perform any term, covenant, or agreement on its part to be performed under any agreement or instrument (other than a Transaction Document) evidencing or securing or relating to any indebtedness owing by Debtor when required to be performed if the effect of such failure is to permit the holder to accelerate the maturity of such indebtedness, if (i) such failure is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor or (ii) adequate cash reserves for payment of such indebtedness are not established with Secured Party.

(h)     Judgments.   Any judgment or judgments against Debtor (other than any judgment for which Debtor is fully insured or other than a money judgment for less than $25,000) shall remain unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for a period of thirty (30) days after notice thereof by Secured Party to Debtor.

(i)     Pension Default.   Any Reportable Event which Secured Party shall determine in good faith constitutes grounds for the termination of any Pension Plan by the Pension Benefit Guaranty Corporation, or for the appointment by an appropriate United States district court of a trustee to administer any Pension Plan, shall occur and shall continue thirty (30) days after written notice thereof to Debtor by Secured Party; or the Pension Benefit Guaranty Corporation shall institute proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; or a trustee shall be appointed by an appropriate United States district court to administer any Pension Plan; or any Pension Plan shall be terminated; or Debtor shall withdraw from a Pension Plan in a complete withdrawal or a partial withdrawal; or there shall arise vested unfunded liabilities under any Pension Plan that, in the good faith opinion of Secured Party, have or will or might have a material adverse effect on the finances or operations of Debtor; or Debtor shall fail to pay to any Pension Plan any contribution which it is obligated to pay under the terms of such plan or any agreement or which is required to meet statutory minimum funding standards.

(j)     Collateral; Impairment.   There shall occur with respect to the Collateral any (i) misappropriation, conversion, diversion, or fraud; (ii) levy, seizures, or attachment; or (iii) material uninsured loss, theft, or damage and such event shall continue uncured for thirty (30) days following notice from Secured Party to Debtor.

(k)     Insecurity; Change.   Secured Party shall believe in good faith that the prospect of payment of all, or any part, of the Indebtedness or performance of Debtor's obligations under the Transaction Documents or any other agreement between Secured Party and

Confidential – Subject to Protective
Order

AP-0001368

EXECUTION COPY

Debtor is impaired; or there shall occur any materially adverse change in the business or financial condition of Debtor which is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

(l)   Third Party Default.  There shall occur with respect to any Third Party, including, without limitation, any guarantor (i) any event described in Section 11.1(e), 11.1(f), 11.1(g), or 11.1(h); (ii) any pension default or Reportable Event such as described in Section 11.1(i) with respect to any Pension Plan maintained by such Third Party; or (iii) any failure by such Third Party to perform in accordance with the terms of any agreement between such Third Party and Secured Party, which default is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

(m)   Representations.  Any certificate, statement, representation, warranty, or financial statement furnished by, or on behalf of, Debtor or any Third Party, pursuant to, or in connection with, this Agreement (including, without limitation, representations and warranties contained herein) or as an inducement to Secured Party to enter into this Agreement or any other lending agreement with Debtor shall prove to have been false in any material respect at the time as of which the facts therein set forth were certified or to have omitted any substantial contingent or unliquidated liability or claim against Debtor or any such Third Party, or if on the date of the execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed by any such statement or certificate  which shall not have been disclosed in writing to Secured Party at, or prior to, the time of such execution and such event or condition is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

(n)   Challenge to Validity.  Debtor or any Third Party commences any action or proceeding to contest the validity or enforceability of any Transaction Document or any Lien or security interest granted or obligations evidenced by any Transaction Document.

(o)   Death or Incapacity; Termination.  Any Third Party that is a natural person dies or becomes incapacitated, or terminates or attempts to terminate, in accordance with its terms or otherwise, any guaranty or other Transaction Document executed by such Third Party.

(p)   Change of Ownership.  Purchase or retire any of its membership interests or units or issue any membership interests or units, except pro rata to its present members, or otherwise change Debtor's capital structure or change the relative rights, preferences, or limitations relating to any of its membership units without the prior consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that changes in ownership which are, in the aggregate, less than 5% of the membership units shall not require consent or be a violation of this covenant.

(q)   Impermissible Grant of Security Interest.  If a security interest, Lien or other encumbrance shall be granted or otherwise acquired in or with respect to the Collateral without the prior written consent of Secured Party, which consent shall not be unreasonably withheld, conditioned or delayed if Debtor and Guarantors are in compliance with all financial covenants.

Confidential – Subject to Protective Order

AP-0001369

EXECUTION COPY

(r)     Adverse Effect Under Mercuria Documents.  The termination of (i) that certain Coal Services Agreement dated on an even date hereof between MR Coal and Debtor, (ii) that certain Master Coal Purchase and Sale Agreement dated on an even date hereof between MR Coal and Debtor, (iii) that certain Guaranty Reimbursement and Indemnification Agreement dated on an even date hereof between MR Coal and Debtor, (iv) that certain Guarantee dated on an even date hereof by Mercuria Energy Group Limited, a company organized under the laws of Cyprus, in favor of Debtor; or the election of rights under (i) that certain Guarantee by Debtor in favor of MR Coal and Mercuria US Asset Holdings, LLC, a Delaware limited liability company, ("MUSAH") or (ii) that certain Put and Call Agreement dated on an even date hereof by and between Debtor and MUSAH.

