**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re | ) | **Chapter 11** |
| **Blackjewel, L.L.C., et al.,** | ) | **Case No. 19-30289** |
| Debtors, | ) | **(Jointly Administered)** |
| _____ | ) | |
| | ) | |
| **BLACKJEWEL, L.L.C., et al.,** | ) | |
| Plaintiffs, | ) | |
| | ) | **Adv. Proceeding No. 3:20-ap-03007** |
| **v.** | ) | |
| | ) | |
| **UNITED BANK,** | ) | |
| Defendant. | ) | |

### DEFENDANT UNITED BANK'S RESPONSE AND BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United Bank opposes the Motion for Partial Summary Judgment ("Motion") filed by the Blackjewel Liquidation Trust ("Trust") [ECF No. 138].

United Bank had a significant lending relationship with Clearwater Investment Holdings, LLC ("Clearwater") and, as such, had a financial interest at stake when it became aware that Clearwater defaulted on its loan and intended to use related collateral to fund a DIP loan to the Trust. The Trust believes that "the bank's conduct was somehow wrong, morally if not legally, and that" Clearwater and the Trust have "been victimized by its conduct." But "[i]n the sometimes-harsh world of commercial lending, that is not enough, uncomfortable though that conclusion may be. . . . The moral analysis contributes little." *Schwan's Sales Enters., Inc. v. Com. Bank & Trust Co.*, 397 F. Supp. 2d 189, 202 (D. Mass. 2005) (citation omitted).

The Trust's Motion is based on misinterpretation of contracts and mischaracterization of facts. First, the Trust has failed to establish a *prima facie* case of tortious interference. Second, even if the Trust could establish a *prima facie* case—which it cannot—United Bank's actions were justified and did not constitute wrongful means.

1

## I. <u>COUNTERSTATEMENT OF FACTS</u>

United Bank contends that there is no dispute of material fact and that it is entitled to judgment [ECF Nos. 136, 137]. That said, the Trust has inaccurately—or at least incompletely—described the facts in "Plaintiffs' Statement of Material Facts" ("PSMF") [ECF No. 138 at 4-13]. United Bank thus makes the following counterstatement of facts.[1]

**A.     United Bank disputes that the Trust has accurately and completely presented the facts regarding ownership and control of Revelation Energy, LLC and Blackjewel, LLC, as well as their lending relationship with United Bank.**

1.     Jeffrey Hoops, Sr. ("Hoops") formed Revelation Energy LLC ("Revelation") in 2008. Deposition of Hoops (Oct. 13, 2021), 43:16-44:17, attached as **Exhibit 1**.[2] He was President and CEO of Revelation. No. 3:19-bk-30289, ECF No. 14 at ¶ 1 (S.D. W. Va. Bankr. July 1, 2019) [hereinafter "Hoops Declaration"].

2.     From 2009 through 2014, Lime Rock Partners ("Lime Rock"), invested almost $90 million in Revelation, becoming 62.5% owner. **Ex. 1** at 170:19-21, 172:2-18, 173:13-174:3.

3.     In 2017, Revelation decided to rebrand its active mines under new company Blackjewel LLC ("Blackjewel"). *Id.* at 45:2-22; *see also* Hoops Declaration at ¶ 9.

4.     Lime Rock had the same ownership in Blackjewel due to its 62.5% interest in sole member Blackjewel Holdings LLC. *Pls.' App to Mot. for Partial Summ. J. as to Liability on Count 1 for Tortious Interference*, ECF No. 138-1 [hereinafter Trust App.], at 200.

5.     The Hoops family's ownership of the other 37.5% of Blackjewel was held by Blackjewel Investment LLC, which was owned by the Blackjewel Trust of which Hoops' son,

---

[1] This counterstatement contains additional facts that the Trust failed to include in its Motion, thus creating a dispute regarding their applicability. As ordered by the Court [ECF No. 131], where applicable, the paragraphs above conclude with a bracketed citation to paragraphs of the PSMF being disputed.

[2] The deposition transcripts attached by the Trust do not contain page numbers, so United Bank attaches all excerpts from deposition transcripts cited in this brief.

Jeremy, was the trustee. Trust App. at 200; **Ex. 1** at 32:22-33:1, 165:5-7, 172:19-22, 309:17-310:5; Emails by Hoops, attached as **Exhibit 2**. [PSMF ¶ 3]

6.      The operating agreement for Blackjewel Holdings gave Blackjewel Investment, not Hoops, the right to appoint a director to its board. Trust App. at 177, 204. [PSMF ¶ 5]

7.      Hoops was a board member for Revelation and Blackjewel at all relevant times, **Ex. 1** at 47:6-11, 171:4-19, and the other two board members were appointed by Lime Rock, *id.* at 47:8-19, with each board member having equal voting rights. *Id.* at 171:14-19.

8.      Although overseen by the board, the operating agreement for Blackjewel Holdings indicates that officers had "primary responsibility for the day-to-day operations of the Company." Trust App. at 181-82. [PSMF ¶ 4]

9.      Hoops was President and CEO of Blackjewel and Blackjewel Holdings from 2017 through at least July 1, 2019. Hoops Declaration at ¶ 1; *see also* Deposition of Drew Kesler (Sept. 15, 2021), at 21:8-13, 22:17-18, 48:18-23, attached as **Exhibit 3**.

10.      In February 2013, United Bank loaned money to Revelation and others in the form of an $11 million line of credit ("Blackjewel Loan Agreement"). Trust App. at 749-813.

11.      The following constitute Events of Default under the Blackjewel Loan Agreement:

(e)      <u>Cessation of Business or Voluntary Insolvency Proceedings</u>. The . . . filing by Debtor of a petition or request for liquidation, reorganization, arrangement, adjudication as bankrupt, relief as a debtor, or other relief under the bankruptcy, insolvency, or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction now or hereafter in effect . . . ;

. . . . .

(k)      <u>Insecurity; Change</u>.      Secured Party shall believe in good faith that the prospect of payment of all, or any part, of the Indebtedness or performance of Debtors' obligations under the Transaction Documents or any other agreement between Secured Party and Debtor is impaired; or there shall occur any materially adverse change in the business or financial condition of Debtor which is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

3

Trust App. at 789-91 (§§ 11.1(e), (k)). There is no cure period or notice requirement for subsection (e) or the first half of subsection (k). *Id.* [PSMF ¶ 44]

12.     In May 2013, United Bank loaned $8.7 million to Revelation in the form of a term loan. Business Loan Agreement, attached as **Exhibit 4**. The "Event of Default" provisions include Material Adverse Change, Judgments or Attachments, and Insecurity, for which there is no relevant cure period or notice requirement. *Id.* at 3. [PSMF ¶ 44]

13.     In July 2017, Blackjewel became a co-borrower and agreed to be bound by these two loan agreements. Joinder Agreement (July 17, 2017), attached as **Exhibit 5**.

14.     During May 2019, credit analyst Bronson Contic evaluated a request to extend the Blackjewel Loan Agreement. Trust App. at 494. His internal memorandum is his limited opinion and not the position of United Bank on its contracts. [PSMF ¶¶ 29, 31]

15.     Hoops and CFO Drew Kesler were authorized signers on the Blackjewel accounts. *See, e.g.*, Various Resolutions and Agreements, attached as **Exhibit 6**.

16.     The Trust admits that Hoops had authority to direct transactions from Blackjewel's accounts. Deposition of Dan Brosious (June 27, 2019), at 86:20-87:3, 88:1-18, excerpts attached as **Exhibit 7**.

