# EXHIBIT 1

Case 3:20-ap-03007   Doc 141-1   Filed 12/14/21   Entered 12/14/21 16:43:55   Desc
Exhibit 1   Page 2 of 17

BLACKJEWEL, LLC, ET AL. v.  
UNITED BANK

JEFFERY HOOPS  
10/13/2021

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3   * * * * * * * * * * * * * * * * * * * * *

 4   In re:
                                   Chapter 11
 5   Blackjewel, L.L.C., et al,
                              Case No. 19-30289
 6          Debtors,
                         (Jointly Administered)
 7   _____

 8
     BLACKJEWEL, L.L.C., et al.
 9
            Plaintiffs,
10
     v.            Adv. Proceeding 3:20-ap-03007
11

12   UNITED BANK,

13          Defendant.

14   * * * * * * * * * * * * * * * * * * * * *

15

16        Videotaped deposition of JEFFERY HOOPS
     taken by the Defendant under the Federal Bankruptcy
17   Rules in the above-entitled action, pursuant to
     notice, before Elizabeth A. Hill, Court Reporter,
18   at Steptoe & Johnson, 1700 Chase Tower, Charleston,
     West Virginia, on the 13th day of October, 2021.
19

20

21            REALTIME REPORTERS, LLC
                Elizabeth A. Hill
22                713 Lee Street
              Charleston, WV  25301
23                (304) 344-8463
               realtimereporters.net
24
```

| | |
|---|---|
| BLACKJEWEL, LLC, ET AL. v. | JEFFERY HOOPS |
| UNITED BANK | 10/13/2021 |

```
 1                       APPEARANCES

 2   APPEARING FOR THE PLAINTIFFS:

 3        Scott A. Kane, Esquire
          Jennifer Dollard-Smith, Esquire (telephonically)
 4        SQUIRE PATTON BOGGS
          201 E. Fourth Street
 5        Suite 1900
          Cincinnati, OH  45202
 6        Scott.Kane@squirepb.com
          Jennifer.Dollard-Smith@squirepb.com
 7
     APPEARING FOR THE DEFENDANT:
 8
          C. Haley Bunn, Esquire
 9        Peter J. Raupp, Esquire
          STEPTOE & JOHNSON
10        1700 Chase Tower
          17th Floor
11        Charleston, WV  25336-1588
          Haley.Bunn@Steptoe-Johnson.com
12        Peter.Raupp@Steptoe-Johnson.com

13   APPEARING FOR THE DEPONENT:

14        K. Elizabeth Sieg, Esquire
          Dion Hayes, Esquire
15        A. Wolfgang McGavran, Esquire
          McGUIRE WOODS, LLP
16        Gateway Plaza
          800 East Canal Street
17        Richmond, VA 23219-3916
          (804) 775 1137
18        bsieg@mcguirewoods.com
          dhayes@mcguirewoods.com
19        wmcgavran@mcguirewoods.com

20        Connor D. Robertson, Esquire (telephonically)
          WESTON ROBERTSON
21        2939 Virginia Avenue
          Hurricane, WV  25526
22        (304) 522-4100

23   Also Present:

24        Chris Leigh, Certified Legal Video Specialist
```

BLACKJEWEL, LLC, ET AL. v.
UNITED BANK

JEFFERY HOOPS
10/13/2021

```
 1     Q.  The -- I have viewed your property taxes in
 2  Florida from the Assessor's Office in Pinellas
 3  County, and it lists a Milton address as the
 4  address of record for purposes of property taxes.
 5  Are you aware of that?
 6     A.  I am not surprised by that, but I'm --
 7     Q.  To your knowledge, are those taxes
 8  forwarded to your Milton address, the Florida
 9  property taxes?
10     A.  Yes, sir.
11     Q.  Okay.  You're married to Patricia Hoops;
12  correct?
13     A.  That's correct.
14     Q.  How long have you been married?
15     A.  47 years.
16     Q.  Often that question gets asked with the
17  wife here and it is very awkward, but you didn't
18  pause very long.  Do you recall your wedding date?
19     A.  June 15th, 1974.
20     Q.  Did you get married out of high school?
21     A.  One week after we graduated, yes.
22     Q.  How many kids do you have?
23     A.  Three sons.
24     Q.  What are their names?
```

