# EXHIBIT 26

1              IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2

3
* * * * * * * * * * * * * * * * * * * * * * * *
4
BLACKJEWEL, LLC, et. al.
5
          Debtors,
6

7  vs.                              Case No. 19-30289

8  United Bank,

9          Defendant.

10 * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13        Deposition of Matthew Bond taken by the
   Debtors under the West Virginia Rules of Civil
   Procedure in the above-entitled action, pursuant to
14 notice, before Angela L. Curtis, a Certified Court
   Reporter, at Steptoe & Johnson, 700 Virginia Street,
15 East, Charleston, West Virginia, on the 23rd day of
   September 2021.
16

17
              REALTIME REPORTERS, LLC
18             ANGELA L. CURTIS, CCR
                 713 Lee Street
19           Charleston, WV  25301
                (304) 344-8463
20           realtimereporters.net

21

22

23

24

BLACKJEWELL, LLC, et al. v.                                                   MATTHEW BOND
UNITED BANK                                                                September 23, 2021

1  several years, it's July 1st, 2019.

2      A.   It's burned into my head, but I want to make

3  sure.

4      Q.   Okay.  When you say the early morning, do you

5  have an understanding of was it -- it was technically

6  July 1st, but do you understand that to be essentially

7  very early, before business hours on July 1st or do you

8  have, does United Bank have such an understanding?

9      A.   United Bank's understanding that I believe

10 there were multiple entities that were filing and so

11 the commencement of those filings occurred pre business

12 hours on the 1st.

13     Q.   Okay.  All right.

14     A.   I don't know when the final filings occurred.

15     Q.   Okay.  And do you understand July 1st, 2019 to

16 have been a Monday?

17     A.   I do, yes, sir.

18     Q.   Okay, so when I was asking you questions about

19 United Bank's understanding of the proposed DIP in

20 Blackjewel's bankruptcy cases, I think you indicated

21 that United Bank became aware of it on Sunday; is that

22 correct?

23     A.   To the best of my recollection we became aware

24 of it on Sunday.

BLACKJEWELL, LLC, et al. v.                                    MATTHEW BOND
UNITED BANK                                                    September 23, 2021

1       Q.   Okay and that would have been June 30th then?

2       A.   Yes.

3       Q.   Okay.  All right.

4                  DEPOSITION EXHIBIT D

5                        (E-mail Chain was marked

6            for identification purposes as Deposition

7            Exhibit D.)

8       Q.   The court reporter's handed you what we've

9  marked as plaintiff's Exhibit D.  I'm going to ask you

10 a few questions about that.  Just let me know when

11 you're ready.

12      I will tell you now as well that I'm not going to,

13 it's not my intention right now initially to ask you a

14 lot of questions about the lengthy attachment.

15      A.   Okay.  When you refer to the attachment, are

16 you referring to the debtor in possession note that's

17 attached in the filing or the attachment to the e-mail?

18      Q.   The attachment, all of the attachments to the

19 e-mail we marked as plaintiff's Exhibit D is what I was

20 referring to.

21      A.   Okay.

22      Q.   Okay.  Well, I'll tell you this:  Let me just

23 start asking you questions and if you need more time to

24 review you'll tell me and I'll give it to you.

1    Q.   Okay.  You had, you personally had

2  conversations with Ms. Simpkins?

3    A.   Yes, I personally had conversations.  I can't

4  say that that was -- I think she looked into it and

5  that's what occurred and there may have been others

6  that had conversations as well.

7    Q.   Okay.

8    A.   But that was the conclusion that was reached.

9    Q.   All right.  Do you recall when those

10  conversations occurred?

11   A.   It would have been immediately following all

12  of this.  I mean, so probably over the weekend or

13  within the first couple days of the court or the

14  bankruptcy proceedings.

15   Q.   Okay.  All right.  When did United Bank first

16  become aware that there was a possibility of a

17  Blackjewel bankruptcy filing?

18   A.   Late in the afternoon on the 28th.

19   Q.   Okay.

20   A.   When I say late, I believe 3:00 o'clock or

21  later.

22   Q.   All right.  And how did United Bank become

23  aware of that possibility?