## 11.2.   EFFECTS OF AN EVENT OF DEFAULT.

(a)     Upon the happening of one or more Events of Default (except an Event of Default under either Section 11.1(e) or 11.1(f)), Secured Party may declare any obligations it may have hereunder to be cancelled, and the principal of the Indebtedness then outstanding to be immediately due and payable, together with all interest thereon and costs and expenses accruing under the Transaction Documents.  Upon such declaration, any obligations Secured Party may have hereunder shall be immediately cancelled, and the Indebtedness then outstanding shall become immediately due and payable without presentation, demand, or further notice of any kind to Debtor.

(b)     Upon the happening of one or more Events of Default under Section 11.1(e) or 11.1(f), Secured Party's obligations hereunder shall be cancelled immediately, automatically, and without notice, and the Indebtedness then outstanding shall become immediately due and payable without presentation, demand, or notice of any kind to Debtor.  Upon the happening of one or more Events of Default, all requests for an Advance from Debtor pursuant to Section 2.1 of this Agreement shall be denied by Secured Party.

(c)     If any Event of Default shall be cured prior to the later of (i) the expiration of any applicable grace period or (ii) the expiration of any Extensions granted in writing by Secured Party, Debtor's rights to request Advances shall be reinstated at the time such Events of Default are cured.

## 12. SECURED PARTY'S RIGHTS AND REMEDIES.

### 12.1.   GENERALLY.

Secured Party's rights and remedies with respect to the Collateral, in addition to those rights granted herein and in any other agreement between Debtor and Secured Party now or hereafter in effect, shall be those of a secured party under the UCC as in effect in the State and under any other applicable law.

Confidential – Subject to Protective Order

AP-0001370

### 12.2.  NOTIFICATION OF ACCOUNT DEBTORS.

Upon the occurrence of an Event of Default or an event which with notice or lapse of time, or both, would constitute an Event of Default, Secured Party may, at any time and from time to time, notify any and all Account Debtors of the Secured Party's security interests and may direct such Account Debtors to make all payments on Receivables directly to Secured Party.

### 12.3.  POSSESSION OF COLLATERAL.

Whenever Secured Party may take possession of the Collateral, pursuant to Section 12.1, Secured Party may take possession of the Collateral on Debtor's premises or may remove the Collateral, or any part thereof, to such other places as the Secured Party may, in its sole discretion, determine.  If requested by Secured Party, Debtor shall assemble the Collateral and deliver it to Secured Party at such place as may be designated by Secured Party.

### 12.4.  COLLECTION OF RECEIVABLES.

Upon the occurrence of an Event of Default or an event which with notice or lapse of time, or both, would constitute an Event of Default, Secured Party may demand, collect, and sue for all monies and Proceeds due, or to become due, on the Receivables (in either Debtor's or Secured Party's name at the latter's option) with the right to enforce, compromise, settle, or discharge any or all Receivables.  If Secured Party takes any action contemplated by this Section with respect to any Receivable, Debtor shall not exercise any right that Debtor would otherwise have had to take such action with respect to such Receivable.

### 12.5.  ENDORSEMENT OF CHECKS; DEBTOR'S MAIL.

Debtor hereby irrevocably appoints Secured Party Debtor's agent with full power, which power is coupled with an interest, in the same manner, to the same extent, and with the same effect as if Debtor were to do the same to do any of the following:  upon the occurrence of an Event of Default or an event which with notice or lapse of time, or both, would constitute an Event of Default, to endorse Debtor's name on any Instruments or Documents pertaining to any Collateral, to receive and collect all mail addressed to Debtor, to direct the place of delivery of such mail to any location designated by Secured Party, to open such mail, to remove all contents therefrom, and to retain all contents thereof constituting or relating to the Collateral.  This agency is unconditional and shall not terminate until all of the Indebtedness is paid in full and this Agreement has been terminated.  Secured Party agrees to give Debtor notice in the event it exercises this agency, except with respect to the endorsement of Debtor's name on any instruments or documents pertaining to any Collateral.

Confidential – Subject to Protective Order

AP-0001371

## 13. MISCELLANEOUS.

### 13.1. PERFECTING THE SECURITY INTEREST; PROTECTING THE COLLATERAL.

Debtor hereby authorizes Secured Party to file such financing statements relating to the Collateral with or without Debtor's signature thereon as Secured Party may deem appropriate, and appoints Secured Party as Debtor's attorney-in-fact (without requiring Secured Party) to execute any such financing statement or statements in Debtor's name and to perform all other acts which Secured Party deems appropriate to perfect and continue the Secured Party's security interests and to protect, preserve, and realize upon the Collateral.

### 13.2. COMPLIANCE WITH OTHER LAWS.

Secured Party may comply with any applicable law requirements in connection with a disposition of the Collateral, and compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

### 13.3. WARRANTIES.

Upon an Event of Default, Secured Party may sell the Collateral without warranties and may specifically disclaim any and all warranties with respect to the Collateral of any kind or nature, including, without limitation, of title, possession, quiet enjoyment or the like and such will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

### 13.4. SALES ON CREDIT.

If Secured Party sells any of the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the Indebtedness. If the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral, and the Debtor shall be credited with the proceeds of the sale.