**B.     United Bank disputes that the Trust has accurately and completely presented the facts regarding ownership and control of Clearwater Investment Holdings, LLC, as well as its lending relationship with United Bank.**

17.     Clearwater was formed on March 30, 2017. Trust App. at 281-99. Hoops' wife, Patricia A. Hoops ("Patricia"), is 1% owner of Clearwater, and the Clearwater Trust is 99% owner. *Id.* at 299; **Ex. 1** at 32:11-13. Hoops is the grantor of the Clearwater Trust, and the trustees are Jeffrey A. Hoops, II and Jeremy A. Hoops, his sons. Trust App. at 299; Trust Agreement, attached as **Exhibit 8**; **Ex. 1** at 32:22-33:1. [PSMF ¶ 10]

18.     Those eligible to be "manager" with "sole authority" are Hoops, Patricia, and their descendants. Patricia was the initial manager. Trust App at 283, 286.

19.     Brent Walls ("Walls") has been the Chief Financial Officer ("CFO") for Clearwater "during its entire existence" since 2017. Deposition of Patricia Hoops (Oct. 12, 2021), at 25:23-26:5, 26:16-18, 28:5-12, excerpts attached as **Exhibit 9**.

20.     Although Patricia is the "manager" of Clearwater, she is not compensated and has no role other than discussing some things with Walls and visiting two of the properties in which Clearwater invests. *Id.* at 24:14-25:19, 34:4-6.

21.     Walls "keeps up with everything, all the daily transactions," and "handle[s] the day-to-day finances" and "banking." *Id.* at 24:19-20, 26:6-8, 32:11-21. Patricia gave him this authority and has been given no reason to question his ability and trustworthiness as CFO. *Id.* at 26:6-15, 32:22-24, 99:19-100:6; *accord* Deposition of Brent Walls (Oct. 15, 2021), at 77:21-78:4, attached as **Exhibit 10**. [PSMF ¶ 15]

22.     Although Patricia testified that Hoops had no role in Clearwater, **Ex. 9** at 38:8-13, this was not the case. Hoops clearly viewed Clearwater's money as his money. *See* Email from Hoops (July 4, 2019), attached as **Exhibit 11**. [PSMF ¶¶ 15, 16]

23.     Hoops described Clearwater as "a holding company for all *my* non-coal related investments." Email from Hoops, attached as **Exhibit 12** (emphasis added). He said its manner of organization was "for tax purposes," with the general partner ownership by Patricia sufficient to "give[] *us* the control needed." *Id.* (emphasis added). [PSMF ¶¶ 15-17, 19]

24.     According to an Executive Summary approved by Hoops and provided to Patricia in January 2019, "[t]he primary purpose [of] Clearwater is to leave a financial dynasty to Jeff and Patricia's heirs . . . ." Email from Hoops to Hoops Family (Jan. 27, 2019), attached as **Exhibit 13**.

5

The summary also says: "Jeffrey A. Hoops, Sr., will from time to time act as manager for Clearwater." *Id.* [PSMF ¶¶ 15-17, 19]

25.    When Clearwater opened accounts at the bank, its CFO Walls sent United Bank the same Executive Summary. Trust App. at 868-88; **Ex. 9** at 64:18-69:4 (Patricia testifying she thinks the summary is "okay"); *see also* Email from Brent Walls, attached as **Exhibit 14**. [PSMF ¶¶ 15-17, 19]

26.    Walls testified that describing Hoops as "manager" was inaccurate, but he never notified the bank. **Ex. 10** at 127:14-128:2. [PSMF ¶¶ 15-17, 19]

27.    Walls also represented to the bank that Clearwater was "set up" by Hoops and directed the bank to make Hoops an authorized signer. Trust App. at 231-32, 277-80; *see also* **Ex. 9** at 69:17-73:24 (Patricia testifying that she "didn't mind if [Hoops] signed a few things"). [PSMF ¶¶ 15-17, 19-20]

28.    In January 2019, Clearwater opened an investment management account at the bank with $2.3 million ("Clearwater IMA"). Investment Management Agreement, attached as **Exhibit 15**. Hoops and the Clearwater Trust trustees signed that agreement for Clearwater. *Id.* at 8-9.

29.    At this time, United Bank received a copy of the Clearwater operating agreement. The bank's policy did not require obtaining the operating agreement; it was just one document that could confirm Clearwater was an existing entity that could open an account. Deposition of Stacy Miller (Oct. 5, 2021), at 37:20-38:11, 41:22-42:12, attached as **Exhibit 16**.

30.    Thereafter, United Bank received a resolution in which Hoops identified himself as "Manager" and "Owner." Resolution, attached as **Exhibit 17**. [PSMF ¶¶ 15-17, 19]

31.    United Bank also negotiated with Hoops regarding the terms of proposed financing for Clearwater. Letter from David Mills, attached as **Exhibit 18**. [PSMF ¶¶ 15-17, 19]

32.     As a result, in April 2019, Clearwater obtained an $11 million line of credit from United Bank ("Clearwater Loan Agreement"). Trust App. at 368-90. The entire agreement between United Bank and Clearwater includes the Clearwater Loan Agreement, as well as a Promissory Note, Control Agreement, and the Guaranty. *Id.* at 370, 386 § 13(c); Commercial Guaranty, attached as **Exhibit 19**; Commercial Promissory Note, attached as **Exhibit 20**; Control Agreement, Trust App. at 391-98; Clearwater Investment Holdings, LLC Resolution, attached as **Exhibit 21**.

33.     The loan was secured by the Clearwater IMA, which contained roughly $25 million as of July 1, 2019. Trust App. at 368, 712.

34.     Hoops and Patricia guaranteed the loan and represented to United Bank that they had "the power and authority to enter into" the agreement and were both "members of [Clearwater]." *See* Trust App. at 371 § 2(b), 389; **Ex. 19** at 4, 8. [PSMF ¶¶ 11, 19]

35.     Among other things, the following constitutes an "Event of Default" under the Clearwater Loan Agreement:

(c)     *Cross Default*. Should Borrower and/or ***any of its affiliates*** default under any loan, extension of credit, security agreement, or other debt owing to Lender, if such default is not cured within any applicable cure period.

Trust App. at 382 § 9(c) (emphasis added). [PSMF ¶ 33]

36.     If an "Event of Default" occurs under the Clearwater Loan Agreement, United Bank may, "without limitation . . . exercise . . . rights and remedies" including the following:

(b)     *Assemble Collateral*:  Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender.

*Id.* at 384 § 11(b). [PSMF ¶ 28]

37.     The related Control Agreement was among Clearwater as borrower, United Bank as lender, and United Bank as intermediary and manager of the Clearwater IMA. It provided:

(a)    **Notice of Sole Control**.    If *at any time* Lender delivers to Intermediary a notice instructing Intermediary to terminate Borrower's access to the Account (the "<u>Notice of Sole Control</u>"), Intermediary agrees that, after receipt of such notice it will take all instruction with respect to the Account or any funds therein, and cease taking instructions from Borrower, including, without limitation, instructions for distribution or transfer of any funds in the Account.