```
 1      A.   Jeffery II, Jeremy, and Joshua.
 2      Q.   I don't want to assume, but I think -- is
 3 that the order of their births, Jeffery, Jeremy,
 4 and then Joshua?
 5      A.   That's correct, yes.
 6      Q.   How old is Jeffery?
 7      A.   44.
 8      Q.   How old is Jeremy?
 9      A.   40.
10      Q.   And Joshua?
11      A.   33.
12      Q.   Where does Jeffery live?
13      A.   He lives in Scott Depot, West Virginia.
14      Q.   That's pretty close to Milton, isn't it?
15      A.   10 miles or so.
16      Q.   And where does Jeffery work, or where is he
17 employed as best you know?
18      A.   He works for Lexington Coal Company.
19      Q.   For Lexington Coal Company?
20      A.   Yes.
21      Q.   And what does he do for Lexington Coal
22 Company?  What is his position?
23      A.   He's an engineer.
24      Q.   Does Jeffery have a degree in engineering?
```

BLACKJEWEL, LLC, ET AL. v.                                          JEFFERY HOOPS
UNITED BANK                                                            10/13/2021

```
1        A.   Until 2008.
2        Q.   So what happened in 2008?
3        A.   The company was sold.
4        Q.   So did Denham Capital at that point sell
5   their portion of Frasure Creek?
6        A.   Yes.  Actually, I resigned prior to the
7   sale.  The sale was subsequent to my resignation.
8        Q.   Okay.  Why did you resign?
9        A.   I really didn't want to have to work for
10  the next company.  It was for sale, and obviously
11  it was going to be sold, so they brought in a new
12  management team and allowed me to resign and move
13  on at that point.
14       Q.   Time to do something else?
15       A.   Yes, sir.
16       Q.   Okay.  What did you do next?
17       A.   Started Revelation Energy.  It was formed
18  in late -- right at the end of the year in 2008.
19       Q.   When you started Revelation, did you have
20  any mines already --
21       A.   No, sir.
22       Q.   Okay.  When did you first acquire mines for
23  Revelation?
24       A.   Probably early 2009.
```

BLACKJEWEL, LLC, ET AL. v.                                        JEFFERY HOOPS
UNITED BANK                                                         10/13/2021