24   A.   Mark Weintraub, who was counsel for

1 Riverstone, reached out to D.F. Mock and indicated that

2 there was a bankruptcy imminent and that Mr. Hoops had

3 resigned his position as CEO of Blackjewel.

4     Q.   Is what you just relayed, is that based on

5 your personal knowledge?

6     A.   That is based upon conversation that I had

7 with D.F. Mock and then a subsequent conversation that

8 I had with Mark Weintraub.

9     Q.   Okay, so Mr. Weintraub's conversation with

10 Mr. Mock took place on the afternoon of June 28th we

11 said?

12    A.   Yes, sir.

13    Q.   When did your subsequent conversation with

14 Mr. Weintraub take place?

15    A.   Within an hour.

16    Q.   Okay.

17    A.   Because I basically spoke to D.F.  D.F. asked

18 that I call Mr. Weintraub to get an understanding.  Had

19 a brief conversation to the same effect of what had

20 been relayed to D.F.

21    Q.   So Mr. Weintraub told you the same things?

22    A.   Yes, sir.

23    Q.   And those things were that a bankruptcy was

24 imminent and that Mr. Hoops had resigned?

1  Mark Weintraub to Mr. Mock and to you; correct?

2      A.   I believe my call was back to Mr. Weintraub,

3  but yes.

4      Q.   Okay.  Fair.  I appreciate that and then you

5  indicated there was, following your call with

6  Mr. Weintraub, there was a meeting between you,

7  Mr. Mills, Mr. Mock and Dave Smith that lasted

8  approximately 20 to 30 minutes to the best of your

9  recollection?

10     A.   Yes, sir.

11     Q.   Okay.  What was discussed at that meeting?

12     A.   Again, our focus was very much on the risk of

13 an overdraft if a bankruptcy filing occurred, so we

14 discussed how we thought we could prevent that to

15 occur.

16     Q.   Okay and how did you believe you could prevent

17 that from occurring?

18     A.   We believed that we had the basis to place

19 post no debits on deposit accounts of Blackjewel and

20 other Hoops entities.

21     Q.   In lay terms, is post no debits freezing the

22 accounts so no obligations can post to it?

23     A.   Not quite.  So post no debit, really that

24 creates a decisioning process for us, a manual

1  decisioning process.  So when you freeze an account, no

2  money can ever go out.  When a post no debit, that

3  limits the ability of others, the ACH money out, to

4  push money out and then a decision any presented items.

5      Q.   Got it.  To make sure I understood that

6  correctly, it doesn't freeze -- post no debits doesn't

7  freeze the account, but it makes sure no money can

8  leave the account without United Bank manually allowing

9  it?

10      A.   That's correct.

11      Q.   Okay.  All right.  So on the afternoon of June

12  28 you said you believed you could place post no debit

13  status.  Can you tell me the accounts again?

14  Blackjewel and what other ones?

15      A.   I can't list out all the accounts, but I

16  believe there was a Clearwater deposit account.  There

17  were other Jeff Hoops related entity accounts.  I can't

18  provide a complete list.

19      Q.   Okay, but United Bank placed numerous accounts

20  in post no debit status on the afternoon of June 28th

21  that included Blackjewel accounts, Clearwater accounts

22  and other accounts?

23      A.   Yes, sir.

24      Q.   Who would know what the other accounts were?

BLACKJEWELL, LLC, et al. v.
UNITED BANK

MATTHEW BOND
September 23, 2021

1      A.    Dave Mills would likely know.  Again, by
2  recollection I'm not sure he can recite off every
3  account, but.
4      Q.    Okay.  Just for clarity of the record, then
5  United Bank did, in fact, place those accounts in post
6  no debit status?
7      A.    That is correct.
8      Q.    Okay.  As the result of that meeting on June
9  28, did United Bank take any other action?
10     A.    No.
11     Q.    Okay, so it was putting the accounts in post
12  no debit status and that was it?
13     A.    That's correct.  We may have, and when I say
14  there may have been an ACH limit reduction, so but that
15  goes with the sort of hand and glove with the post no
16  debit.
17     Q.    Explain the ACH limit reduction to me.
18     A.    So everybody has the -- has limits on what
19  they can ACH out and so if, for example, and this is
20  purely hypothetical, if you're ACH limit were $100,000
21  a day or something like that, then you could generate
22  ACHs up to $100,000 that day.  What we did is we
23  dropped that limit down to I believe it was a nominal
24  number, maybe a dollar or something, again, to prevent

 1  conversation.