### 13.5. PERFORMANCE OF DEBTOR'S DUTIES.

Upon Debtor's failure to perform any of its duties under the Transaction Documents, including, without limitation, the duty to obtain insurance as specified in Section 9.10, Secured Party may, but shall not be obligated to, perform any or all such duties and the cost of performance shall added to and become part of the Indebtedness.

### 13.6. NOTICE OF SALE.

Without in any way requiring notice to be given in the following manner, Debtor agrees that any notice by Secured Party of any sale, disposition, or other intended action hereunder, or in connection herewith (other than the sale of any mortgaged property in Kentucky, for which notice shall be provided as provided by law and the applicable mortgages), whether required by

Confidential – Subject to Protective Order

AP-0001372

EXECUTION COPY

the UCC or otherwise, shall constitute reasonable notice to Debtor if such notice is mailed by regular or certified mail, postage prepaid, at least ten (10) days prior to such action, to Debtor's address or addresses specified above or to any other address which Debtor has specified in a writing to Secured Party as the address to which notices hereunder shall be given to Debtor. Debtor shall have no obligation to clean up or otherwise prepare the Collateral for sale.

### 13.7.   WAIVER BY SECURED PARTY.

No course of dealing between Debtor and Secured Party and no delay or omission by Secured Party in exercising any right or remedy under the Transaction Documents or with respect to any Indebtedness shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. All rights and remedies of Secured Party are cumulative.

### 13.8.   WAIVER BY DEBTOR.

Secured Party shall have no obligation to take, and Debtor shall have the sole responsibility for taking, any and all steps to preserve all rights against any and all Account Debtors and against any and all prior parties to any note, Chattel Paper, draft, trade acceptance, or other instrument for the payment of money covered by the Secured Party's security interests whether or not in Secured Party's possession. Secured Party shall not be responsible to Debtor for any loss or damage resulting from Secured Party's failure to enforce any Receivables or to collect any moneys due, or to become due, thereunder or other Proceeds constituting Collateral hereunder. Debtor waives protest of any note, check, draft, trade acceptance, or other instrument for the payment of money constituting Collateral at any time held by Secured Party on which Debtor is in any way liable and waives notice of any other action taken by Secured Party, including, without limitation, notice of Secured Party's intent to accelerate the Indebtedness or any part thereof.

### 13.9.   SETOFF.

Without limiting any other right of Secured Party, whenever Secured Party has the right to declare any Indebtedness to be immediately due and payable (whether or not it has so declared), Secured Party, at its sole election, may setoff and recoup against the Indebtedness any and all monies then or thereafter owed to Debtor by Secured Party in any capacity, whether or not the Indebtedness or the obligation to pay such monies owed by Secured Party is then due, and Secured Party shall be deemed to have exercised such right of setoff or recoupment immediately at the time of such election even though any charge therefore is made or entered on Secured Party's records subsequent thereto.

### 13.10.   ASSIGNMENT.

The rights and benefits of Secured Party hereunder shall, if Secured Party so agrees, inure to any party acquiring any interest in the Indebtedness or any part thereof. No assignment shall release Secured Party of its obligations hereunder unless Debtor consents in writing.

Confidential – Subject to Protective Order

AP-0001373

### 13.11. SUCCESSORS AND ASSIGNS.

Secured Party and Debtor, as used herein, shall include the successors or assigns of those parties, except that Debtor shall not have the right to assign its rights hereunder or any interest herein.

### 13.12. MODIFICATION.

No modification, rescission, waiver, release, or amendment of any provision of this Agreement shall be made, except as may be provided by a written agreement signed by Debtor and a duly authorized officer of Secured Party.

### 13.13. COUNTERPARTS.

This Agreement may be executed in any number of counterparts, and by Secured Party and Debtor on separate counterparts, each of which, when so executed and delivered, shall be an original, but all of which shall together constitute one and the same Agreement.

### 13.14. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

Any financial calculation to be made, all financial statements and other financial information to be provided, and all books and records to be kept in connection with the provisions of this Agreement, shall be in accordance with GAAP consistently applied during each interval and from interval to interval; provided, however, that in the event changes in GAAP shall be mandated by the Financial Accounting Standards Board or any similar accounting body of comparable standing, or should be recommended by Debtor's certified public accountants, to the extent such changes would affect any financial calculations to be made in connection herewith, such changes shall be implemented in making such calculations only from and after such date as Debtor and Secured Party shall have amended this Agreement to the extent necessary to reflect such changes in the financial and other covenants to which such calculations related.

### 13.15. INDEMNIFICATION.

(a)    If after receipt of any payment of all, or any part of, the Indebtedness, Secured Party is, for any reason, compelled to surrender such payment to any person or entity because such payment is determined to be void or voidable as a preference, an impermissible setoff, or a diversion of trust funds, or for any other reason, the Transaction Documents shall continue in full force and effect, and Debtor shall be liable, and shall indemnify and hold Secured Party harmless for, the amount of such payment surrendered. The provisions of this Section shall be and remain effective notwithstanding any contrary action which may have been taken by Secured Party in reliance upon such payment, and any such contrary action so taken shall be without prejudice to Secured Party's rights under the Transaction Documents and shall be deemed to have been conditioned upon such payment having become final and irrevocable. The provisions of this Section 13.15(a) shall survive the termination of this Agreement and the Transaction Documents.