Trust App. at 392 § 4(a) (emphasis added); *see also id.* at 394 § 7 (stating that Control Agreement prevails over any other agreement, including the Clearwater Loan Agreement). [PSMF ¶ 28]

38.    Hoops was an authorized signer for Clearwater and represented that he was the "Manager or Designated Member" and "Owner." *See, e.g.*, Various Resolutions and Agreements, attached as **Exhibit 22**; *see also* Emails between Hoops and Walls, attached as **Exhibit 23** (Walls agreeing with Hoops that Hoops—not Walls—should be a signer); **Ex. 10** at 86:11-88:9 (Walls testifying he had authority to make Hoops an authorized signer or that Hoops had authority from Patricia). [PSMF ¶¶ 11, 15-17, 19]

39.    Walls discussed Clearwater financing arrangements with Hoops, looked to him for direction regarding the business, and deferred to his judgment with respect to the United Bank relationship. Various Emails among Walls, Hoops, and United Bank, attached as **Exhibit 24**. [PSMF ¶¶ 15-17, 19]

40.    The CFOs at Blackjewel and Clearwater were fully aware that Hoops directed the activities of Clearwater, as well as the exchange of Clearwater and Blackjewel funds. *See, e.g.*, Various Email Correspondence, attached as **Exhibit 25**. [PSMF ¶¶ 15-17, 19]

**C.    United Bank disputes that the Trust has accurately and completely described the events that occurred from June 28 through July 2, 2019.**

41.    United Bank first became aware of Blackjewel's imminent bankruptcy when it received a call from counsel for Riverstone, another creditor, at around 3:00 PM on June 28. Deposition of Matthew Bond (Sept. 23, 2021), at 74:15-75:22, attached as **Exhibit 26**.

42.     Thereafter, United Bank placed Blackjewel, Clearwater, and other Hoops-related accounts in a post-no-debit status. This did not "freeze" the accounts, but it required United Bank to manually decide whether transactions should be processed. *Id.* at 78:4-80:10. United Bank employee David Mills advised Hoops of the status of the accounts. *Id.* at 88:17-20; Deposition of J. David Mills (Sept. 24, 2021), at 37:1-10, attached as **Exhibit 27**.

43.     Also on June 28, 2019, Untied Bank became aware that certain ACH transfers for Blackjewel payroll had not processed. The bank addressed this issue the next day, Saturday, June 29, 2019, by opening its operations center to gather, issue, and deliver to Hoops cashier's checks for the affected employees. **Ex. 26** at 85:6-88:2, 89:1-5, 210:12-25. [PSMF ¶ 36]

44.     On June 30, 2019, United Bank became aware of proposed post-petition financing from Hoops and Clearwater. *Id.* at 49:18-50:2; *see also* Emails among Counsel, attached as **Exhibit 28**. United Bank was concerned those funds would come from Hoops and Clearwater's lines of credit or from collateral securing existing debts. **Ex. 26** at 100:16-23.

45.     On June 30, 2019, United Bank notified Blackjewel, Revelation, and others that they had defaulted under the Blackjewel Loan Agreement due to, *inter alia*, a judgment against Revelation, the poor state of Wyoming operations, Hoops' resignation, prolonged exhaustion of the line of credit, and imminent bankruptcy. *See* Trust App. at 639-43.

46.     The notice specifically identified §§ 11.1(j) and (k) of the agreement, but only as "*inter alia*" examples of current defaults. Trust App. at 640. [PSMF ¶ 43]

47.     Around 12:30 AM on July 1, 2019,[3] United Bank notified Clearwater that, due to the default of its affiliates, Clearwater was in default under the Clearwater Loan Agreement. It also

---

[3] The Bates numbered production version of this correspondence indicates only that United Bank sent it at "4:24:29 AM." Trust App. at 708-10. Attached as **Exhibit 29** is a screenshot of the native format

advised that, until the defaults were cured, it would exercise its right under the Control Agreement to exclusive control over the Clearwater IMA. Trust App. at 708-10. [PSMF ¶ 62]

48.    There was no cure period or notice requirement. *See supra* ¶¶ 35-36. [PSMF ¶ 67]

49.    The Debtors also received a copy of the notice to Clearwater. Correspondence, attached as **Exhibit 30**. [PSMF ¶ 61]

50.    United Bank took control of the Clearwater IMA to prevent its collateral from being used to provide post-petition financing. *See* **Ex. 26** at 115:10-14.

51.    Thereafter, at around 7:00 AM on July 1, 2019, Debtors sought permission for $20 million post-petition financing ("DIP Loan") to be provided by Hoops and Clearwater, representing to the Court that Clearwater "is an entity owned directly or indirectly by Jeffery [sic] A. Hoops." Emergency Motion, Case No. 3:19-bk-30289, ECF No. 12 at ¶¶ 6 n.6, 31.

52.    At approximately 8:30 AM on July 1, 2019, United Bank employees, Hoops, and counsel for Blackjewel had a phone call to discuss United Bank's "concerns with the proposed DIP and the structure." **Ex. 26** at 99:9-100:15. [PSMF ¶ 61]

53.    At a hearing that afternoon, Debtors withdrew the motion due to the unavailability of funds from the Clearwater IMA. *See* Hearing Transcript at 13:2-8, attached as **Exhibit 31**.

54.    At the same time, Debtors acknowledged they were "obviously[] in default" on their own obligations "through a bankruptcy filing." *Id.* at 12:23-25.

55.    At all times, Clearwater could have used the $25 million Clearwater IMA to pay off its $11 million line of credit and use the remaining funds to finance a DIP Loan for Debtors. **Ex. 26** at 116:21-117:7, 157:3-14;  Deposition of Jason D. Koontz (Oct. 27, 2021), at 146:16-19, ttached as **Exhibit 32**. It did not do so. [PSMF ¶ 70]

---

with the correct time as "4:24:29 AM (UTC)," which is Universal Coordinated Time. Converting to Eastern Standard Time on July 1, 2019, demonstrates that United Bank sent the correspondence at 12:24:29.

56.     Throughout the day on July 1, 2019, United Bank made proposals that would address its concerns and allow Clearwater to fund the DIP Loan. None were accepted. Ultimately, United Bank made the business decision that evening to rescind its exclusive control. **Ex. 26** at 157:18-168:18; Correspondence, attached as **Exhibit 33**. [PSMF ¶¶ 70, 71]

57.     Patricia, the supposed manager of Clearwater, was not advised of the terms of the proposed DIP Loan or its negotiation. **Ex. 9** at 81:4-84:4.

58.     The next day, Debtors submitted a supplemental motion, again seeking permission to obtain a DIP Loan from Hoops and Clearwater. The terms, however, required a priming DIP Loan and a broad liability release in favor of Hoops. Supplemental Emergency Motion, Case No. 3:19-bk-30289, ECF No. 36.

59.     At the hearing on that motion on July 2, 2019, the Trust again acknowledged that Clearwater is "an entity that [Hoops] controls." Hearing Transcript at 11:13-15, excerpts attached as **Exhibit 34**; *see also id.* at 33:5-7.

60.     The Court denied the supplemental motion. *Id.* at 260:6-262:19.

**D.      United Bank disputes that the Trust has accurately and completely described the expert testimony that United Bank has disclosed on the issues in the Motion.**

61.     United Bank retained an expert witness who opines, among other things, that Clearwater would be considered an affiliate of other Hoops-controlled companies such as Blackjewel, and that it is reasonable for a bank to place a hold on the accounts of affiliated companies upon default [ECF No. 106]. [PSMF ¶ 49]

62.     The Trust did not disclose an expert witness to testify on this topic. *See* Plaintiff's Disclosure of Primary Expert (Aug. 31, 2021), attached as **Exhibit 35**.

63.     United Bank also retained an expert witness who opines that the unavailability of post-petition financing did not cause the damages alleged by the Trust [ECF No. 111].

## II. <u>ARGUMENT</u>[4]

A *prima facie* case of tortious interference includes the following elements:

(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages.

Syl. Pt. 2, in part, *Torbett v. Wheeling Dollar Savings & Trust Co.*, 173 W. Va. 210, 314 S.E.2d 166 (1983). "[A] defendant may prove justification or privilege, affirmative defenses." *Id.* at Syl. Pt. 2. Interference is justified if the interferer has a financial interest to protect and "(a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation." *Id.* at 216 & n.14, 314 S.E.2d at 172 & n.14 (citing *Restatement (Second) of Torts* § 769).