```
 1      Q.  Did you start off with one mine, more than
 2　one?  Do you recall?
 3      A.  It was just one mine when we started.
 4      Q.  What mine was that?
 5      A.  It was Hunts Branch Mine in Phelps,
 6　Kentucky.
 7      Q.  Did you eventually acquire other mining
 8　operations?
 9      A.  Yes, sir.
10      Q.  How many mining operations did Revelation
11　ultimately acquire?
12      A.  It was more than 10.  I don't recall
13　exactly.
14      Q.  And what states were those mines located
15　in?
16      A.  Revelation was West Virginia, Kentucky, and
17　Virginia.
18      Q.  I have seen records that indicate that
19　Revelation -- and if I'm using the incorrect
20　terminology, please feel free to correct me --
21　became Blackjewel at some point in 2017.  Am I
22　correct in that?
23      A.  Yes, sir.
24      Q.  What was the reason for the creation of
```

1  Blackjewel?
2      A.  In 2017 it was decided by the management
3  and board at Blackjewel that -- or at Revelation at
4  the time.  It was much the same if you looked in
5  the coal industry.  All the major producers were
6  moving to focus on their metallurgical mines.  So
7  the reason was to -- basically, by 2017 Revelation
8  had idled its mines that were used for thermal coal
9  and was focused on just mining metallurgical coal.
10 And so the thought was to really kind of rebrand
11 the company as Blackjewel and focus on maximizing
12 the metallurgical coal that it produced.  And the
13 thermal mines were idled, and so they were left in
14 Revelation.  And the new mines or the metallurgical
15 mines were placed in Blackjewel at the time.
16     Q.  How many mines were idled?  Do you recall?
17     A.  That happened over a number of years, so
18 there were probably 8 or 10 mines idled.
19     Q.  Then how many mines survived?  How many
20 were the met coal mines that kept going?
21     A.  There were probably -- deep mines and
22 surface mines, probably 12 to 15 mines.
23     Q.  So after the creation of Blackjewel, were
24 there any -- did Revelation or Blackjewel operate

1  was made to acquire operations out in Wyoming, but
2  those were thermal?  Were those thermal coal mines?
3     A.  Thermal mines, yes, sir.
4     Q.  We may get into that a little more later,
5  but I appreciate you clarifying that.
6     You testified that in 2017 that decision to
7  create Blackjewel and create the separation was
8  decided by the board.  Who was the board in 2017
9  when that decision was made?
10    A.  The board of directors was Jeff Scofield,
11 John Reynolds, and myself.
12    Q.  And who are Jeff Scofield and John
13 Reynolds?
14    A.  They are -- John Reynolds was the founder
15 of Lime Rock Partners, and obviously a partner in
16 Lime Rock, and Jeff Scofield was the chief
17 operating officer of Lime Rock Partners.
18    Q.  Did you say "chief operating officer"?
19    A.  Yes, sir.
20    Q.  Excuse me.  Are you currently an officer in
21 any business?
22    A.  Not to my knowledge, no.
23    Q.  Are you working today?  And that's a kind
24 of vague question, but are you currently -- do you

1      A.   No.
2      Q.   Was Jeffery a trustee of the Blackjewel
3  Trust?
4      A.   I don't think so.
5      Q.   Was Jeremy a trustee of the Blackjewel
6  Trust?
7      A.   He may have been.
8      Q.   Were you a trustee of the Blackjewel Trust?
9      A.   I'm not sure.  I may have been.  I don't
10 think I could be a trustee, but I -- so I'm not
11 sure.  I don't think so, but I'm not -- you would
12 have to get the organization documents and see.  I
13 just can't tell you off the top of my head.
14     Q.   Whatever the document says it obviously
15 says.  Is that fair enough?
16          MR. KANE:  Object to the form of the
17 question.
18     A.   I wouldn't -- I wouldn't make a blanket
19 statement saying that -- we have seen a number of
20 times here that documents prepared, even prepared
21 by United's attorney, are wrong.  So I'm not going
22 to give you a blanket statement to say because a
23 document says it that it's correct.
24     Q.   You can't -- as you sit here today, you

1  focus of it, and I kind of told them about the
2  project, but I don't remember any questions or
3  anything related to who the owners were or
4  whatever.
5      I think -- I think it's pretty common knowledge
6  that the Hoops family is involved with the Grand
7  Patrician, and I don't know that anybody ever said,
8  "Do you own it?  Are you the member?  Are you the
9  manager?"  I don't remember having those
10 conversations with anyone.
11     Q.  You testified earlier that you -- that Lime
12 Rock was involved with Blackjewel.  Do you recall
13 that?
14     A.  Yes, sir.
15     Q.  I don't think we got into great detail
16 about that, but we'll touch back on that a little
17 more.  What was the nature of the relationship
18 between Lime Rock and Blackjewel?
19     A.  Lime Rock is a private equity fund.  They
20 made a substantial capital investment, almost $90
21 million, in Blackjewel.  They owned 62.5 percent of
22 the company.  They controlled the board.  They were
23 very actively involved in preparing financial
24 models.  They were actively involved in weekly

```
 1  calls, reviewing operations and finances of the
 2  company.  So they were very hands-on and very
 3  involved in the management of the company.
 4      Q.  And I know you already provided this to me,
 5  and I know I'm asking the same question again, but
 6  who were the two individuals?  I think it was --
 7  was it Jeff Scofield and who else were board
 8  members?
 9      A.  John Reynolds.
10      Q.  John Reynolds.  And did they have titles as
11  members of the board?  Were all three of you just
12  members of the board?
13      A.  Just all three board members.
14      Q.  Did you have equal voting rights?
15      A.  They controlled the board.
16      Q.  I understand there were two of them and
17  you, but if you had a vote on the board, did you
18  each get a vote?
19      A.  Yes.
20      Q.  Obviously, two to three would win?
21      A.  Yes.
22              MR. HAYES:  Two to one.
23              MR. KANE:  Two to one.
24              MR. RAUPP:  Two to one.  Thank you for
```

BLACKJEWEL, LLC, ET AL. v.                                    JEFFERY HOOPS
UNITED BANK                                                      10/13/2021

```
 1  the math correction.
 2      Q.  And they invested $90 million, you said?
 3      A.  Approximately, yes.
 4      Q.  When was that?
 5      A.  Over a several year period of time from
 6  2009 to probably 2014.
 7      Q.  And so it wasn't one lump sum?
 8      A.  No.
 9      Q.  Do you remember how many payments they made
10  towards --
11      A.  I would just be guessing, but it was
12  multiple payments, five, six, or more.
13      Q.  And the total about 90?
14      A.  Yes.
15      Q.  And you said that was from 2009 to 2014, so
16  would that have been in the period when it was
17  still Revelation?
18      A.  Yes.
19      Q.  Did their stake transfer then to
20  Blackjewel?
21      A.  Yes.  Yeah.  Blackjewel is actually
22  Revelation, if you look.  Basically, it's the same
23  FEIN number, so it was just a name change of
24  Revelation to Blackjewel.
```