 2      Q.   Did he indicate that operations in the west

 3  would cease if the fuel supplier was not paid?

 4      A.   I believe he did indicate that they were low

 5  on fuel.

 6      Q.   Okay.  To your, to United Bank's knowledge,

 7  how long was that conversation between Mr. Hoops and

 8  Mr. Mills on June 28, 2019?

 9      A.   Very brief.  Again, less than five minutes.

10      Q.   Okay.  Did United Bank take any action as a

11  result of that call?

12      A.   Yes, sir.

13      Q.   What action did United Bank take?

14      A.   So that's when we discovered the payroll

15  issue.

16      Q.   Does that mean before that time United Bank

17  believed the ACH transfer had been initiated?

18      A.   Yes.  The assigned officers believed that had

19  been -- that had occurred.

20      Q.   Okay and following Mr. Hoops's call to

21  Mr. Mills on the afternoon of June 28, other officers

22  at United Bank discovered that the payroll ACH had, in

23  fact, not gone out?

24      A.   That's correct.  And I believe those officers,

BLACKJEWELL, LLC, et al. v.
UNITED BANK

MATTHEW BOND
September 23, 2021

1  Dave and Nicole identified that as well.

2      Q.   Okay.  Mr. Mills and Ms. Simpkins became aware

3  of it on that afternoon?

4      A.   That's correct.

5      Q.   All right, so what happened next?

6      A.   We -- we tried to get hold of counsel

7  immediately and we engaged, or not engaged, but we were

8  able to connect with Mr. Bunn and we tried to determine

9  how we could get the -- get the payroll processed.

10      Q.   Okay.  And was it processed?

11      A.   It was -- we were not able to process it via

12  ACH because cutoffs had past and at that point we could

13  not sent an ACH or ACH files out for that payroll.

14      Q.   Okay.

15      A.   So and, again, this was going long into that

16  evening, we were trying to identify ways to get the

17  payroll taken care of and I believe Mr. Bunn was having

18  conversations with Blackjewel's counsel about this and

19  the idea turned to cashier's checks.

20      Q.   Okay.  And I'm going to tell you my

21  understanding and you tell me if it's consistent with

22  United Bank's and yours as its representative that

23  cashier's checks were collected and cut in the net

24  amount of the pay that would have been due to the

1 employees?  Let me stop there.  Is that consistent with
2 United Bank's understanding?
3     A.   United Bank's understanding is that the
4 payroll, that the cashier's checks were gathered.  We
5 were able to identify them.  Initially we didn't think
6 we had enough cashier's checks.  Over the course of the
7 evening we were able to identify enough cashier's
8 checks and cashier's checks were cut based upon the ACH
9 file that had been submitted.
10    Q.   Yes.  And I was -- I was maybe trying to be
11 too precise.  When they were cut on the basis of that
12 ACH file, the amount of the check for an employee would
13 have corresponded to the amount of that employee's net
14 pay, the amount of the ACH transfer the employee would
15 have received?
16    A.   The ACH transfer they would have received.
17    Q.   Okay.  And all those cashier's checks were
18 cut?
19    A.   That's correct.
20    Q.   How were they delivered to Blackjewel?
21    A.   They were to a pilot that I -- a pilot that we
22 were instructed to deliver them to by Jeff Hoops or
23 Mr. Hoops.
24    Q.   All right and Mr. Hoops flew them out to

 1  Wyoming.  Is that United Bank's understanding?

 2      A.   That's our understanding, yes.

 3      Q.   Okay, so back to the conversation on between

 4  Mr. Hoops and Mr. Mills on June 28 when you came out of

 5  your United Bank meeting.  To United Bank's knowledge,

 6  did Mr. Mills ask Mr. Hoops if he had resigned?

 7      A.   I believe that he did, yes, sir.

 8      Q.   What was the response to United Bank's

 9  knowledge?

10      A.   I believe that he said that he had not

11  resigned.