Page 42 of 47

Confidential – Subject to Protective Order

AP-0001374

EXECUTION COPY

(b)     Debtor agrees to indemnify, defend, and hold harmless Secured Party from, and against, any and all liabilities, claims, damages, penalties, expenditures, losses, or charges, including, but not limited to, all out-of-pocket costs of investigation, monitoring, legal representations, remedial response, removal, restoration, or permit acquisition, which may now, or in the future, be undertaken, suffered, paid, awarded, assessed, or otherwise incurred by Secured Party or any other Person as a result of the presence of, Release of, or threatened Release of Hazardous Substances on, in, under, or near the property owned, leased, or operated by Debtor. The liability of Debtor under the covenants of this Section 13.15(b) is not limited by any exculpatory provisions in this Agreement or any other documents securing the Indebtedness and shall survive repayment of the Indebtedness or any transfer or termination of this Agreement regardless of the means of such transfer or termination. Debtor agrees that Secured Party shall not be liable in any way for the completeness or accuracy of any environmental report or the information contained therein. Debtor further agrees that Secured Party has no duty to warn Debtor or any other Person about any actual or potential environmental contamination or other problem that may have become apparent, or will become apparent, to Secured Party.

(c)     Debtor agrees to pay, indemnify, and hold Secured Party harmless from, and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever (including, without limitation, counsel and special counsel fees and disbursements in connection with any litigation, investigation, hearing, or other proceeding) with respect, or in any way related, to the existence, execution, delivery, enforcement, performance, and administration of this Agreement and any other Transaction Document (all of the foregoing, collectively, the "Indemnified Liabilities"); provided, however, that Indemnified Liabilities shall not include any rights of Debtor by virtue of any breach hereof by Secured Party. The agreements in this Section 13.15(c) shall survive repayment of the Indebtedness and the termination of this Agreement and the Transaction Documents.

13.16.  TERMINATION; PREPAYMENT PREMIUM.

(a)     Termination.  This Agreement is, and is intended to be, a continuing Agreement and shall remain in full force and effect until the maturity date provided in Section 3.5. At the end of such period all Indebtedness shall be immediately due and payable in full without presentation, demand, or further notice of any kind, whether or not all or any part of such Indebtedness is otherwise due and payable pursuant to the agreement or instrument evidencing same. Secured Party may terminate this Agreement immediately and without notice of the occurrence of an Event of Default that continues uncured beyond any applicable cure period. Notwithstanding the foregoing or anything in this Agreement or elsewhere to the contrary, the Secured Party's security interests, Secured Party's rights and remedies under the Transaction Documents and Debtor's obligations and liabilities under the Transaction Documents, shall survive any termination of this Agreement and shall remain in full force and effect until all of the Indebtedness outstanding, or contracted for or committed for (whether or not outstanding), before the receipt of such notice by Secured Party, and any extensions or renewals thereof (whether made before or after receipt of such notice), together with interest accruing thereon after such notice, shall be finally and irrevocably paid in full. No Collateral shall be released or financing

Confidential – Subject to Protective
Order

AP-0001375

statement terminated until: (i) such final and irrevocable payment in full of the Indebtedness as described in the preceding sentence; and (ii) provided Secured Party has not breached this Agreement, Debtor and Secured Party execute a mutual, general release, subject to Section 13.15 of this Agreement, in form and substance satisfactory to Secured Party and Debtor and their counsel.

(b)     Prepayment Premium.  Debtor may prepay the Indebtedness in whole or in part at any time without premium or penalty.

## 13.17. FURTHER ASSURANCES.

From time to time, Debtor shall take such action and execute and deliver to Secured Party such additional documents, instruments, certificates, and agreements as Secured Party may reasonably request to effectuate the purposes of the Transaction Documents.

## 13.18. HEADINGS.

Article and Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

## 13.19. CUMULATIVE SECURITY INTEREST, ETC.

The execution and delivery of this Agreement shall in no manner impair or affect any other security (by endorsement or otherwise) for payment or performance of the Indebtedness, and no security taken hereafter as security for payment or performance of the Indebtedness shall impair in any manner or affect this Agreement, or the security interests granted hereby, all such present and future additional security to be considered as cumulative security.

## 13.20. SECURED PARTY'S DUTIES.

Without limiting any other provision of this Agreement: (a) the powers conferred on Secured Party hereunder are solely to protect its interests and shall not impose any duty to exercise any such powers; and (b) except as may be required by applicable law, Secured Party shall not have any duty as to any Collateral or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral.

## 13.21. NOTICES GENERALLY.

All notices and other communications hereunder shall be made by telegram, telex, electronic transmitter, overnight air courier, or certified or registered mail, return receipt requested except as otherwise specifically provided herein, and shall be deemed to be received by the party to whom sent one (1) Business Day after sending, if sent by telegram, telex, electronic transmitter, or overnight air courier, and three (3) Business Days after mailing, if sent by certified or registered mail. All such notices and other communications to a party hereto shall be addressed to such party at the address set forth on the cover page hereof or to such other address as such party may designate for itself in a notice to the other parties given in accordance

Confidential – Subject to Protective Order

AP-0001376

with this Section 13.21.