A creditor's rights qualify as a financial interest. *Restatement (Second) of Torts* § 769 cmt. c. Some *methods* of interference are considered "wrongful means," but they are limited: threats of violence, fraudulent misrepresentations, threatening of civil litigation in bad faith, threatening to cause criminal prosecution in bad faith, violating the law, exerting economic pressure, or violating business ethics and customs. *Id.* §§ 767 cmt. c, 769 cmt. c.

### A.    United Bank disputes that the Trust can establish a *prima facie* case of tortious interference against United Bank, and the Motion does not address this issue.

The Trust begins its argument by incorrectly stating that the "elements are satisfied and undisputed" [ECF No. 138 at 16-17]. This is wrong.

The Trust bears the burden of establishing a *prima facie* case, *Torbett*, 173 W. Va. 210, 314 S.E.2d 166, at Syl. Pt. 2, and it has not even attempted to do so. United Bank concedes only the first element, inasmuch as there was "a contractual or business relationship or expectancy." *See id.* The Trust, however, cannot establish the other elements.

---

[4] Citations to "PSMF" reference "Plaintiffs' Statement of Material Facts" in the Motion [ECF No. 138 at 4-13], and citations to "CSF" reference the "Counterstatement of Facts" above.

The second element requires United Bank to perform an "intentional act of interference." *Id.* Under West Virginia law, it is not sufficient that there was "an intentional act that led to interference." The alleged tortfeasor must have intended to interfere. *In re 201 North George St., LLC*, 551 B.R. 786, 791-92 (Bankr. N.D. W. Va. 2016); *see also Arthur-Nelson v. U.S. Bancorp Gov. Leasing & Fin. Inc.*, No. 1:19CV167, 2020 WL 5822211, at *10 (N.D. W. Va. Sept. 30, 2020) (quoting *Restatement (Second) of Torts* § 766 cmt. h (June 2020 Update)) ("The essential thing is to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect . . . ."); *Nidy v. U.S. Bancorp Gov. Leasing & Fin., Inc.*, No. 2:198-cv-01061, 2019 WL 2537418, at *8 (S.D. W. Va. June 19, 2019) ("[m]otive or purpose to disrupt . . . is of central concern in a tortious interference case").[5]

United Bank acted to protect its collateral until the defaults of Clearwater were cured. Its primary purpose was not to disrupt the DIP Loan. In fact, throughout July 1, 2019, United Bank proposed avenues for the financing to move forward. CSF ¶ 56. That disruption would occur was an incidental result. The Trust cannot establish that United Bank intended to interfere with the DIP Loan in the manner required for tortious interference.

The third element requires "proof that the interference caused the harm sustained." *Torbett*, 173 W. Va. 210, 314 S.E.2d 166, at Syl. Pt. 2. "Proximate cause must be understood to be that cause which in actual sequence, unbroken by independent cause, produced the wrong complained of, without which the wrong would not have occurred." Syl. Pt. 7, *Wal-Mart Stores East, L.P. v. Ankrom*, 244 W. Va. 437, 854 S.E.2d 257 (2020). In this case, the failure of the DIP Loan was not caused by United Bank's decision to exercise control over the Clearwater IMA. It was caused by

---

[5] *Accord WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174-75 (Del. 2012) ("The defense of justification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering.").

Clearwater's decision not to cure the defaults and use the remaining funds in the Clearwater IMA to fund the DIP Loan. It could have done so at any time but did not. CSF ¶ 55.

The fourth element requires proof of damages. *Torbett*, 173 W. Va. 210, 314 S.E.2d 166, at Syl. Pt. 2. The Trust indicates that it will establish damages through expert testimony [ECF Nos. 70 at Ex. 7; 77 at 22], but United Bank filed a motion to exclude the testimony of the Trust's only expert witness [ECF No. 134]. If that motion is granted, the Trust has no evidence of its alleged damages. *See Just. v. Pennzoil Co.*, 598 F.2d 1339, 1343 (4th Cir. 1979) ("[D]amages cannot be based on speculation, guess or conjecture."). And, in any event, United Bank has disclosed its own expert who opines that the Trust did not suffer damages due to United Bank's actions. CSF ¶ 63.

In sum, the Trust has inaccurately styled its Motion as seeking a ruling on liability. United Bank disputes the existence of a *prima facie* case, and the Motion is focused exclusively on its defense of justification. Any ruling by the Court should be similarly confined.

**B.      Even if the Trust could make out a *prima facie* case—which it cannot—any intentional interference by United Bank was justified.**

**1.      United Bank was justified to interfere in the relationship between Clearwater and Blackjewel because it had a financial interest to protect.**

United Bank had a financial interest at stake.  United Bank loaned millions to Revelation, Blackjewel, and other Debtors. *See* CSF ¶¶ 10-13. United Bank also loaned $11 million to Clearwater under the Clearwater Loan Agreement, which was secured by the Clearwater IMA. *Id.* ¶¶ 32-33. United Bank thus had a financial interest in both Clearwater's and the Trust's businesses, including the proposed DIP Loan. *Restatement (Second) of Torts* § 769 cmt. c (creditor); *In re Crestmark of Pinellas Park, Inc.*, 218 B.R. 621, 624 (Bankr. M.D. Fla. 1997) (lost value of collateral); *see also Bryan v. Mass. Mut. Life Ins. Co.*, 178 W. Va. 773, 780, 364 S.E.2d 786, 793 (1987).

14

Blackjewel was in default under its loan agreements due to, among other things, its imminent bankruptcy filing. *See* CSF ¶ 45. After notifying Blackjewel that it was in default on June 30, 2019, United Bank notified Clearwater that, due to the default of its affiliate, Clearwater was in default under the Clearwater Loan Agreement. *Id.* ¶ 47. United Bank exercised rights under the Clearwater Loan Agreement and Control Agreement to assemble collateral and take exclusive control of the Clearwater IMA. *Id.*

There is no dispute that Clearwater intended to use the Clearwater IMA to fund post-petition financing. United Bank was understandably concerned that, despite Clearwater being in default on its loan obligations, Clearwater would fund the DIP Loan with a significant portion of the collateral, so the bank took action to protect that collateral. *Id.* ¶¶ 44, 47. At all times, United Bank acted pursuant to contractual rights to protect collateral securing a defaulted loan. United Bank's conduct is the definition of justified interference.

**2.      United Bank did not use "wrongful means" or otherwise pursue an improper purpose when it took action to protect its financial interest, which was at stake in the bankruptcy and proposed financing.**

The Trust does not contest that United Bank had a financial interest, but rather argues that the bank used "wrongful means" because it 1) allegedly acted without contractual rights, and 2) committed various other supposedly unfair acts [ECF No. 138 at 19-31]. The Trust is wrong.

**a.      United Bank acted at all times pursuant to its rights under the loan agreements with Clearwater and the Debtors.**

**i.      Clearwater was in cross-default because it was an "affiliate" of Blackjewel due to common ownership and control.**

The Trust claims that Debtor entities were not "affiliates" of Clearwater as that term is used in the cross-default provision of the Clearwater Loan Agreement [ECF No. 138 at 19-23]. It says that "Debtors were never contractually designated as 'affiliates' of Clearwater" and that "Debtors

are not 'affiliates' of Clearwater based on alleged common ownership and control." *Id.* The undisputed facts demonstrate that the Trust is wrong on both accounts.