```
 1      Q.  So in terms of your relationship with Lime
 2   Rock and their participation in the board,
 3   nothing -- nothing changed; is that correct?
 4      A.  That's correct, yes, they still had
 5   control.
 6      Q.  Did they always -- I guess from the get-go,
 7   when they first made their first payment towards
 8   their last payment and then onwards towards
 9   bankruptcy, did their ownership percentage ever
10   change?
11              MR. HAYES:  Objection to form.
12      A.  Yes.
13      Q.  I know you testified that they were, I
14   think, 62.5 percent owners.
15      A.  Yes.
16      Q.  Was it ever more than that?
17      A.  I don't think so.
18      Q.  So what -- I guess was it ever less than
19   that?
20      A.  Yes.
21      Q.  Did it increase over time then?
22      A.  Yes.
23      Q.  When they first invested, what was their
24   ownership percentage?
```

| BLACKJEWEL, LLC, ET AL. v. | JEFFERY HOOPS |
|---|---|
| UNITED BANK | 10/13/2021 |

```
1       A.  I don't recall exactly.  It was somewhere
2   in the neighborhood of 50, close to 50 percent
3   owner.
4       Q.  In 2009, or from 2009 until the time of the
5   bankruptcy, were there ever more than the three of
6   you on Blackjewel's board of directors?
7       A.  No.
8       Q.  And you testified a minute ago that they
9   had a somewhat active role.  Am I characterizing
10  that correctly?
11      A.  Yes.  They were very, very involved in the
12  business.
13      Q.  And if you don't mind, tell me what exactly
14  was their day-to-day role in the running of
15  Blackjewel?
16      A.  As I stated, you know, any major
17  acquisitions or decisions related to the company
18  required board -- board approval.  They had weekly
19  calls where they reviewed all the operations each
20  Friday.  They prepared the financial models, the
21  ones that we used for banks.  And they certainly --
22  in the case of Riverstone, they're the ones that
23  came -- came -- brought Riverstone to the table.
24  So they were very involved, especially on the
```

```
 1      A.   That is correct.
 2           MR. RAUPP:  Object to form.
 3      Q.   Because there was no money to pay them?
 4      A.   Yes.
 5           MR. KANE:  Let's take a like
 6  5-minute break so I can organize myself.
 7           THE VIDEOGRAPHER:  The time is
 8  5:10 p.m.  We're off the record.
 9           (Off the record.)
10           THE VIDEOGRAPHER:  The time is
11  5:14 p.m.  We're on the record.
12  BY MR. KANE:
13      Q.   Mr. Hoops, I'm going to jump around a
14  little bit in an effort to make sure I have asked
15  all the questions I want to ask, so apologies.
16  I'll try to let you know when I'm changing topics.
17      I'm going to start with the ownership of
18  Blackjewel.  You said that at the time of the
19  bankruptcy filing, that Lime Rock owned 67.5
20  percent and that your side owned 32.5?  Did I --
21  I'm sorry.  I got it wrong.  62.5 on the Lime Rock
22  side, 37.5 on what I'm going to call just
23  imprecisely your side for now; is that right?
24      A.   That's correct.
```

BLACKJEWEL, LLC, ET AL. v.                                       JEFFERY HOOPS
UNITED BANK                                                       10/13/2021

```
 1              MR. HAYES:  Object to the
 2   characterization.
 3       Q.   Was your side owned by you directly, or was
 4   it owned through another entity?
 5       A.   It was owned by the Blackjewel Trust.
 6       Q.   Okay.  And that -- you testified in
 7   response to questions that those ownership
 8   percentages changed over time as Lime Rock put more
 9   money into Blackjewel.  Did I recall that
10   correctly?
11       A.   That's correct.
12       Q.   Do you recall as of March 30, 2017, what
13   the ownership percentages were?
14       A.   Well, at that time Blackjewel didn't exist.
15   It wasn't formed until the Riverstone loan and
16   restructuring took place in July of 2017.
17       Q.   What about on the Revelation side, what was
18   the ownership percent -- or of Revelation, what was
19   the ownership percentages as between Blackjewel
20   Trust and Lime Rock then?
21       A.   It was a little different than that.  It
22   was -- I would just be guessing.  It was probably
23   60 percent Lime Rock or probably 60 -- yeah, 60
24   percent Lime Rock, probably 35 percent -- I'm
```