12      Q.   Okay.  All right.  Did Mr. Mills ask him if a

13  bankruptcy filing was imminent?

14      A.   I do not recall.

15      Q.   Okay.  I'd have to ask Mr. Mills?

16      A.   Yeah.

17      Q.   Okay.  Did Mr. Mills indicate to Mr. Hoops

18  that the accounts had been placed in post no debit

19  status?

20      A.   Yes, sir, he had.

21      Q.   Okay.  To United Bank's knowledge did he list

22  the accounts then?

23      A.   Not to my knowledge.  Or not to the bank's

24  knowledge.

1      Q.   Okay.  My understanding, and I want you to

2   tell me if it's consistent with yours for United Bank,

3   is that those cashier's checks were cut sometime on the

4   following Saturday, June 29; is that right?

5      A.   Yes, sir.

6      Q.   Okay.  Did anything else happen at United Bank

7   with respect to Blackjewel or Clearwater accounts on

8   Saturday January 29?

9      A.   No, not to my knowledge.

10            MR. RAUPP:  Scott, you said January.  You

11   mean June.

12      Q.   June 29.

13      A.   I didn't catch that.

14            MR. RAUPP:  I didn't mean to interrupt.

15            MR. KANE:  No, I'm glad you did.

16      Q.   June 29?

17      A.   That is correct.

18      Q.   Okay, so to United Bank's knowledge, other

19   than those checks going out and the accounts having

20   been placed in the post no debit status, nothing else

21   had happened then?

22      A.   That's correct.

23      Q.   Okay.  Do you and United Bank know, were there

24   intended debit transactions hitting the account those

1     A.   I would agree with that.

2     Q.   Okay, so without asking you to indicate that

3  based on what you've already testified, that would

4  indicate that Mr. Bunn's e-mail reflected in

5  plaintiff's Exhibit D, if what we just said about

6  Greenwich Mean Time was accurate, may have been later

7  on July 1st than we talked about before.

8     A.   That would make sense.

9     Q.   Back to the questions about the phone call

10 that you mentioned with Blackjewel's counsel around

11 8:30 am on July 1st.

12    A.   Yes.

13    Q.   Who participated for that call, in that call,

14 for United Bank?

15    A.   For United Bank, I believe it was my self,

16 D.F. Mock and Julie Gurtis.

17    Q.   Who is Julie Gurtis?

18    A.   Julie Gurtis is our chief commercial banking

19 officer.

20    Q.   Okay.  How do you spell her name?

21    A.   G-U-R-T-I-S, Gurtis and then Julie, J-U-L-I-E.

22    Q.   Okay.  All right, so for United Bank, you,

23 Mr. Mock and Ms. Gurtis.  Who participated for

24 Blackjewel?

1      A.    Jeff Hoops.  I believe there was a

2   representative of Lime Rock who was a board member of

3   Blackjewel.  Counsel for Blackjewel was Mr. Lerner.  I

4   don't know if there were others, but those are the ones

5   that I definitely remember.

6      Q.    Okay and other than the people you just listed

7   for United Bank, and I'll say the debtors, did anyone

8   else participate in that call?

9      A.    Our attorney, Mr. Bunn, participated in that

10  call.

11     Q.    Okay.  And what was the purpose of that call?

12     A.    The purpose of that call was to express our

13  concerns with the proposed DIP and the structure of

14  that and how we believed there was a path forward for

15  it.

16     Q.    Okay.  And what were United Bank's concerns

17  regarding the proposed structure of the DIP?

18     A.    So there were several concerns.  It really

19  centered on two different things.  The primary was that

20  the funds used for the DIP were contemplated either as

21  borrowed moneys from United Bank on existing credit

22  facilities or collateral from United Bank accounts that

23  were held as collateral for other loans.  Number one.

24     Number two, we were concerned that the cash

1  that United Bank had already indicated that it would

2  not allow a Clearwater DIP loan?

3          MS. BUNN:   Objection in so far as it

4  calls for privileged information and for speculation.