### 13.22. SEVERABILITY.

The provisions of this Agreement are independent of, and separable from, each other, and no such provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other such provision may be invalid or unenforceable in whole or in part.  If any provision of this Agreement or the Transaction Documents is prohibited or unenforceable in any jurisdiction, such provision shall be ineffective in such jurisdiction only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent it is not prohibited or unenforceable nor render prohibited or unenforceable such provision in any other jurisdiction.

### 13.23. INCONSISTENT PROVISIONS.

The terms of this Agreement and the other Transaction Documents shall be cumulative except to the extent that they are specifically inconsistent with each other, in which case the terms of this Agreement shall prevail.

### 13.24. ENTIRE AGREEMENT.

This Agreement and the other Transaction Documents constitute the entire agreement and understanding between the parties hereto with respect to the transactions contemplated hereby and supersede all prior negotiations, understandings, and agreements between such parties with respect to such transactions, including without limitation, those expressed in any commitment letter delivered by Secured Party to Debtor.

### 13.25. APPLICABLE LAW.

THIS AGREEMENT, AND THE TRANSACTIONS EVIDENCED HEREBY, SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE INTERNAL LAWS OF THE STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW, AS THE SAME MAY FROM TIME TO TIME BE IN EFFECT, INCLUDING, WITHOUT LIMITATION, THE UCC AS IN EFFECT IN THE STATE.

### 13.26. CONSENT TO JURISDICTION.

DEBTOR AND SECURED PARTY AGREE THAT ANY ACTION OR PROCEEDINGS TO ENFORCE, OR ARISING OUT OF, THE TRANSACTION DOCUMENTS MAY BE COMMENCED IN ANY COURT OF THE STATE IN ANY COUNTY, OR IN THE DISTRICT COURT OF THE UNITED STATES IN ANY DISTRICT, WHERE SECURED PARTY'S OFFICE, AS INDICATED ON THE COVER PAGE HEREOF, IS LOCATED (AS AMENDED FROM TIME TO TIME).

Confidential – Subject to Protective
Order

**EXECUTION COPY**

13.27. <u>JURY TRIAL WAIVER</u>.

DEBTOR AND SECURED PARTY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY DEBTOR OR SECURED PARTY MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.   DEBTOR REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF SECURED PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS RIGHT TO JURY TRIAL WAIVER. DEBTOR ACKNOWLEDGES THAT SECURED PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION 13.27.

*[Signatures on following pages]*

Confidential – Subject to Protective
Order

AP-0001378

IN WITNESS WHEREOF, Debtor, Secured Party and Guarantors have caused this Loan and Security Agreement to be signed by their respective proper officers thereunto duly authorized, all as of the day and year first above written.

REVELATION ENERGY, LLC, a Kentucky limited liability company

By: _____
    Jeffery A. Hoops
Its:  President

REVELATION ENERGY HOLDINGS, LLC, a Delaware limited liability company

By: _____
    Jeffery A. Hoops
Its:  President

ALPHA HIGHWALL MINING, LLC, a Kentucky limited liability company

By: _____
    Jeffery A. Hoops
Its:  President

UNITED BANK, INC., a West Virginia banking corporation

By: _____
    Timothy A. Paxton
Its:  Senior Vice President

[Signature Page to Second Amended and Restated Loan and Security Agreement]

Confidential – Subject to Protective Order

EXECUTION COPY

## SCHEDULE

This Schedule is a part of a Second Amended and Restated Loan and Security Agreement ("Agreement"), dated February 28, 2013, between REVELATION ENERGY, LLC, as Debtor, REVELATION ENERGY HOLDINGS, LLC, as Guarantor I, ALPHA HIGHWALL MINING, LLC, as Guarantor II, and UNITED BANK, INC., as Secured Party. All capitalized terms in the Schedule shall have the meanings ascribed to them in the Agreement, unless specifically defined herein.

1. Cash Discount (3)

   not applicable

2. Receivables --Age (1.1(aa))

   Except for MR Coal Receivables, 60 calendar days from the invoice date for the applicable Receivable. With regard to MR Coal Receivables, three (3) Business Days from the invoice date (if issued on a Tuesday) for the applicable Receivable or four (4) Business Days from the invoice date (if issued on a Monday) for the applicable Receivable. From time to time, as needed, Borrower may request a different aging period to be approved by Secured Party in its sole discretion.

3. Receivables Disqualification Percentage    (1.1 (aa))

   25% (except for MR Coal to whom this restriction does not apply)

4. Permissible Foreign Account Debtors    (1.1(aa))

   None.

   Borrower may submit additional Foreign Account Debtors for inclusion under this Item 4 by written request to Secured Party, consent to which inclusion shall not be unreasonably withheld, conditioned or delayed.

5. United Payment Account    (1.1(hhh))

   Name and address of depository bank:
   Revelation Energy, LLC
   United Bank, Inc.
   Charleston, WV
   Account number: ▮▮▮6324

Page 1 of 6

Confidential – Subject to Protective Order

EXECUTION COPY

6.   Permitted Encumbrances

Recognition of these encumbrances shall not be construed as a subordination by Secured Party to any such encumbrances. (4.5(a), 4.5(c) & 10.3) :

Ad valorem property taxes that are not delinquent.