"It is the province of the court, and not of the [factfinder], to interpret a written contract." Syl. Pt. 2, *iPacesetters, LLC v. Douglas*, 239 W. Va. 820, 806 S.E.2d 476 (2017) (citation omitted).

> To respect the parties' intent, courts should give the words in a contract their ordinary meaning. An agreement expressing the parties' intentions in 'plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.'

*Safeco Ins. Co. of Am. v. Mountaineer Grading Co.*, 2:10-CV-01301, 2012 WL 830158, at *4 (S.D. W. Va. Mar. 9, 2012) (internal citation omitted)."The mere fact that parties do not agree to the construction of a contract does not render it ambiguous." Syl. Pt. 4, *Blake v. State Farm Mut. Auto. Ins. Co.*, 224 W. Va. 317, 685 S.E.2d 895 (2009).

*First*, the Trust posits that nothing prior to July 1, 2019, specifically states that Clearwater and Blackjewel are affiliates such that a cross-default relationship exists. The Trust also relies on statements made by one United Bank credit analyst who suggested in an internal memorandum that a cross-default relationship should be required [ECF No. 138 at 19-20]. These arguments are a hollow attempt to distract the Court and should be disregarded.

It is black-letter law that "[a] written contract merges all . . . representations which occurred before its execution, and . . . extrinsic evidence cannot be used to alter or interpret language in a written contract which is otherwise plain and unambiguous on its face." Syl. Pt. 4, *HN Corp. v. Cyprus Kanawha Corp.*, 465 S.E.2d 391 (W. Va. 1995). The law is clear that extrinsic evidence about what United Bank thought, what its employees thought, or what the bank told others about its interpretation of a contract at any time is completely irrelevant. The proper inquiry is whether undisputed facts about Clearwater and Blackjewel establish that they were "affiliates" under the

cross-default provision of the Clearwater Loan Agreement. The contract language and the facts about these entities—and nothing else—are the basis of the analysis.

*Second*, the Trust has painted an incomplete picture of the facts about affiliation [ECF No. 138 at 20-23]. There can be no genuine dispute that Revelation, Blackjewel, and Clearwater were affiliated by common ownership and control of Hoops and his family.

The term "affiliate" is unambiguous. It is "[a] corporation that is related to another corporation by shareholdings or other means of control." *Affiliate*, BLACK'S LAW DICTIONARY (11th ed. 2019); ECF No. 106-1 at 8 (similar banking industry definitions based on common ownership and control). Commonly owned and controlled corporations "clearly" constitute "affiliates." *See, e.g.*, *Churchville v. GACS Inc.*, 973 So.2d 1212, 1215 (Fla. Dist. Ct. App. 2008).

**The Hoops family had common ownership interests in Blackjewel and Clearwater**.

Hoops' son, Jeremy, was the trustee of the Blackjewel Trust, which held a 37.5% interest in Blackjewel. CSF ¶ 5. Likewise, Hoops was the grantor of the Clearwater Trust, which owned 99% of Clearwater. Hoops' sons, Jeffrey and Jeremy, were the trustees of the Clearwater Trust. Hoops' wife, Patricia, owned the other 1%. *Id.* ¶ 17. Therefore, Blackjewel and Clearwater share common owners.

In addition, Hoops controlled both Blackjewel and Clearwater. **Hoops controlled Blackjewel**, and it is absurd to claim otherwise. The Trust's contrary argument rests only on the fact that Hoops was not majority owner or majority board member [ECF No. 138 at 23].

But one does not have to be a majority stakeholder to have control. "[I]n the context of corporations and partnerships, the word 'control' can refer to either the management of a company's day-to-day operations *or* to a majority ownership interest." *Newport Assocs. Phase I Devs. Ltd. P'Ship v. Travelers Cas. & Sur. Co.*, No. A-5543-11T1, 2013 WL 10090299, at *10

(N.J. Super. Ct. App. Div. Jan. 16, 2015) (analyzing "control" in contract); *see also Voigt v. Metcalf*, No. 2018-0828-JTL, 2020 WL 614999 at *10-11 (Del. Ch. Feb. 10, 2020) (discussing factors: "ownership of a significant equity stake (albeit less than a majority), the right to designate directors (albeit less than a majority), . . . rules . . . that enhance the power of a minority stockholder or board-level position, and the ability to exercise outsized influence in the board room or on committees, such as through high-status roles like CEO, Chairman, or founder").

As discussed, the Hoops family had a significant 37.5 % ownership interest in Blackjewel. Hoops founded predecessor entity Revelation, was the President and CEO of Blackjewel, and had one of the three votes on the board at Blackjewel. CSF ¶¶ 1, 5, 7, 9. By Blackjewel's own documents, officers had "primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board" on which Hoops sat. Trust App. at 181-82. He was also an authorized signer on Blackjewel accounts—which gave him authority to "[e]xercise all of the powers" available—and the Trust agrees that he had authority to conduct financial transactions. CSF ¶¶ 15-16.[6] Hoops controlled Blackjewel.

The undisputed evidence also indicates that **Hoops controlled Clearwater**. The Trust contends that, because the Clearwater operating agreement identifies Patricia as initial manager, Hoops could not have exercised control [ECF No. 138 at 21]. This one fact taken out of context is far from the entire story about who controlled Clearwater.

As an initial matter, the Trust fails to mention that it has represented to the Court on multiple occasions that Clearwater "is an entity owned directly or indirectly by Jeffery [sic] A. Hoops," and that it is "an entity that [Hoops] controls" or that "is an entity controlled by Mr. Hoops

---

[6] The Trust relies on statements by a United Bank credit analyst about who controlled Blackjewel [ECF No. 138 at 23]. The thoughts of one United Bank employee are not determinative on this legal issue.

or his family." CSF ¶¶ 51, 59. These constitute judicial admissions and cannot be denounced by

the Trust. *See, e.g.*, *1899 Holdings, LLC v. 1899 Liab. Co.*, 568 F. App'x 219, 225 (4th Cir. 2014)

(citation omitted) ("[A] lawyer's statements may constitute a binding admission of a party if the

statements are deliberate, clear, and unambiguous.").[7]

Moreover, these judicial admissions are consistent with the record. While the Trust argues

that Hoops did not control Clearwater because Patricia was identified as the initial manager it its

operating agreement, every other piece of evidence points to Hoops exercising control.

Hoops viewed Clearwater's money as his money and described it to third parties as a

holding company for *his* investments, which had been organized "for tax purposes." CSF ¶¶ 22-

23. Patricia testified that she gave Walls authority to manage the affairs of Clearwater. *Id.* ¶ 21. In

turn, when Clearwater opened its accounts at United Bank, Walls sent an Executive Summary—

approved by Hoops and transmitted to Patricia—that indicated Hoops would "from time to time

act as manager." He also told the bank that Clearwater was "set up" by Hoops and directed it to

make him an authorized signer. *Id.* ¶¶ 24-25, 27, 38.

Everyone knew that Hoops was managing Clearwater. CFO Walls permitted Hoops to do

so and behaved as if Hoops was his direct report. *Id.* ¶¶ 38-40. Hoops signed an investment

management account agreement and negotiated financing for Clearwater. *Id.* ¶¶ 28, 31.  Hoops

also guaranteed the Clearwater Loan Agreement with Patricia, both representing that they had the

authority and were members of Clearwater. *Id.* ¶ 34. As Walls instructed, Hoops was an authorized

signer for Clearwater—which gave him authority to "[e]xercise all of the powers" available—and

---

[7] *See also* 6 Handbook of Fed. Evid. § 801:23 Rule 801(d)(2)(D) (9th ed.); 2 McCormick on Evid.
§ 259 (8th ed.) ("If an attorney is employed to manage a party's conduct of a lawsuit, the attorney has prima
facie authority to make relevant judicial admissions . . . which unless allowed to be withdrawn are
conclusive in the case.").

held himself out as "manager" and "owner." *Id.* ¶¶ 30, 38; *see also W. Assur. Co. v. Star Fin. Bank of Indianapolis*, 3 F.3d 1129, 1131 (7th Cir. 1993) (following signature card is good faith and reasonable).[8]

Hoops thus had actual authority from Walls, and by extension his wife Patricia, to manage Clearwater.