5  He can't answer as to privileged information.

6          MR. KANE:   I'm not asking him for

7  privileged information.  I'm asking him for United

8  Bank's knowledge.

9      A.    You're going have to ask that one again.

10     Q.    You said, well, you indicated your perspective

11  that United Bank's intent was the notice of exclusive

12  control meant that there could be no Clearwater funded

13  DIP; right?

14     A.    That's correct.

15     Q.    Okay and that notice of exclusive control was

16  provided to Clearwater, I acknowledge your earlier

17  testimony about whether it was early or not, but as

18  reflected by plaintiff's Exhibit E at 4:24 a.m.;

19  correct?

20     A.    Correct.

21     Q.    And my question was:  As reflected in

22  plaintiff's Exhibit D, Mr. Bunn was providing comments

23  about a proposed Clearwater DIP at least an hour and

24  maybe five or six hours after that; right?

1    A.    Yes, sir.

2    Q.    Why was he doing that if United Bank wasn't

3    going to allow the Clearwater DIP?

4    A.    Because we were trying to find a path to cure

5    the defaults that were noted in the notice of exclusive

6    control and thus, if we had been able to come up with a

7    resolution for that, we would have rescinded our notice

8    for exclusive control.

9    Q.    Okay.

10   A.    And we made that through various offers.

11   Q.    Who made that through various offers?

12   A.    The bank via the phone call at 8:30 and also

13   additionally I believe in conversations with counsel.

14   Q.    Okay.  But as to my specific question about --

15   I just want to make sure it's clear for the record.

16   A.    Yeah.

17   Q.    That your view is the notice of exclusive

18   control informed the debtors and Clearwater that there

19   could be no Clearwater DIP?

20   A.    Yes.

21   Q.    Okay.  And you said that Clearwater could have

22   funded the DIP if it would have paid off the Clearwater

23   loan; correct?

24   A.    It could have funded the DIP if it would have

1 cured the defaults.

2    Q.   Okay.

3    A.   And there are multiple case you can cure

4 defaults.

5    Q.   Okay and you referenced paying off the

6 Clearwater line of credit; correct?

7    A.   That's correct.

8    Q.   All right.  What is the -- take a look at the

9 notice of exclusive control.

10    A.   Okay.

11    Q.   What is the default that's referenced here?

12    A.   Under Section 9C of the loan agreement,

13 "Should Clearwater or any of its affiliates default

14 under any loan, extension of credit, security agreement

15 or any other debt owing to the lender."

16    Q.   Okay.

17    A.   "Such event shall constitute a default under

18 the loan agreement."

19    Q.   All right.

20    A.   "Please take notice of such as that default."

21             DEPOSITION EXHIBIT F

22                  (Commercial Loan Agreement

23        was marked for identification purposes as

24        Deposition Exhibit F.)

1  stated that it couldn't proceed forward because the

2  debtor in possession didn't have access to those funds.

3      Q.   And the reason it didn't have access to those

4  funds is because United Bank would not allow the

5  Clearwater funds to be used to fund the proposed debt;

6  right?

7      A.   Again, the default that we had declared had

8  not been cured.  If the cure had occurred, they could

9  have used those funds.

10     Q.   Okay.  And earlier you said the cure was

11 paying off the Clearwater line of credit; correct?

12     A.   That would have been one potential cure.  If

13 the note's gone, there's no -- there's clearly no

14 default.

15     Q.   All right.  Did United Bank ask Clearwater to

16 pay off the Clearwater line of credit?

17     A.   I don't believe we asked that, no.

18     Q.   Okay.  So after the hearing did not go forward

19 on the anticipated DIP on July 1, my understanding is

20 there were some meetings between the parties; is that

21 right?

22     A.   That is correct.

23     Q.   Well, before we get to that, like, everyone

24 left the courtroom, we're not going forward, we may or

1  may not come back.  Is that a fair general

2  characterization?

3      A.   Yeah, that would be a fair general

4  characterization.

5      Q.   Where did the United Bank people go after they

6  left the courtroom?

7      A.   We returned to my office.

8      Q.   Okay.  Was there a meeting following that

9  hearing?

10     A.   There was.

11     Q.   Okay.  Who was at that meeting?

12     A.   So it would have been my self, Dave Smith who

13  was at the hearing.  Joe Bunn as counsel.  I can't

14  recall if Dave Mills was in that meeting.  I don't

15  believe he was.  D.F. Mock would have been in that

16  meeting and there may have been participants via phone,

17  but I can't recall.