7.   Business Records Location (4.8(a), 4.8(c) & 10.1)

Revelation Energy, LLC
1051 Main Street
Milton, WV. 25541

8.   Authorized Membership Units (4.22)

Revelation Energy, LLC:

   No. of authorized membership units: 1

   No. of issued and outstanding membership units: 1

9.   Required Documents (5.1 & 8.2(b))  Check  Required, if Required

| | Required | Frequency Due |
|---|---|---|
| Receivables Schedules | X | To be submitted with Loan Base Reports |
| Loan Base Reports | X | At least weekly on every Wednesday by no later than 12 p.m. (EST) |
| Credits and Extensions Reports | | |
| Cash Receipts Journal and Schedule of Payments on Receivables | | |
| Copies of shipping documents relating to the Receivables | X | As and when requested by Secured Party |

Page 2 of 6

Confidential – Subject to Protective Order

AP-0001381

**EXECUTION COPY**

| | | |
|---|---|---|
| List of names and addresses of Account Debtors | X | As and when requested by Secured Party |
| Open Accounts Payable showing the amounts due and owing on all of Debtor's account payables according to Debtor's records as of the close of such periods as shall be specified by Secured Party | X | Monthly |
| Advance Request and Confirmation of Borrowing Capacity based on current Receivables Borrowing Base And Outstanding Advances | X | On the date of each Advance Requested by Debtor |

Other as indicated below:

10.   <u>Interest Rate</u> (7.1)

Interest shall accrue on the outstanding principal Advances and any other Indebtedness (other than accrued interest) at a per annum rate equal to the greater of (i) The Wall Street Journal Prime Commercial Lending Rate <u>minus</u> 0.25%, adjusted daily with each change in and on the same day as a change in such Prime Commercial Lending Rate or (ii) 3%. Interest shall be calculated daily based on the then current interest rate applied to the resulting balance of the outstanding principal Advances and any other Indebtedness at the end of each day after the Debtor Accounts have been debited and credited and Advances have been made pursuant to this Loan and Security Agreement.

11.   <u>Fees and Due Dates</u>   (7.3)

| <u>Type</u> | <u>Amount</u> | <u>Due Date(s)</u> |
|---|---|---|
| Unused Line Of Credit/Unused Facility Fee | **NONE** | **n/a** |
| Late Fee Charge | _____ | If payment is made more than fifteen (15) days after due date. |
| Origination Fee | $0.00 | Upon Execution of Loan Agreement |

Such other costs and fees as authorized under any of the Transaction Documents.

Page 3 of 6

Confidential – Subject to Protective Order

**EXECUTION COPY**

13. <u>Uncollected Funds Adjustment</u>      ( 7.6)

      _____ calendar days; or

      _____one_____ Business Days; or

for each Item, the number of days estimated by Secured Party as necessary for collection of funds from the particular institution on which such Item is drawn.

14. <u>Additional Covenants</u> (Articles 9 & 10)

Additional Negative Pledge/Covenant – Encumbering Reserves: Debtor shall not further encumber its coal reserves existing as of the date of this Agreement.

15. <u>Terms of Sale</u> (9.3)

Due dates of no more than thirty (30) calendar days from date of shipment, except as approved in writing by Secured Party, except in sales to MR Coal and, in such event, payment for all coal produced in any given week shall be made on Friday of the following week.

16. <u>Permitted Borrowings</u> (10.2)

Additional borrowing that does not require consent: (i) borrowing for purchase and lease of equipment, (ii) borrowing for acquisitions of property, mineral reserves and operations (asset or entity acquisition), and (iii) letters of credit/bonding related to Debtor's properties and operations. Other additional borrowings must be approved by Secured Party's prior written consent, which shall not unreasonably be withheld, conditioned or delayed.

17. <u>Permitted Investments and Advances</u> ( 10.8(d))

All excess funds of the Debtor shall be invested in accordance with Section 2.4 of the Loan Agreement

18. <u>Permitted Guaranties</u> (10.9)

Guaranties provided by the Debtor or Guarantor I to the customers of MR Coal pursuant to the Guaranty Reimbursement and Indemnification Agreement, and any other guaranties approved by Secured Party's prior written consent, which shall not unreasonably be withheld.

Confidential – Subject to Protective
Order

AP-0001383

19.   Financial Covenants   (10.12)

(a)   Minimum Tangible Net Worth: Debtor shall at all times maintain a minimum Tangible Net Worth (as defined below) of the lesser of (i) the prior year end's net worth plus 65% of current year net income or (ii) $100,000,000 as defined by GAAP. Additionally, loans/advances/payables to members will be subordinated in payment and priority to the Indebtedness in payment and priority or converted to paid-in-capital so long as any Indebtedness is outstanding. "Tangible Net Worth" means the sum of members' equity plus the principal balance of any debt that is subordinated to Secured Party in a manner satisfactory to Secured Party, minus the book value of Intangible Assets (as defined below), all determined in accordance with generally accepted accounting principles of consistently applied. "Intangible Assets" means (1) all loans or advances to, and other receivables owing to Debtor from, any officers, employees, subsidiaries and other Affiliates of Debtor, (2) all investments, whether in a subsidiary or otherwise, (3) goodwill, (4) any other assets deemed intangible under generally accepted accounting principles, and (5) any other assets determined to be intangible by Secured Party in its reasonable credit judgment.