The facts and circumstances also indicate that Hoops had apparent authority over Clearwater. "[A]pparent authority . . . may be inferred," when "[o]ne who by his acts or conduct has permitted another to act apparently or ostensibly as his agent," and a third person "dealt with the apparent or ostensible agent in good faith and in the exercise of reasonable prudence," the principal "is estopped to deny the agency relationship." *Messer v. Huntington Anesthesia Grp., Inc.*, 222 W. Va. 410, 418, 664 S.E.2d 751, 759 (2008) (citation omitted).Hoops

The Trust argues incorrectly that the only evidence upon which United Bank relies is "[s]tray language in an email"—*i.e.*, the email where Clearwater CFO Walls said Hoops would "from time to time act as manager"—and it contends that the communication is meaningless because Walls testified "this language was in error" [ECF No. 138 at 21-22]. What the Trust omits is that Walls testified he never notified United Bank of the purported error, and Patricia testified she thought the summary was "okay." CSF ¶¶ 25-26.

Moreover, Walls directed United Bank to make Hoops an authorized signer—which gave him authority to exercise all powers available to a manager and owner—and Patricia testified that this was acceptable to her. *Id.* ¶¶ 27, 38.  Both the manager and the CFO of Clearwater were aware

---

[8] The Trust attempts to downplay Hoops' authority as only the ability to "initiate certain transactions in Clearwater accounts" [ECF No. 138 at 21], but it must be emphasized that Clearwater was an investment holding company and its financial assets were at United Bank.

that Hoops had been identified as a manager to United Bank, but neither did anything to correct the representation. That is the definition of apparent authority.

The Trust further contends that United Bank cannot rely on this apparent authority because the bank possessed an operating agreement that identified Patricia as the sole manager [ECF No. 138 at 21-22]. But the mere fact an operating agreement identified Patricia as the sole manager does not destroy Hoops' authority. Notably, the operating agreement also identified Hoops as eligible to be named manager. Trust App. at 283, 286 (§§ 1.1(k) & 3.1). And, of course, management at Clearwater is free to delegate authority to others—including Hoops—as it sees fit.

How Clearwater governed and managed itself was no concern of United Bank. United Bank did not have a duty to obtain the operating agreement, much less ensure that Clearwater complied with its terms. *Greenfield Plaza Invs. LLC v. Stearns Bank N.A.*, No. CV 12-389-PHX-SRB, 2012 WL 13024089, at *9 (D. Ariz. Aug. 14, 2012) ("Such a duty would require banks to insert themselves into the private affairs of their customers and police agreements . . . ."). In fact, United Bank personnel testified that the bank's own policy did not require obtaining the operating agreement. It was just one of the documents that could confirm Clearwater was an existing entity before opening an account. CSF ¶ 29.

Clearwater and Blackjewel were "affiliates" under the Clearwater Loan Agreement and Clearwater was subject to cross default when Blackjewel defaulted.

### ii.   United Bank complied with all relevant contract terms when it exercised control over the Clearwater collateral.

In the alternative, the Trust contends that "United Bank was not entitled to exercise collateral remedies against Clearwater on July 1, 2019" [ECF No. 138 at 23]. It says that, due to supposedly applicable cure periods in their loan agreements, neither Blackjewel nor Clearwater were in default at the time. *Id.* at 23-26. These arguments are incorrect.

21

*First*, Blackjewel was undoubtedly in default under its loan agreements with United Bank. The Trust's contrary contention that "no default existed" because United Bank "ignored the cure period" is without merit [ECF No. 138 at 25-26].

As an initial matter, the Trust discusses only the two sections of the Blackjewel Loan Agreement specifically cited in the notice of default sent to Blackjewel on June 30, 2019, those being §§ 11.1(j) and (k). *Id.* Not only is the Trust's interpretation of the agreement incorrect, but it also fails to account for any number other defaults by Blackjewel under its revolving line of credit and its term loan with United Bank, none of which contained cure periods or required United Bank to notify Blackjewel of its default.[9] The applicable provisions bear reproduction here.

"Events of Default" under the Blackjewel Loan Agreement are "[t]he occurrence and continuance uncured beyond any applicable cure period" of events including:

> (e)     Cessation of Business or Voluntary Insolvency Proceedings. The . . . filing by Debtor of a petition or request for liquidation, reorganization, arrangement, adjudication as bankrupt, relief as a debtor, or other relief under the bankruptcy, insolvency, or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction now or hereafter in effect . . . ;
>
> . . . . .
>
> (k)     Insecurity; Change.   Secured Party shall believe in good faith that the prospect of payment of all, or any part, of the Indebtedness or performance of Debtors' obligations under the Transaction Documents or any other agreement between Secured Party and Debtor is impaired; or there shall occur any materially adverse change in the business or financial condition of Debtor which is not remedied within thirty (30) days after notice thereof by Secured Party to Debtor.

Trust App. at 789-91 (§§ 11.1(e), (k)). Subsection (e) does not contain a cure period; the existence of default is immediate upon filing for bankruptcy protection. *Id.* And, contrary to the Trust's incomplete quotation [ECF No. 138 at 25-26], the 30-day cure period in subsection (k) only applies

---

[9] Nor does the notice of default sent to Blackjewel limit the ways it was in default; it merely recites the defaults of which United Bank was notifying Blackjewel and says they are "*inter alia.*" CSF ¶ 46.

to the second half regarding "materially adverse change," not the first half regarding the "prospect

of payment" of any portion of the debt. Trust App. at 790-91 (§ 11.1(k)). Neither subsection (e)

nor the first portion of subjection (k) requires any notice to the Debtors.

In addition, Blackjewel had a term loan that included "Events of Default":

> **Material Adverse Change**. Any material adverse change in Borrower's business,
> financial condition, or the Property has occurred or is imminent; if the full
> performance of the obligations of any Party is materially impaired; or if the
> Collateral and its value or Lender's rights with respect thereto are materially
> impaired in any way. The existence or reasonable likelihood of litigation,
> governmental proceeding, default, or other event that may materially and adversely
> affect a Party's business, financial condition, or the Property.
>
> . . . . .
>
> **Judgments or Attachments**. If there is entered against a Party a judgment that
> materially affects the Borrower's business, financial condition, or the Property, or
> if a tax lien, levy, writ of attachment, garnishment, execution, or similar item is or
> will be issued against the Collateral or which materially affects Borrower's
> business, financial condition, or the Property, and which remains unpaid, unstayed
> on appeal, undischarged, unbonded, or undismissed for thirty days after it was
> issued.
>
> . . . . .
>
> **Insecurity**. If Lender has a good-faith belief that any Party is unable or will soon
> be unable to perform the Party's duties under this Agreement or under the Related
> Documents.