18     Q.   Okay.  All right.  I will again say I don't

19  want to intrude into attorney client privilege and ask

20  you what was discussed with the bank's counsel, but was

21  there anything discussed in that meeting that was not

22  essentially a privileged discussion with counsel?

23     A.   No.  I mean, we were very surprised.

24     Q.   Why were you surprised?

BLACKJEWELL, LLC, et al. v.
UNITED BANK

MATTHEW BOND
September 23, 2021

1      A.   We were surprised that no resolution had been

2   able to -- we had not been able to reach a resolution.

3   We had, prior to the hearing, we had made an offer to

4   release exclusive control for a waiver of claims and

5   that was rejected and we were very surprised by that.

6      Q.   When was that offer made?

7      A.   That offer was made prior to the hearing in

8   the foyer or the rotunda area of the courtroom.

9      Q.   Okay.  And who communicated that offer?

10      A.   Joe Bunn.

11      Q.   And to whom was the offer communicated?

12      A.   It was communicated to Jeff Hoops, Eddie

13   Cunningham and myself and Dave Smith were standing by.

14      Q.   So it was Joe Bunn who communicated that to

15   Hoops, Cunningham and then you and Mr. Smith observed

16   it?

17      A.   That's correct.

18      Q.   No lawyer for Blackjewel was present?

19      A.   Not -- if you don't mind, can I sort of

20   describe it?

21      Q.   Sure.

22      A.   So there was a huddle here.  Mr. Lerner was in

23   the doorway and it was communicated to him that he

24   didn't agree, not Mr. Lerner, but that Mr. Hoops had

1  not agreed to that.

2      Q.   Okay and the specific offer was that United

3  Bank would release the notice of exclusive control if

4  who would give up claims?

5      A.   If -- and this is where I'm going to refer to

6  it as what our intent was was Jeff Hoops, Blackjewel,

7  Clearwater, et. al., the Hoops entities.

8      Q.   Okay.  And what claims would they have been

9  releasing related to the payroll issues and fuel

10  supplier issues?

11      A.   If you remember, as I mentioned earlier, one

12  of the first things that Mr. Hoops indicated was that

13  he planned to sue United Bank, so that had been

14  swirling around since that initial conversation.

15      Q.   Okay.  Why would United Bank have released

16  exclusive control of the funds in exchange for a

17  release of claims given what you described as its

18  substantive concerns?

19      A.   We had been working, like I said, all morning

20  to try and come up with a resolution and there had been

21  various iterations of proposals that were all met with

22  rejection and at that point we didn't see a path that

23  was going to be productive and we made the business

24  decision that it was better to move forward with that

BLACKJEWELL, LLC, et al. v.
UNITED BANK

MATTHEW BOND
September 23, 2021

1  proposal and release the notice of exclusive control

2  for that waiver.

3       Q.   Okay.  In the various proposals that were met

4  with rejection, when were those communicated?

5       A.   That 8:30 call, I remember that was a focus of

6  that.

7       Q.   Okay.  And tell me what specific proposal was

8  communicated during the 8:30 call?

9       A.   So the initial proposal was that Clearwater

10  agreed to use some of the proceeds from the DIP loan to

11  pay down the Blackjewel line of credit.  And the focus

12  of that was, again, our concern in the DIP and the

13  first day motions was the use of cash collateral that

14  should have been used to pay down the Blackjewel note.

15  That was rejected.

16       Then we made a proposal that Clearwater guarantee

17  up to 3 million dollars of the Blackjewel note.  The

18  logic behind that or the basis behind that was, again,

19  the same concerns, but there was no immediate cash

20  outlay and if everything proceeded as was being

21  presented to us, there would be no material impact.

22       Q.   Okay.  Other than those two proposals, was

23  anything else specifically proposed?

24       A.   No.  Those were the three over the course of

1  the day.

2      Q.   Okay.  All right, so back to the post hearing

3  meeting between you and Mr. Bunn and the other United

4  Bank representatives.  I've told you I'm not going to

5  ask about privileged communications.

6      Did any United Bank business person communicate

7  with another United Bank business person as a result of

8  that meeting outside the presence of counsel?