(b)   Total Debt to Tangible Net Worth: Debtor will maintain a Total Debt to Tangible Net Worth ratio that is less than 2 to one, measured as of the end of each calendar quarter.

(c)   Debtor shall maintain a minimum Debt Service Coverage Ratio (as defined below), on a 4 quarter rolling basis, of (i) 1 to 1 by March 31, 13, (ii) 1.10 to 1 as of June 30, 2013, (iii) 1.20 to 1 as of December 31, 2013, and (iv) 1.20 to 1 as of the end of each quarter thereafter.

"Debt Service Coverage Ratio" means the ratio of (1) net cash provided by or used in operating activities to (2) required principal payments on term indebtedness (including capital leases but excluding the Indebtedness for such the period plus interest expenses. In addition, the Seventeen Million Dollar ($17,000,000) advance mineral royalty payment paid in July 2011 and Debtor's Seven Million Dollar ($7,000,000) debt payment to Lime Rock Partners ("Lime Rock") in December 2011 shall be excluded when calculating the Debt Service Coverage Ration as cash was not utilized to settle this debt; rather, Debtor issued Seven Million Dollars ($7,000,000) in equity shares to Lime Rock such that the line item shall be treated as a non-cash item for the purposes of this particular calculation and Debtor's $7,000,000 debt payment to Lime Rock Partners.

20.   Percentage of Ownership of Consolidated Subsidiaries (9.23): 100%

21.   Other Provisions: None.

22.   Litigation: None.

Confidential – Subject to Protective Order

AP-0001384

EXECUTION COPY

IN WITNESS WHEREOF, Debtor, Secured Party and Guarantors have caused this Schedule to the Second Amended and Restated Loan and Security Agreement dated February 28, 2013 to be signed by their respective proper officers thereunto duly authorized, all as of the day and year first above written.

REVELATION ENERGY, LLC, a Kentucky
limited liability company

By: _____
    Jeffery A. Hoops
Its:  President


REVELATION ENERGY HOLDINGS, LLC, a
Delaware limited liability company

By: _____
    Jeffery A. Hoops
Its:  President


ALPHA HIGHWALL MINING, LLC, a Kentucky
limited liability company

By: _____
    Jeffery A. Hoops
Its:  President


UNITED BANK, INC., a West Virginia
banking corporation

By: _____
    Timothy A. Paxton
Its:  Senior Vice President

Page 6 of 6

AP-0001385

EXECUTION COPY

IN WITNESS WHEREOF, Debtor, Secured Party and Guarantors have caused this Schedule to the Second Amended and Restated Loan and Security Agreement dated February 28, 2013 to be signed by their respective proper officers thereunto duly authorized, all as of the day and year first above written.

REVELATION ENERGY, LLC, a Kentucky
limited liability company

By: _____
       Jeffery A. Hoops
Its:    President

REVELATION ENERGY HOLDINGS, LLC, a
Delaware limited liability company

By: _____
       Jeffery A. Hoops
Its:    President

ALPHA HIGHWALL MINING, LLC, a Kentucky
limited liability company

By: _____
       Jeffery A. Hoops
Its:    President

UNITED BANK, INC., a West Virginia
banking corporation

By: _____
       Timothy A. Paxton
Its:    Senior Vice President

Page 6 of 6

Confidential – Subject to Protective Order

AP-0001386

EXECUTION COPY

## EXHIBIT A

### FINANCIAL STATEMENT CERTIFICATION

The undersigned, the _____ of Revelation Energy, LLC ("Debtor") hereby certifies to United Bank, Inc. that attached hereto is a true, correct and complete copy of the Debtor's financial statements as of the month ending _____, 20___, which financial statements fairly present Debtor's financial position and consist of a balance sheet and related statements of income, retained earnings, and sources and uses of cash covering the period from the end of the immediately preceding fiscal year to the end of such month.

_____

Name:
Title:

Date: _____, 20____

EXECUTION COPY

## EXHIBIT B

### COMPLIANCE CERTIFICATE

REVELATION ENERGY, LLC ("Debtors") hereby certifies to UNITED BANK, INC. ("Secured Party") pursuant to the Second Amended and Restated Loan and Security Agreement between Debtor and Secured Party dated February 28, 2013, as may be amended from time to time ("Loan Agreement") that:

A.    General

1.    Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

2.    Debtor has complied with all the terms, covenants and conditions to be performed or observed by them contained in the Loan Agreement and the Transaction Documents to which Debtor is a party.

3.    Neither on the date hereof nor, if applicable, after giving effect to the Advance made on the date hereof, does there exist an Event of Default or an event which would, with notice or the lapse of time, or both, constitute an Event of Default.

4.    The representations and warranties contained in the Loan Agreement, in any Transaction Document to which Debtor is a party and in any certificate, document or financial or other statement furnished at any time thereunder are true, correct and complete in all material respects with the same effect as though such representations and warranties had been made on the date hereof, except to the extent that any such representation and warranty relates solely to an earlier date (in which case such representation and warranty shall be true, correct and complete on and as of such earlier date).