**Ex. 4** at 3. There is no cure period associated with these events, and none of them require any

notice to Debtors before the default becomes effective. *Id.*

United Bank did not "ignore[] the cure period." Blackjewel and Revelation were in default

based on all the quoted provisions, none of which include a cure period or require notice. For the

reasons stated in the notice of default transmitted on June 30, 2019—*inter alia*, a judgment against

Revelation, the poor state of Wyoming operations, Hoops' resignation, prolonged exhaustion of

the line of credit, and imminent bankruptcy—the quoted insecurity, material adverse change, and

judgment events of default had occurred when United Bank issued the notice. Trust App. at 639-43. And, of course, the Trust acknowledges that Blackjewel and Revelation were, at the very least, in default under § 11.1(e) of the Blackjewel Loan Agreement when they filed for bankruptcy protection. *See* CSF ¶ 54.

*Second*, Clearwater was in default under the Clearwater Loan Agreement, and there was no period that United Bank had to wait before assembling its collateral.

No one disputes that, if Clearwater was affiliated with Blackjewel, the defaults of Blackjewel result in defaults by Clearwater. As for United Bank's "Remedies Upon Default," however, the Trust only quotes part of the relevant provision. The opening paragraph, as well as the relevant portion of the section on assembling collateral, are as follows:

> 11.    **Remedies Upon Default.**  If an Event of Default occurs under this Agreement, which remains for a period of ten (10) days for a monetary default or a period of thirty (30) days for a non-monetary default (or such other period as agreed to by Borrower and Lender) following written notice provide to Borrower (except as to a monetary default in Paragraph 9(a) for which no notice is required), at any time thereafter Lender shall have all the rights of a secured party at law, in equity, and all rights as set forth in the Loan Documents. ***In addition and without limitation, Lender may exercise any one or more of the following rights and remedies***:
>
> . . . . .
>
> (b)    *Assemble Collateral:* Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. . . .

Trust App. at 384 (emphasis added).

The Clearwater Loan Agreement did not place any restraints on United Bank's right to assemble collateral in the event of cross-default. That right was "[i]n addition and without limitation," unlike the remedies to which the agreement assigns cure periods.

One piece of evidence the Trust relies on in support of its contrary interpretation is testimony of United Bank's Rule 30(b)(6) designee [ECF No. 138 at 24-25]. This reliance is unavailing. The cited testimony does not discuss all of the language addressed herein, and it consists almost exclusively of improper leading questions that call for legal conclusions. Interpretating the agreement is the province of the Court, *iPacesetters, LLC*, 239 W. Va. 820, 806 S.E.2d 476, at Syl. Pt. 2, not the extrinsic testimony of a corporate representative.[10]

Moreover, United Bank could exercise control over the Clearwater IMA at any time. The parties executed a Control Agreement among Clearwater as borrower, United Bank as lender, and United Bank as intermediary and manager of the Clearwater IMA. It provided:

> (a)   **Notice of Sole Control**.      If *at any time* Lender delivers to Intermediary a notice instructing Intermediary to terminate Borrower's access to the Account (the "<u>Notice of Sole Control</u>"), Intermediary agrees that, after receipt of such notice it will take all instruction with respect to the Account or any funds therein, and cease taking instructions from Borrower, including, without limitation, instructions for distribution or transfer of any funds in the Account.

Trust App. at 392 § 4(a) (emphasis added). To the extent of any conflict between the Clearwater Loan Agreement and the Control Agreement, the Control Agreement prevailed. *See id.* at 394 § 7.

In sum, United Bank complied with the terms of the loan agreements with Clearwater and Blackjewel, and the Trust's contrary argument should be rejected.

> ### iii.    Even if United Bank was mistaken regarding its contract rights, it acted in good faith, which is not a "wrongful means."

In the alternative, even if the Court disagrees with United Bank's contractual interpretation, United Bank cannot be punished in tort for taking the wrong side of a debatable legal question.

---

[10] Nor is the bank bound by Rule 30(b)(6) testimony about contract interpretation. *See, e.g.*, *HSK v. Provident Life & Accident Ins. Co.*, 128 F. Supp. 3d 874, 882 (D. Md. 2015) ("[A] corporate designee cannot 'bind' the corporation to *legal* conclusions[.]"); *Biltmore Ave. Condo. Ass'n, Inc. v. Hanover Am. Ins. Co.*, No. 1:15-CV-00043-MR-DLH, 2017 WL 927259, at *5 (W.D.N.C. Mar. 8, 2017); *Cat Iron, Inc. v. Bodine Env't Servs., Inc.*, No. 10-CV-2102, 2011 WL 2457486, at *8 (C.D. Ill. June 15, 2011); *Town of Lexington v. Pharmacia Corp.*, No. 12-CV-11645, 2015 WL 1321457, at *6 (D. Mass. Mar. 24, 2015).

Courts across the country hold that a good faith belief is sufficient justification for tortious interference. *See, e.g.*, *Rockey Mountain Biologicals, Inc. v. Microbix Biosystems, Inc.*, 986 F. Supp. 2d 1187, 1200 (D. Mont. 2013) ("[A]ction taken in the good faith belief that it is performed with right and justifiable cause cannot serve as the basis for a tortious interference claim, even if it turns out that, in fact, the action is not legally justified."); *see also Am. Broad. Co. v. Maliack Prods., Inc.*, 34 F. Supp. 2d 665, 675 (N.D. Ill. 1998); *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 218 (Tex. App. 2013).

At the very least, the evidence establishes that United Bank acted under a good-faith belief that Blackjewel and Clearwater were "affiliates" and that it could assemble and control collateral due to cross-default. Mistakenly exercising contract rights in good faith cannot constitute "wrongful means" sufficient to impose liability.

### b.    None of United Bank's other conduct was "wrongful" or otherwise negates the justified efforts to protect its collateral.

The Trust also takes issue with a hodge-podge of details that it claims constitute "wrongful means." It says United Bank acted improperly by 1) exercising control over all of its collateral, 2) holding collateral until the defaults—including those of the Debtors—were cured, 3) requesting a release in exchange for giving up the contractual right to control its collateral, and 4) placing holds on accounts not intended for use in the DIP Loan [ECF No. 138 at 26-32]. These actions were not improper in any way, much less "wrongful means" that defeat justification.

Tellingly, the Trust does not cite a single case holding that these circumstances constitute "wrongful means," and its argument evinces a fundamental misunderstanding of tortious interference. The "wrongful means" that will negate justification must be the means used to interfere; the act of interference must be "through wrongful means." *See, e.g.*, *In re LightSquared Inc.*, 504 B.R. 321, 351 (S.D.N.Y. 2013); *In re Montagne*, 425 B.R. 111, 135 (Bankr. D. Vt. 2009)

("The act of interference must be wrongful or improper . . . ."); *Dykstra v. Page Holding Co.*, 766 N.W.2d 491, 499 (S.D. 2009) ("The . . . act of interference . . . must be improper."). The "act of interference" here is the exercise of control over the Clearwater IMA. Other acts that the Trust claims were somehow improper, though they occurred around the same time, are simply irrelevant to the analysis. But, in any event, none of the conduct identified by the Trust was improper.