9      A.   Candidly, I'm sure.  I don't know.  There were

10  phone calls going every which way, so I'm sure that

11  probably did occur.

12      Q.   Okay.  Got it.  But you don't recall anything

13  specific?

14      A.   No, sir.

15      Q.   Okay.  To the best of your recollection you

16  can't think of someone asked for a particular document

17  or piece of information, you don't remember anything

18  like that?

19      A.   No, sir.

20      Q.   Okay.  All right.  So that meeting happens

21  after the hearing which we established was sometime

22  2:30-ish, 3:00-ish that we're not holding each other,

23  but somewhere in that rough time period.  How long did

24  your meeting at United Bank take?

BLACKJEWELL, LLC, et al. v.
UNITED BANK

MATTHEW BOND
September 23, 2021

1    A.   I don't think it went beyond an hour.

2    Q.   Okay.

3    A.   We, like I said, we were just -- honestly it

4  was more sort of where do we go from here and those

5  kind of things and then I believe Mr. Bunn received a

6  phone call from Mr. Lerner inviting us over to Bailey &

7  Glasser.

8    Q.   Okay and there was an in person meeting at

9  Bailey Glasser?

10   A.   There was, yes.

11   Q.   Who attended that meeting?

12   A.   From United Bank it was myself, Dave Smith,

13  D.F. Mock and counsel Joe Bunn.

14   Q.   Okay.  Of and that's every one you remember on

15  the United Bank side?

16   A.   That's correct.

17   Q.   Okay.  How about, well, who else was there

18  other than United Bank people?

19   A.   I remember a gentlemen from Lime Rock that I

20  can't remember his name.

21   Q.   Okay.

22   A.   Mr. Hoops was there.  Drew Kesler was there.

23  Dave Beckman was there.  Dan Broscious was there.  I

24  may be mispronouncing his name.

1    Q.   No, that's correct.

2    A.   Then I don't remember any other business

3  people.  I remember there were quite a few attorneys

4  from your firm, but I can't remember their names.

5    Q.   Certainly Mr. Lerner was there?

6    A.   Mr. Lerner was there.

7    Q.   Okay.  Maybe Travis McRoberts?

8    A.   He would have been there, yes, sir.

9    Q.   Okay.  I don't know anyone else, but let's say

10 plus other potential Squire people?

11   A.   And candidly, at that point we were having --

12 we didn't know all the players.  There were analysts

13 for FTI and Associates, so there may have been another

14 business person there that I didn't recognize.

15   Q.   Got it.  Fair enough.  But the ones you've

16 named are the ones you recall specifically?

17   A.   Yes.

18   Q.   Okay.  No one from Riverstone was there;

19 correct?

20   A.   No, Riverstone was not there.

21   Q.   Okay.  And was Bailey Glasser Riverstone's

22 counsel?

23   A.   They were.

24   Q.   It was at Bailey Glasser, but no one from

1   Bailey Glasser participated he in the meeting; right?

2       A.   That's correct.

3       Q.   Okay, so what transpired at that meeting?

4       A.   A lot.  Mr. Lerner was very animated and

5   basically said you all don't understand what you're

6   doing.  Your counsel doesn't understand what he's doing

7   and all of this.  There was, you know, they told us

8   that mines were on fire, that they had sent employees

9   home and all of this had occurred since the hearing.

10      They, again, asked us to consider releasing our

11  hold or our notice of exclusive control and asked us to

12  go to a separate conference room at that point.

13      Q.   Okay.  And did that happen, did United Bank go

14  to a separate --

15      A.   We did, yes.

16      Q.   Okay and Mr. Bunn was there.  Was that

17  essentially just a privileged discussion with counsel

18  in the separate room?

19      A.   It was.  I mean, it was again just sort of

20  what are we going to do and what can we do.

21      Q.   Okay.  Did United Bank have a reaction when

22  the debtor said they sent employees home?

23      A.   We were surprised.  I mean, I don't think that

24  we verbally reacted.  It was very much we listened.

1    Q.    Okay.  Did United Bank make proposals at that

2  meeting, I'm going to call it, the they weren't there,

3  but the Bailey Glasser meeting for lack of a better

4  term?