B.    Financial Covenants:

1.    As of the date hereof or, for such period as may be designated in the attached calculations, the computations, ratios and calculations as set forth in the attached are true and correct.

Confidential – Subject to Protective
Order

AP-0001388

**EXECUTION COPY**

IN WITNESS WHEREOF, the undersigned, a duly authorized officer of Revelation Energy, LLC has executed and delivered this certificate in the name and on behalf of Debtor on _____, _____.

REVELATION ENERGY, LLC

By: _____

Name: _____

Title: _____

AP-0001389

*EXECUTION COPY*

## EXHIBIT C

[List of Transaction Documents and Other Required Items]

1.     Second Amended and Restated Loan and Security Agreement dated February 28, 2013 by and among Revelation Energy, LLC, a Kentucky limited liability company; Revelation Energy Holdings, LLC, a Delaware limited liability company; Alpha Highwall Mining, LLC, a Kentucky limited liability company; and United Bank, Inc., a West Virginia banking corporation.

2.     Amended and Restated Revolving Line of Credit Note dated February 28, 2013 by and between Revelation Energy, LLC, a Kentucky limited liability company; and United Bank, Inc., a West Virginia banking corporation.

3.     Intercompany Debt Subordination Agreement dated July 18, 2012 by and among Revelation Energy, LLC, a Kentucky limited liability company; United Bank, Inc., a West Virginia banking corporation; Alpha Highwall Mining, LLC, a Kentucky limited liability company; Candle Ridge Mining, Inc., a Kentucky corporation; Revelation Management Corporation, a Delaware corporation; and Revelation Energy Holdings, LLC, a Delaware limited liability company.

4.     Mortgage dated July 18, 2012 by and between Revelation Energy, LLC, a Kentucky limited liability company, and United Bank, Inc., a West Virginia banking corporation as recorded in the Clerk's Office of the County Commission of Pike County, Kentucky in Book 888 at Page 405.

5.     Mortgage dated July 18, 2012 by and between Revelation Energy, LLC, a Kentucky limited liability company, and United Bank, Inc., a West Virginia banking corporation, as recorded in the Clerk's Office of the County Commission of Breathitt County, Kentucky in Mortgage Book 137 at Page 50.

6.     Guaranty Agreement dated July 18, 2012 by and between Revelation Energy Holdings, LLC, a Delaware limited liability company, and United Bank, Inc., a West Virginia banking corporation.

7.     Guaranty Agreement dated July 18, 2012 by and between Alpha Highwall Mining, LLC, a Kentucky limited liability company, and United Bank, Inc., a West Virginia banking corporation.

8.     Assignment of Life Insurance As Collateral dated July 13, 2012 by and among Northwestern Mutual Life Insurance Company and United Bank, Inc.

9.     Insurance Proceeds Escrow Agreement dated July 18, 2012 by and between Revelation Energy, LLC, a Kentucky limited liability company, and United Bank, Inc., a West Virginia banking corporation.

AP-0001390

EXECUTION COPY

10.      Secured Party Lockbox Agreement dated July 18, 2012 by and between United Bank, Inc., a West Virginia banking corporation, and Revelation Energy, LLC, a Kentucky limited liability company.

11.      Opinion of Counsel Letter by Huddleston Bolen LLP dated February 28, 2013.

12.      Uniform Commercial Code Financing Statement Amendment dated February 28, 2013 (Commonwealth of Kentucky)

13.      Uniform Commercial Code Financing Statement Amendment dated February 28, 2013 (State of West Virginia).

14.      Written Agreement In Lieu of Meeting of Board of Directors dated February 28, 2013 by Directors of Revelation Energy Holdings, LLC.

15.      Written Action by Sole Member In Lieu of Meeting dated February 28, 2013 by Revelation Energy Holdings, LLC, the sole member of Revelation Energy, LLC.

16.      Written Action by Sole Member In Lieu of Meeting dated February 28, 2013 by Revelation Energy, LLC, the sole member of Alpha Highwall Mining, LLC.

17.      Certificate of Liability Insurance dated February 22, 2013.

18.      Evidence of Property Insurance dated February 22, 2013.

19.      Intercreditor Agreement dated February 28, 2013 by and among United Bank, Inc., a West Virginia banking corporation; Revelation Energy, LLC, a Kentucky limited liability company; and MR Coal Marketing & Trading, LLC, a Delaware limited liability company.

20.      Consent and Right of Entry dated February 28, 2013 by and among United Bank, Inc., a West Virginia banking corporation; Revelation Energy, LLC, a Kentucky limited liability company, and MR Coal Marketing & Trading, LLC, a Delaware limited liability company.

21.      Certificate of Existence of Revelation Energy, LLC dated October 3, 2012 by Alison Lundergan Grimes, the Secretary of State of the Commonwealth of Kentucky.

22.      Certificate of Good Standing of Revelation Energy Holdings, LLC dated October 3, 2012 by Jeffrey W. Bullock, the Secretary of State of the State of Delaware.

23.      Certificate of Existence of Alpha Highwall Mining, LLC dated October 26, 2012 by Alison Lundergan Grimes, the Secretary of State of the Commonwealth of Kentucky.

Confidential – Subject to Protective Order