*First*, it was not wrongful for United Bank to exercise control over the entire $25 million account that secured an $11 million debt. The entire Clearwater IMA was collateral under the defaulted Clearwater agreement. CSF ¶ 33. The contract between United Bank and Clearwater— not the Trust's self-serving desire—dictates how the bank was entitled to protect its collateral upon default. The Clearwater Loan Agreement gave United Bank the right to assemble its collateral and exercise control without regard for the amount of collateral in which it was protecting an interest. Exercising a contract right to protect collateral is not wrongful.[11]

Moreover, the Clearwater Loan Agreement did not require United Bank to take on the risk that the Trust thinks it should have. On July 1, 2019, the Clearwater IMA contained approximately $19.7 million in cash and $5.4 million in bonds and equities. Trust App. at 712. Had United Bank held all but the $9 million needed for the post-petition financing, there would only have been about

---

[11] *See, e.g.*, *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 477-78 (S.D.N.Y. 2013) (because "defendants were exercising discretion afforded by" a contract "they could not have employed the requisite 'wrongful means'"); *In re Bath*, 442 B.R. 377, 393 (E.D. Pa. 2010) ("[T]he fact that a breaching party acted 'to advance [its] own interest and financial position' does not establish . . . malice or wrongful conduct."); *Dalton Diversified, Inc. v. AmSouth Bank*, 270 Ga. App. 203, 209, 605 S.E.2d 892, 898 (2004) ("The actions by a secured creditor exercising its contractual rights does not constitute the wrongful improper conduct necessary for this tort action[.]"); *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 651-52, 891 P.2d 639, 647 (1995) ("When a party invokes an express contractual remedy in circumstances specified in the written contract . . . that party cannot be liable for intentional interference with economic relations based solely on that party's reason for invoking the express contractual remedy.").

$10.7 million in cash and $5.4 million in fluctuating bonds and equities.[12] Approximately a third of that remainder could change in value at any moment. Contrary to the Trust's bare assertions [ECF No. 138 at 26-27], there can be no doubt that United Bank was acting to protect its financial interest by exercising control over the entire Clearwater IMA.

*Second*, it was not wrongful for United Bank to indicate that it would continue protecting its collateral until the cross-default was cured, with one option for that cure being payment by Clearwater for the outstanding debts of defaulted Debtor entities.  It is confounding that the Trust claims this is "wrongful" conduct and that "[n]othing in the Clearwater Loan Agreement or any other document or agreement required Clearwater to pay off someone else's loan, even upon the occurrence of an alleged cross-default." *Id.* at 28. Defaulting an affiliate and exercising remedies until the defaults of the other entity are cured—by the cross-defaulted affiliate if it so chooses—is the very purpose of a cross-default provision in a loan agreement.

Courts hold that requesting payment of a bankruptcy debtor's obligation by a cross-defaulted entity is not improper. *See, e.g.*, *In re Formica*, No. 20-23404-ABA, 2021 WL 1921842, at *19 (D.N.J. May 21, 2021) (analyzing issue in the context of automatic stay). And, like the exercise of any other contractual right, requesting payment of a debt due under a contract cannot be improper.  *See, e.g.*, *In Touch Concepts, Inc.* 949 F. Supp. 2d at 477-78; *In re Bath*, 442 B.R. at 393; *Dalton Diversified, Inc.*, 270 Ga. App. at 209, 605 S.E.2d at 898; *Uptown Heights Assocs. Ltd. P'ship*, 320 Or. at 651-52, 891 P.2d at 647. That the Trust feels the source of its post-petition financing was held "hostage" has no bearing on the analysis.

---

[12] The Trust says this amount exceeded the loan-to-collateral requirements of the Clearwater Loan Agreement [ECF No. 138 at 27]. That is a borrower's covenant that applies during the ordinary course of the loan; it has no effect on United Bank's remedies in the event of default.

*Third*, it was not wrongful for United Bank to propose a release of claims as one of the terms under which it would stop exercising control over the collateral. Both before and after the first day hearing on July 1, 2019, United Bank sought a release as possible consideration for giving up its bargained-for collateral rights because Hoops threatened to sue United Bank. **Ex. 26** at 157:18-160:14. It is especially disingenuous for the Trust to claim requesting a release is somehow wrongful, given that the Debtors asked to release Hoops from liability at the beginning of this bankruptcy but are now suing him separately. *See* CSF ¶ 58.

Moreover, the allegation that United Bank somehow concealed an error with processing payroll is a red herring. When United Bank learned that payroll had not been processed on Friday, June 28, 2019, it corrected this issue by opening its operations center on Saturday, June 29, 2019, and processing cashiers' checks that it had gathered from various branches so that Blackjewel could pay employees. *Id.* ¶ 43. No one has ever alleged that these circumstances caused the DIP Loan to fail, and the Trust has not alleged how United Bank could be liable in connection with a payroll processing issue that was quickly remedied.

*Fourth*, it was not wrongful for United Bank to place an administrative hold on the Clearwater deposit account or any other account. *See Id.* ¶ 61; ECF No. 106-1. But, more importantly, those holds had nothing to do with the allegations of tortious interference. As the Trust notes, the Clearwater deposit account contained under $600,000 [ECF No. 138 at 29]. No one has ever argued that the Clearwater deposit account would have been the source of funds for the $9 million that Clearwater agreed to loan the Debtors, much less that the unavailability of the deposit account was the reason the financing could not go forward. The same is true of the accounts of non-debtor entities to which the Trust vaguely refers. Rather, the control that United Bank exercised over the $25 million Clearwater IMA is the act of interference at issue in this case.

None of the supposedly improper acts complained of by the Trust were wrongful, much less the "wrongful means" of interference that might subject United Bank to tort liability.

### III. CONCLUSION

No one disputes that the Trust's bankruptcy reorganization efforts have been atypical. The Trust had not accounted for its affiliation with Clearwater when the Trust hinged the whole of its operations on the availability and approval of $9 million in proposed financing from Clearwater. But the reality is that Clearwater and Blackjewel were affiliated due to common ownership and control by Hoops and his family. As a result, under the Clearwater Loan Agreement, Clearwater defaulted when Blackjewel defaulted, giving United Bank the right to exercise its contractual rights to protect collateral.

The Trust believes that it was treated unfairly. The Trust claims that the affiliation caught it off guard. The Trust says that there were grievous consequences for its unexpected miscalculation. None of these beliefs, however, affect whether United Bank was justified to interfere with the financing. Based on the material facts as to which there is no genuine dispute— try as the Trust may to distort them—there can be no doubt that United Bank acted with justification and did not employ wrongful means.

For the reasons set forth above, United Bank respectfully requests that this Honorable Court deny the Trust's Motion [ECF No. 138], grant its competing motion for summary judgment [ECF Nos. 136, 137], enter summary judgment in its favor against the Trust, and dismiss all claims in the First Amended Complaint with prejudice.

Respectfully submitted,

**UNITED BANK**,
by Counsel,

/s/ Peter J. Raupp
Ancil G. Ramey (WVSB # 3013)
Joseph G. Bunn (WVSB #11319)
Peter J. Raupp (WVSB #10546)
C. Haley Bunn (WVSB #11313)
James E. McDaniel (WVSB #13020)
Chase Tower, 17th Floor
Post Office Box 1588
Charleston, West Virginia 25326-1588
Telephone: (304) 353-8000
Facsimile: (304) 353-8180
Ancil.Ramey@Steptoe-Johnson.com
Joe.Bunn@Steptoe-Johnson.com
Peter.Raupp@Steptoe-Johnson.com
Haley.Bunn@Steptoe-Johnson.com
Jim.McDaniel@Steptoe-Johnson.com

**STEPTOE & JOHNSON PLLC**
**OF COUNSEL**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| | ) | |
| **Blackjewel, L.L.C., et al.,** | ) | **Case No. 19-30289** |
| | ) | |
| **Debtors,** | ) | **(Jointly Administered)** |
| _____ | ) | |
| | ) | |
| | ) | |
| **BLACKJEWEL, L.L.C., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Adv. Proceeding No. 3:20-ap-03007** |
| **v.** | ) | |
| | ) | |
| **UNITED BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that **"DEFENDANT UNITED BANK'S RESPONSE
AND BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT "** was filed and served upon counsel via the court's filing system on the 14th day of
December 2021.



*/s/* Peter J. Raupp_____