5    A.    Following our break out, we then came back to

6  Mr. Hoops and Mr. Lerner, I mean, everybody at that

7  point.  We said okay, we will release our right to

8  exclusive control.

9    Q.    In exchange for what?

10   A.    For nothing.

11   Q.    Just nothing?

12   A.    Yeah.

13   Q.    No terms whatsoever?

14   A.    No.

15   Q.    Okay.  There was not a request to make

16  payments on --

17   A.    Nothing.

18   Q.    Okay.  It wasn't conditioned on a release of

19  claims?

20   A.    No.  We removed that.

21   Q.    Okay.  Why was it an offer then?

22   A.    I guess it wasn't an offer.

23   Q.    Why didn't United Bank just release it then?

24   A.    We subsequently did.

1    Q.   Okay.  What was the purpose of the meeting at

2  that point if United Bank was willing to release the

3  exclusive control for nothing?

4    A.   Well, we met to come to that conclusion.

5    Q.   Okay.  So United Bank's position is at that

6  meeting there was never any request to make payment on

7  either Blackjewel loans or Clearwater loans as a

8  condition to release of exclusive control?

9    A.   Some of the previous offers that I ran through

10 earlier may have been restated to see why can't can we

11 do this, why can't we do this, but the ultimate

12 resolution was that we agreed to release control.

13   Q.   Okay.

14   A.   So you see what I'm saying?  There wasn't

15 anything new.

16   Q.   Okay.

17   A.   That I can recall.

18   Q.   But the prior United Bank requests were

19 reiterated before United Bank eventually concluded it

20 would just release control?

21   A.   Probably.  As I'm sure is -- we were looking

22 to -- we were receiving no feedback as to why those

23 proposals were not viable and so we, I'm sure, asked

24 again, hey, can we do this, can we do that and, again,

BLACKJEWELL, LLC, et al. v.
UNITED BANK

MATTHEW BOND
September 23, 2021

1  were met with no.  So the ultimate resolution was we'll

2  release the notice of exclusive control.

3      Q.   Okay.  Well, how long were those prior

4  proposals reiterated before United Bank eventually

5  communicated that it was just going to release control?

6      A.   I would say maybe an hour, hour and a half.  I

7  mean, I vividly remember -- this is July, so I guess,

8  but we walked out of there and it was very much

9  sunlight and people from FDL and Squire were talking

10  about dinner plans so it wasn't late.

11      Just going on if we say 2:30 is the hearing, 3:30

12  we're back to everybody's offices, 4:30, 5:00 o'clock

13  and, again, this is general times, we go to Bailey &

14  Glasser.  I'd say 7:00.

15      Q.   Okay.  When did United Bank rescind the

16  exclusive control?

17      A.   I believe a letter was sent somewhere around

18  8:30 or 9:00.

19      Q.   Okay.  After you left Bailey & Glasser, were

20  there any further communications between United Bank

21  and either Clearwater or the debtors regarding loan

22  default, collateral issues to your recollection?

23      A.   To my recollection it was all about getting

24  the notice of exclusive control rescission letter out.

1    Q.   Okay.  Did you have an understanding or belief
2  of what events on June 29, 2019 referred to?
3    A.   I believe it refers to the payroll issue.
4    Q.   Okay.
5    A.   And the phone call and all of that.
6    Q.   All right.
7    A.   June 29th is Friday, correct?
8    Q.   June 28th was Friday, June 29 was Saturday.
9    A.   Okay.  I don't know what the events on -- june
10 29th was nothing but cutting checks.
11   Q.   Okay.  All right.
12   A.   I don't know if that was a misprint, but as
13 far as -- as far as the bank is concerned, June 29th
14 was -- we were in an operations center from 8:00
15 o'clock until about 4:00 o'clock or maybe 3:30.
16   Q.   Okay.  All right.  And as I understood your
17 testimony, it was that the payroll ACHs did not go out
18 initially because of the issue you described with
19 respect to payroll accounts and overdrawn status and
20 then as well the employee who got an e-mail or maybe
21 didn't get an e-mail was out of the office on Friday
22 the 28th; correct?
23   A.   I'll call it human error or human
24 miscommunication.